UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MILAN HEGGS, ROY BECKFORD and PHILIP LEGREE, *individually and on behalf of a class of all others similarly situated*,

Plaintiffs,

and

DISABILITY RIGHTS NEW YORK,

Plaintiff,

and

DISABLED IN ACTION,

Plaintiff,

-against-

THE CITY OF NEW YORK, NEW YORK CITY POLICE (NYPD) COMMISSIONER JAMES P. O'NEILL; NYPD COMMISSIONER DERMOT F. SHEA; NYPD OFFICER (P.O.) ROBERT BERNHARDT; P.O. MOORAN, P.O. SLATER; JOHN DOES 1-8,

Defendants.

**THIRD AMENDED CLASS ACTION COMPLAINT**

**17 Civ. 03234 (RJD)(CLP)**

JURY TRIAL DEMANDED

---

Plaintiffs, individually and on behalf of all others similarly situated, as and for their complaint, by their attorneys Beldock Levine & Hoffman LLP, Michael L. Spiegel, Esq., and Disability Rights New York, allege as follows:

## PRELIMINARY STATEMENT

1.      Despite the many years since Congress spoke as to the illegality of discrimination against those with disabilities, as codified in the Americans with Disabilities Act and related law,

1

Defendants continue to subject pretrial detainees – not proven guilty of any crime – to disparate and discriminatory treatment in their detainment and arrest processing.

2.      Individuals detained in the custody of defendant the City of New York have no choice or discretion in what precinct or bookings facility they are processed through, nor are they provided the choice of a facility with adequate accommodations for persons with disabilities.

3.      While involuntarily held pursuant to a custodial arrest, New Yorkers have the right to water, food, and access to a toilet.  Yet, these services are routinely denied to residents with mobility-based disabilities, or made available in such manner as to preclude their practical access, including requiring that such individuals be detained longer than similarly situated arrestees, thereby denying equal treatment and access under the law.

4.      In New York City, individuals with mobility-based disabilities experience disparate treatment pursuant to custodial arrests in comparison to others similarly situated; have drastically limited access to services at many local precincts and in central booking and while being transported, including but not limited to basic services supporting essential human needs; and are subjected to degrading and dehumanizing treatment.

5.      Arrestees with mobility disabilities are forcibly separated from their prosthetics and assistive mobility devices or handcuffed to stationary structures and forced to remain immobilized on hard surfaces for hours without the ability to stand, walk, or stretch their limbs.

6.       Many arrestees with mobility disabilities are transported between holding facilities in wheelchair inaccessible vehicles, lifted and carried by untrained NYPD officers, and dropped by the same untrained personnel, causing physical injury.

7.      Plaintiffs bring this action against Defendants alleging violations of the Americans with Disabilities Act, the Rehabilitation Act of 1973, the Civil Rights Act of 1871 (amended and

codified as 42 U.S.C. § 1983), and the New York City Human Rights Law, for failing to provide reasonable accommodation, discriminating against them because of their disability, subjecting them to unconstitutional conditions of confinement, and for the deprivation of rights accorded by the Fourth and Fourteenth Amendments to the United States Constitution.

8.      This complaint seeks injunctive relief, compensatory damages, punitive damages, and attorneys' fees.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3-4).  This action is brought pursuant to the Americans with Disabilities Act of 1990, amended and codified as 42 U.S.C. § 12132, *et seq*. and the ADA Amendments Act of 2008 (ADAAA) (collectively the "ADA"), and related amendments and interpreting federal regulations including 28 C.F.R. Part 35; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*. (the "Rehabilitation Act"); and the Civil Rights Act of 1871, 42 U.S.C. § 1983, for violations of the Fourth and Fourteenth Amendments to the Constitution of the United States; in addition to pendant claims under the laws of the City of New York.

10.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1), (2), and (3) in that Plaintiffs' claims arose in the State of New York, within the confines of the Eastern District of New York.

11.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §§ 1988 and 12205.

## PARTIES

### Individual Plaintiffs

3

12.     Plaintiff Milan Heggs ("Mr. Heggs") was at all times relevant to this action a resident of the County of Queens and the City and State of New York. Mr. Heggs is paraplegic due to a bullet becoming inoperably lodged near his L3 vertebrae approximately twenty years ago. The resulting paralysis requires him to use a wheelchair or other assistive mobility device.  Mr. Heggs's disability substantially limits one or more of his major life activities, including his ability to walk.  On the basis of his condition, Mr. Heggs is and was at all times relevant to this action a qualified individual within the meaning of the ADA and the Rehabilitation Act.

13.     Plaintiff Philip Legree ("Mr. Legree") was at all times relevant to this action a resident of the county of Bronx and the City and State of New York.  Mr. Legree has required the use of a cane since 2014 due to a workplace injury that required surgery to repair ruptured tendons in both legs.  Mr. Legree is unable to walk more than a few steps without assistive devices.  Mr. Legree's disability substantially limits one or more of his major life activities, including his ability to walk.  On the basis of his condition, Mr. Legree is and was at all times relevant to this action a qualified individual within the meaning of the ADA and the Rehabilitation Act.

14.     Plaintiff Roy Beckford ("Mr. Beckford") was at all times relevant to this action a resident of the county of Kings and the City and State of New York. Mr. Beckford has required the use of a cane since 2014, due to a nerve degenerative disease. Mr. Beckford is unable to walk or stand without assistive devices. Mr. Beckford's disability substantially limits one or more of his major life activities, including his ability to walk.  On the basis of his condition, Mr. Beckford is and was at all times relevant to this action a qualified individual within the meaning of the ADA and the Rehabilitation Act.

**Institutional Plaintiffs**

**Disabled in Action ("DIA")**

4

15.     Plaintiff Disabled In Action ("DIA"), founded in 1970, is a nonprofit civil rights membership organization committed to ending discrimination against people with disabilities.

16.     DIA consists primarily of, and is directed by, people with disabilities.  DIA's members include residents with disabilities throughout New York City.  Many of DIA's members have mobility disabilities and certain members either have been or could be arrested in New York City.

17.     DIA's objectives include promoting the ability of persons with disabilities to live independently.  To that end, DIA works for the passage of laws that affirm and defend the rights of people with disabilities.  In addition, DIA works to educate government officials, community leaders and the general public about disability issues and plans as well as participates in public demonstrations to draw attention to these issues.

18.     DIA has and continues to expend substantial time and resources on advocacy work concerning policies and practices that affect disabled residents of New York City.  For instance, DIA advocated for passage of Local Law 58, the 1986 NYC Building Code amendment requiring that all commercial and residential buildings include accessible features.  DIA also has participated in legal actions against New York City for its holding a public Town Hall meeting at an inaccessible site, against the federal government for noncompliance with the ADA at federal courthouses, against the New York City Human Rights Commission for failure to provide written material in alternative formats, and against the New York City MTA for not operating Access-A-Ride in compliance with the ADA.  In *Disabled in Action, et al. v. The City of New York, et al.*, 16-CV-8354 (VEC) (S.D.N.Y.), DIA sued the City, alleging that the 77 NYPD precincts were inaccessible to members of the public in wheelchairs and noncompliant with the ADA.  The court

5

granted plaintiffs partial summary judgment, finding the City liable for discrimination against people with disabilities due to the extensive inaccessibility of its precinct stations and the lack of sufficient accommodations to otherwise address these barriers.

19.     DIA itself has been injured as a direct result of Defendants' actions and omissions as discussed herein.  DIA's interests are adversely affected because it must expend resources, as it is doing in this lawsuit, advocating for its constituents who are or could be harmed by Defendants' policies and practices.  DIA has suffered injury in the form of diversion of these resources and frustration of its mission.

20.     In addition, one or more members of DIA have been or could be injured as a direct result of Defendants' discriminatory policies and practices and could have standing to sue in their own right.  As found by a Cornell University study, individuals with disabilities face arrests at disproportionate levels.  Specifically, individuals with disabilities are 14 percent more likely to be arrested than those without a disability while Black men with a disability, like the Individual Plaintiffs, are 27.5 percent more likely to be arrested than white men without a disability.[1]

21.     DIA can bring this action on behalf of its members because the interests at stake are germane to DIA's purpose.

**Disability Rights New York ("DRNY")**

22.     Disability Advocates, Inc. is an independent non-profit corporation organized under the laws of the State of New York.  Disability Advocates, Inc. is authorized to conduct business under the name Disability Rights New York (DRNY).

---

[1] Cornell University, *People with Disabilities More Likely to be Arrested*, SCIENCEDAILY.COM (Nov. 30, 2017), *available at* www.sciencedaily.com/releases/2017/11/171130150418.htm.

23.     Plaintiff DRNY is a Protection and Advocacy system ("P&A"), as that term is defined under the Developmental Disabilities Assistance and Bill of Rights Act ("DD Act"), 42 U.S.C. § 15041 *et seq.*, the Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI Act"), 42 U.S.C. § 10801 *et seq.*, and the Protection and Advocacy of Individual Rights Act ("PAIR Act"), 29 U.S.C. § 794e *et seq.*, with offices in the State of New York located at: 25 Chapel Street, Suite 1005, Brooklyn, NY 11201; 725 Broadway, Suite 450, Albany, NY 12208; and 44 Exchange Blvd., Suite 110, Rochester, NY 14614.

24.     In 1972, Geraldo Rivera exposed the horrific conditions of abuse and neglect at the Willowbrook State School in Staten Island.

25.     Willowbrook was an institution that was supposed to provide care and support to children and adults with intellectual and developmental disabilities.

26.     Instead, these children and adults were subjected to beatings, inappropriate use of restraints, untreated wounds, involuntary medical experimentation and unsanitary living conditions.

27.     In response to this abuse and neglect and in recognition that these individuals had no means of seeking redress, Congress passed the Developmental Disabilities Assistance and Bill of Rights Act of 1975 ("DD Act"), 42 U.S.C. § 6000, *et seq.* (repealed and replaced by 42 U.S.C. § 15001, *et seq.*).

28.     Under the DD Act, a state that accepts federal financial assistance for services for individuals with developmental disabilities is required to have "a system to protect and advocate the rights of individuals with developmental disabilities."42 U.S.C. § 15043(a)(1).

7

29.     The Protection and Advocacy ("P&A") system was created to, among other things, pursue legal remedies, "to ensure the protection of, and advocacy for, the rights of such individuals." 42 U.S.C. § 15043(a)(2)(A)(i).

30.     The DD Act provides that, "[n]othing in this subchapter shall preclude a system from bringing a suit on behalf of individuals with developmental disabilities against a State, or an agency or instrumentality of a State." 42 U.S.C. § 15044(b).

31.     In 1985 Congress enacted the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), to protect and enforce the rights of individuals with mental illness.

32.     Like the DD Act, the PAIMI empowers P&A systems to "pursue administrative, legal and other appropriate remedies to ensure the protection of individuals with mental illness" and "the enforcement of the Constitution and Federal and State statutes." 42 U.S.C. §§ 10805(a)(1)(B), 10801(b)(2)(A).

33.     The federal regulations implementing PAIMI specifically provide that a P&A system may "bring[] lawsuits in its own right to redress incidents of abuse or neglect, discrimination, and other rights violations." 42 C.F.R. § 51.6(f).

34.     On May 7, 2013, Governor Cuomo designated DRNY as New York's P&A system. N.Y. Exec. Law § 558(b).

35.     As New York State's Protection & Advocacy system, DRNY is specifically authorized to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i); N.Y. Exec. Law § 558(b).

36.     Pursuant to the authority vested in it by Congress to litigate claims of abuse, neglect, and rights violations on behalf of individuals with disabilities, DRNY brings claims on

8

behalf of individuals with mobility disabilities in the City of New York held in custody by the City of New York pursuant to an arrest or custodial pre-arraignment detention.  DRNY therefore brings these claims pursuant to its representational standing.

**Defendants**

37.     Defendant City of New York ("City") is a municipal corporation organized under the laws of the State of New York.  It is authorized by law to maintain a police department ("NYPD") which acts as its agent in the area of law enforcement and for which it is ultimately responsible.  It is authorized by law to maintain a department of citywide administrative services ("DCAS") which acts as its agent in the area of maintaining and managing court facilities and for which it is ultimately responsible. Defendant City assumes the risks incidental to the maintenance of the NYPD and DCAS and the employment of corrections/police officers as said risks attach to the public consumers of the services provided by the NYPD/DCAS.

38.     Defendant City, as defined by the laws of the City of New York, is a government entity and thereby qualified as a "public entity" within the meaning of Title II of the ADA, as that term is defined under 42 U.S.C.§ 12131(1) and C.F.R. § 35.104.  Defendant City receives federal financial assistance within the meaning of Section 504 of the Rehabilitation Act.  Defendant City, and its agencies the NYPD and DCAS, are responsible for constructing, repairing, and maintaining police stations and pre-arrangement holding facilities in New York City, and for issuing guidance as to the reasonable accommodation to be provided to arrestees with mobility-based disabilities.

39.     Defendant City operates pre-arraignment holding facilities in each borough, including jailing facilities at local precincts and bookings facilities, such as that located at 120 Schermerhorn Street, Brooklyn, New York 11201 ("Brooklyn Central Booking").  At all relevant times hereto, the New York City Department of City Administrative Services ("DCAS") managed

and maintained the pre-arraignment holding facilities, precinct stationhouses and booking facilities, including operating and overseeing any repairs to these buildings and the issuance of policies for accommodating persons with disabilities and therefore had a duty to ensure compliance with Federal Law.

40.     Upon information and belief, the City operates and manages the custody of detainees held at local precincts and central booking facilities, receives federal funding for the same, and through its senior officials at the central office, in each facility, and in its specialized units and agencies including the NYPD and DCAS, promulgates and implements policies, including those with respect to access to medical and other program services, mandated by law and court order.  In addition, senior officials of the City are aware of and tolerate certain practices by subordinate employees in the jails, including those that are inconsistent with formal policy. These practices, because they are widespread, long-standing, and deeply embedded in the culture of the agency, constitute unwritten City policies or customs.  Defendant City is also responsible for the appointment, training, supervision, and conduct of all City personnel, including the Defendants referenced herein.

41.     Defendants NYPD Officer ("P.O.")  Robert Bernhardt; P.O. Ravi Mooran; P.O. Slater; and John Does 1-8 are and were at all times relevant herein, officers, employees and agents of defendant City, and are hereinafter referred to as the "Individual Defendants."

42.     NYPD Commissioner James P. O'Neill served as the Police Commissioner for the City from September 2016 until his retirement in November 2019, and was responsible for, and the chief architect of, the policies, practices and/or customs of the NYPD, a municipal agency of the City.  He was responsible for the hiring, screening, training, retention, supervision, discipline,

10

counseling and control of the police officers under his command who were employed by the NYPD, including the Individual Defendants named herein. He is sued in his official capacity.

43.     NYPD Commissioner Dermot F. Shea has served as the Police Commissioner for the City since December 2019. He is responsible for the hiring, screening, training, retention, supervision, discipline, counseling and control of the police officers under his command who are or were employed by the NYPD, including the Individual Defendants named herein. He is sued in his official capacity.

44.     The Individual Defendants acted intentionally, recklessly, with malice, and in gross disregard of Plaintiffs' rights, and they are being sued herein in their individual capacities.

45.     At all times relevant herein, the Individual Defendants were employees or agents of defendant City and were acting under color of state law in the course and scope of their duties and functions as agents, servants, and employees of the City and otherwise performed and engaged in conduct incidental to their lawful functions in the course of their duties.  They were acting for and on behalf of the City at all times relevant herein, with the power and authority vested in them as agents and employees of the City and incidental to their duties as agents and employees of the City.

46.     At all relevant times, the Defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

47.     The true names and shield numbers of defendant John Does are not currently known to Plaintiffs.  However, John Doe defendants were employees or agents of the Defendant City, on the dates of the incidents alleged herein.  Accordingly, they may be entitled to representation in this action by the New York City Law Department ("Law Department") upon their request,

pursuant to New York State General Municipal Law § 50-k.  The Law Department, then, is hereby put on notice (a) that Plaintiffs intend to name said officers as defendants in an amended pleading once their true names and shield numbers become known and (b) that the Law Department should immediately begin preparing their defense(s) in this action.

## CLASS ALLEGATIONS

48.     Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, the named Plaintiffs seek to represent two certified plaintiff classes consisting of all persons with mobility disabilities who were taken into police custody pursuant to a custodial arrest, and processed through a precinct or central bookings facility, as follows:

a. All those persons with mobility disabilities who have been or will be held in custody at local precincts and bookings facilities (including being transported to, or between, precincts/facilities) across the City of New York ("the Injunctive Class") and denied disability accommodation including, but not limited to, by means of the following practices:

   i. While held at a local Precinct or Police Service Area in the City of New York.

   ii. While held at a central booking facility in the City of New York.

   iii. While being transported to, or between, precincts/facilities in the City of New York.

b. All those persons with mobility disabilities who have been or will be held in custody at local precincts and bookings facilities (including being transported to, or between, precincts/facilities) across the City of New York ("the Damages Class") and denied disability accommodations including, but not limited to, by means of the following practices:

   i. While held at a local Precinct or Police Service Area in the City of New York.

12

ii.     While held at a central booking facility in the City of New York.

iii.    While being transported to, or between, precincts/facilities in the City of New York.

49.     The members of each class are so numerous as to render joinder impracticable. Data from the 2016 American Community Survey (ACS) indicates the prevalence of an ambulatory disability is 6.7% of the population in New York.[2]  Data from the Mayor's Office for People with Disabilities and the United States Census American Community Survey conducted in 2014 indicate that approximately 180,000 to 500,000 non-institutionalized New York City residents have a mobility disability.[3]  Upon information and belief, hundreds of thousands of persons with mobility disabilities visit the City each year.  According to the most recent United States census, there are over half a million people with mobility disabilities in New York City, constituting over 7% of the population.

50.     Further, in 2015, the year of Mr. Heggs's arrest, there were 255,479 individuals arrested in New York City.  There were 249,459 people arrested in 2016, the year that Mr. Beckford was arrested, and 172,512 people arrested in 2019, the year of Mr. Legree's arrest and of Mr. Beckford's arrest.[4]  Given the substantial population with a mobility disability in the City of New York, as well as the high number of arrests within the City and the disproportionately high

_____

[2] Erickson, W., Lee, C., & von Schrader, S. (2018). 2016 Disability Status Report: New York. Ithaca, NY: Cornell University Yang-Tan Institute on Employment and Disability(YTI), at p. 10, *available at* http://www.disabilitystatistics.org/StatusReports/2016-PDF/2016-StatusReport_NY.pdf?CFID=9908059&CFTOKEN=5ef56b38e4e59517-C96A4F6C-DCA3-3B50-0E9EB409990B9DA6
[3] NYC Mayor's Office for People with Disabilities, Accessible NYC: An Annual Report on the State of People Living with Disabilities in New York City at 8, 16 (2014), *available at* http://www.nyc.gov/html/mopd/downloads/pdf/ACCESS_NYC_updated.pdf; see also NYC Mayor's Office for People with Disabilities, New York City People with Disabilities Statistics Updated 2016, at p. 18, *available at* https://www1.nyc.gov/assets/mopd/downloads/pdf/selected-characteristics-disabled-population.pdf
[4] N.Y. Div. Crim. J. Servs, Adult Arrests: 2010-2019, *available at* https://www.criminaljustice.ny.gov/crimnet/ojsa/arrests/nyc.pdf.

13

number of people with disabilities who are arrested, the members of each class are so numerous as to render joinder impracticable.

51.      In addition, joinder is impracticable because, upon information and belief, many members of each class are not aware of the fact that their constitutional and statutory rights have been violated and that they have the right to redress in Court.  Upon information and belief, many members of the class are without the means to retain an attorney to represent them in a civil rights lawsuit.

52.      Common questions of law and fact predominate over individual ones among class members, including, but not limited to:

a.   Whether the City engages in a policy, practice, and/or custom of forcibly removing individuals with mobility disabilities from their wheelchairs, and/or denying individuals with mobility disabilities reasonable access to assistive mobility devices while being transported to and between, and while in custody at precincts or central booking facilities.

b.   Whether the City engages in a policy, practice, and/or custom of handcuffing individuals with mobility disabilities to stationary physical structures for long periods of their detainment.

c.   Whether the City engages in a policy, practice, and/or custom of forcibly removing individuals with mobility disabilities from their wheelchairs without consent and in a reckless manner constituting a deliberate indifference to the risk of actual physical injury.

d.  Whether the City unreasonably prolongs or extends the detention of individuals with mobility disabilities beyond that of otherwise similarly situated arrestees without mobility disabilities.

e.  Whether the City fails to make reasonable accommodation for individuals with mobility disabilities to access to food and water during their detainment and/or lacks or fails to enforce a policy ensuring such reasonable accommodation.

f.  Whether the City fails to make reasonable accommodation for individuals with mobility disabilities to urinate and defecate at the location of their confinement and/or lacks or fails to enforce a policy ensuring such reasonable accommodation.

g.  Whether the City's failure to make reasonable accommodations for individuals with mobility disabilities during custodial arrests is in violation of Title II of the ADA, and Section 504 of the Rehabilitation Act.

h.  Whether the City's treatment of individuals with mobility disabilities during custodial arrests amounts to an unreasonable seizure and/or unconstitutional conditions of confinement in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

i.  Whether the City, New York City Police Commissioner, and other supervisory defendants, supervising officials, and/or personnel, have knowingly and deliberately failed to screen, train, supervise, monitor, and discipline officers, and whether those failures have resulted in and will continue to result in the unconstitutional conditions of confinements of class members.

j.  Whether the City, the New York City Police Commissioner, and other supervisory defendants, supervising officials, and/or personnel, sanctioned and/or deliberately

15

failed to rectify unconstitutional practices and customs, and whether such acts and omissions have resulted in and will continue to result in constitutional violations by officers and City employees against class members.

k.   Whether the City's treatment of individuals with mobility disabilities during custodial arrests is discriminatory in violation of the NYCHRL.

53.     These common questions of fact and law all flow from the same policies, enacted and implemented by the named and unnamed Defendants.  Defendant City's city-wide policies, practices, and custom with regard to the custodial arrest and confinement of individuals with mobility disabilities constitute a unitary scheme in which the Defendant refuses to comply with the ADA and detains Class members in unconstitutional conditions.  The named Plaintiffs and all class members were and are victimized by these same policies of failing to comply with the ADA's architectural requirements, denying individuals with mobility disabilities reasonable accommodations, subjecting such individuals with mobility disabilities to unconstitutional conditions of confinement, and otherwise discriminating against arrestees with mobility disabilities, and thus the foregoing common questions of law and fact greatly predominate over any questions affecting only individual members, including legal and factual issues relating to damages.

54.     Defendant City failed to implement constitutional and ADA compliant policies city-wide, failed to review and remediate structural ADA noncompliance at holding facilities, and otherwise failed to provide resources to allow for a reasonable accommodation of individuals with mobility disabilities throughout custodial arrests, including wheelchair accessible transport or assistive mobility devices during detainment.

55.     The named plaintiffs, Mr. Heggs, Mr. Legree, Mr. Beckford, and DIA are adequate class representatives because they were and are directly impacted by Defendants' failure to provide a reasonable accommodation or constitutional conditions of confinement to arrestees with mobility disabilities, and Plaintiffs are typical of the members of each class.  Like other members of both the Injunctive and Damages Classes, the individual named Plaintiffs were forcibly removed from their wheelchairs, or had an assistive device taken from them, and were denied access to an assistive mobility device, a reasonable accommodation to urinate and defecate during their confinement, or other reasonable mobility accommodations.  Like the other members of the Injunctive Class, named Plaintiffs have been, and likely will be again, victims of the City's policy, practice, and/or custom in that they have been transported and held pursuant to a custodial arrest in vehicles and facilities that were not ADA compliant, for a period of time far in excess of similarly situated detainees, and were refused reasonable accommodations of their mobility disability.

56.     Like other members of both the Injunctive and Damages Classes, named individual Plaintiffs risk being arrested in the future and/or likely will continue to be subject to the Defendants' unconstitutional conduct.

57.     Plaintiffs are residents of New York City and are susceptible to being arrested, processed, and detained in the same patently impermissible manner should these unconstitutional practices not be enjoined from continuing.

58.     In fact, Mr. Heggs and Mr. Beckford have been arrested multiple times.  During each arrest, they were subjected to the unconstitutional conditions of confinement and failure to accommodate their mobility disabilities as described herein.

17

59.     DRNY is charged by federal and state law with bringing claims on behalf of individuals with disabilities, including those individuals with mobility disabilities who are taken into custody pursuant to an arrest.

60.     Pursuant to 42 U.S.C. § 10805(a)(1)(B) and 42 U.S.C. § 14043(a)(2)(A)(i), DRNY has not only been granted the authority to "pursue administrative, legal, and other appropriate remedies or approaches" to ensure the protection of individuals with disabilities, but can pursue remedies on behalf of harmed individuals.

61.     In its representational capacity for all individuals with disabilities in New York, DRNY brings this claim for injunctive relief on behalf of persons who have been and will be subject to Defendant City's policies and practices concerning the arrest and detention of individuals with mobility disabilities prior to arraignment and whose rights were violated under the ADA and Section 504.

62.     Plaintiff DIA, too, will continue to be harmed by Defendant City's illegal conduct as it will continue to advocate for and expend resources on behalf of for its constituents who are or could be harmed by Defendants' policies and practices.

63.     The legal theories under which the named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by the named Plaintiffs are typical of the harms suffered by the class members.

64.     The named Plaintiffs have a strong personal and representational interests in the outcome of this action, have no conflicts of interest with members of either class, and will fairly and adequately protect the interests of each class.  Plaintiffs' interests are not antagonistic to, or in conflict with, the interests of the class as a whole.

18

65.     As long as the City engages in its policy, practice, and/or custom of detaining arrestees with mobility disabilities in an unconstitutional and discriminatory manner, the named Plaintiffs are and will remain at high risk of having their constitutional rights violated by Defendants.

66.     Named Plaintiffs are represented by the members of the law offices of Beldock Levine & Hoffman LLP, Michael L. Spiegel, Esq., and Disability Rights New York.  Counsel collectively are experienced civil rights attorneys and/or have litigated a wide range of class action lawsuits.  Counsel for the named Plaintiffs have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the class or between the attorneys and members of the class.

67.     The Injunctive Class, represented by Plaintiffs DIA, DRNY, Mr. Legree, Mr. Beckford, and Mr. Heggs (collectively, "Injunctive Class Plaintiffs"),  should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, in engaging in the aforementioned practices and failing to correct the aforementioned unconstitutional policies thereby making class-wide declaratory and injunctive relief appropriate.

68.     The Damages Class, represented by Plaintiffs Mr. Legree, Mr. Beckford, and Mr. Heggs (collectively, "Damages Class Plaintiffs"), should be certified pursuant to Rule 23(b)(3) because questions of law or fact common to the members of the class predominate over any questions affecting only individual class members and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**STATEMENT OF FACTS**

**Reasonable Conditions of Confinement and Required Accommodations**

69.     A custodial arrest, with or without probable cause, is unquestionably a seizure within the meaning of the Fourth Amendment.  Thus, establishing the constitutionally permissible conditions of confinement of a pre-trial, pre-arraignment arrestee requires meeting the reasonability requirements of the Fourth Amendment, pursuant to *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466 (2015), as interpreted and applied to the context at bar by the Second Circuit in *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

70.     Because pre-arraignment custodial arrests occur before an individual has been convicted of a crime or even before formal charges are filed in any criminal court, based simply on the low standard of probable cause, the constitutionally permissible conditions of confinement for pre-arraignment custodial arrestees are not governed by the bounds of the Eighth Amendment prohibiting cruel and unusual punishment.  Pre-trial, pre-arraignment detainees cannot be subject to any punishment in response to or in retaliation for the alleged basis underlying the arrest.

71.     Because New Yorkers may be subject to a custodial arrest at any time, it is often impossible to predict or anticipate which facility a particular resident will be taken to or processed through, following a custodial arrest.  Individuals with mobility disabilities cannot choose the precinct, arrest processing, or booking facilities where they will be detained.  Nor can they choose how they will be transported to and between facilities.  Thus, individuals with mobility disabilities must have the same programs, services, activities, and accommodations regardless of where they are held.

72.     Defendant City, as a qualified "public entity" within the meaning of Title II of the ADA, as that term is defined under 42 U.S.C.§ 12131(1) and C.F.R. § 35.104, and as a recipient

20

of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act, is responsible for constructing, repairing, and maintaining police stations and jailing facilities in New York City, and for issuing guidance as to the detainment and reasonable accommodation to be provided to pre-arraignment arrestees with mobility-based disabilities.

73.     Defendants own, maintain, operate, or lease approximately 77 police stations throughout the five boroughs of New York City and bookings facilities in each borough.  These facilities house approximately 300,000 pretrial, pre-arraignment arrestees annually, and in so doing provide programs, services, and activities that are central to the functioning of the criminal justice system of the City of New York.[5]

74.     Accordingly, Defendant City promulgates procedures and guidelines for the arrest, transport, processing, and detainment of pre-arraignment custodial arrestees with mobility disabilities, and the functions to be performed by personnel involved in these custodial arrests— from the arresting officers, jailors, emergency services personnel, and other custodial personnel, to the supervising officers of precincts and bookings facilities.  These procedures and guidelines are clearly insufficient.

## Experience and Harm to Plaintiff Class

75.     All members of each class ("Class Members") were or shall be the subject of a custodial arrest in which they were involuntarily transported to and/or detained at a City facility, including precincts and central bookings, for the purpose of arrest processing and prior to an arraignment.

---

[5] "Adult Arrests: 2007-2016," Division of Criminal Justice Services, New York State, *available at* http://www.criminaljustice.ny.gov/crimnet/ojsa/arrests/nyc.pdf.

76.     During their custodial arrests, Class Members are subject to discrimination, unconstitutional conditions of confinement, and are otherwise harmed by Defendants, including by means of:

a.  Denying Class Members wheelchair accessible vehicle transport and accommodation of other mobility disabilities during transport to and from the arrest processing facilities, precincts, and/or central bookings;

b.  Recklessly removing Class Members from their wheelchairs and otherwise depriving mobility disabled arrestees of their assistive devices in a manner that is deliberately indifferent to the risk of harm, often dropping Class Members on the ground, or causing falls or other harm resulting in actual physical injury;

c.  Denying Class Members reasonable access to assistive mobility devices during their confinement,

d.  Handcuffing Class Members to stationary physical structures for long periods of their detainment, thereby unreasonably precluding the ability to reposition themselves, avoid physical strain or injury, and otherwise limiting their mobility, range of motion, and liberty beyond that of similarly situated custodial arrestees;

e.  Failing to make reasonable accommodation for Class Members to access food, water, and sanitary or hygiene supplies during their detainment;

f.  Housing Class Members in cells or in such manner that there are architectural impediments and obstacles, not otherwise present for similarly situated arrestees, precluding access to toilets or the ability to urinate and defecate;

g.  Housing Class Members in cells with numerous other non-disabled arrestees in circumstances that make them vulnerable to being preyed upon, denied access to food, water, and sanitary supplies, and otherwise harmed and injured;

h.  Failing to make catheterization kits available to Class members at the location of detention;

i.  Failing to adequately supervise Class Members during the period of detention or respond to reasonable requests for assistance;

j.  Prolonging the duration of processing and detainment of Class Members beyond that of otherwise similarly situated custodial arrestees, by:

    i.  Transferring non-mobility disabled arrestees to bookings facilities prior to Class Members.

    ii.  Requiring Class Members to consent to unreasonably prolonged detainment to access the programs, services, activities, and accommodations otherwise provided to similarly situated arrestees without mobility disabilities.

77.  Upon information and belief, Defendant City has failed to promulgate reasonably specific procedures and guidelines for the arrest, processing, and detainment of pre-arraignment custodial arrestees with mobility disabilities.

78.  Where official procedures and guidelines have been written, Defendant City fails to provide sufficient resources for implementation of procedures and guidelines that would allow personnel the ability to adhere to those policies, including by failing to procure necessary equipment, make architectural modifications, or implement effective training.  This policy, custom, and practice results in the practical inaccessibility of, for example, wheelchair accessible transport, wheelchair accessible cells, wheelchair accessible entrances and hallways, wheelchair

accessible toilets, catheter kits, guard and support rails, as well as the facilities themselves or mobility within them; or of safe transport, movement and detention of mobility disabled arrestees. Further, this policy, custom, and practice, results in widespread discriminatory and dehumanizing treatment.

79.     Defendant City further fails to make arrest personnel reasonably aware of ADA and constitutional requirements so that they are reasonably knowledgeable of the appropriate procedures and guidelines governing arrests and detentions and can reasonably respond to the needs of pre-arraignment custodial arrestees with mobility disabilities, and in a timely manner. This policy, custom, and practice, results in, *inter alia*:

a. The failure to make appropriate record of a mobility disability or timely notify appropriate support services personnel;

b. The verbal denial of rights and accommodations actually available to Class Members;

c. The failure to record, report, or respond to the complaints of Class Members;

d. The denial of services, rights, and accommodations to Class Members that are otherwise afforded to other arrestees;

e. The otherwise discriminatory, abusive, inhumane, degrading, and humiliating treatment of Class Members.

80.     All Class Members have been subject to the unlawful, unconstitutional, and unreasonable arrests and detainments, and otherwise harmed as a result of Defendants' conduct, policies, customs, and practices.

**The Experience of Plaintiff Milan Heggs**

81.     At the time of his arrest, Plaintiff Mr. Heggs was a forty-year-old man and a qualified individual with a disability as defined under the ADA.  Mr. Heggs has required the use

24

of a wheelchair and/or prosthesis for approximately twenty years due to a gunshot wound in which a bullet became inoperably lodged in or near his spine.  Mr. Heggs became an L3 paraplegic as a result of the injury.  Mr. Heggs is unable to walk or stand without an assistive device.

82.     Due to Mr. Heggs's condition, he is also only able to sit or hold himself up for short periods of time.  He requires an accommodation in order to use a toilet.

83.     On April 30, 2015, Mr. Heggs was arrested just after midnight by officers of the NYPD after a vehicle collision in which he was driving a participant vehicle.

84.     Mr. Heggs was removed from his vehicle by emergency services personnel and transported on a stretcher and by ambulance to a hospital for treatment.

85.     Upon his release from the hospital, Mr. Heggs was transported in a wheelchair out of the hospital to a NYPD patrol vehicle.

86.     As the NYPD vehicle was not wheelchair accessible, Mr. Heggs was removed from the wheelchair and placed handcuffed into the patrol car.

87.     Mr. Heggs's prosthesis was thrown into the NYPD vehicle separately.

88.     Mr. Heggs was transported in this manner to the 73rd precinct.

89.     P.O. Robert Bernhardt processed Mr. Heggs's arrest and was responsible, in part, for Mr. Heggs's care and confinement.

90.     At the 73rd precinct, Mr. Heggs was placed on a bench in a cell without his wheelchair or prosthesis.

91.     Mr. Heggs was left without any form of assistive mobility device and was thus unable to move about the cell.

92.     As Mr. Heggs was detained in a cell with other non-mobility disabled inmates, he was left vulnerable to attack.

93.     Mr. Heggs was unable to stand, walk, or use the restroom.  Officers did not provide Mr. Heggs with a reasonable accommodation despite requests to do so.

94.     When Mr. Heggs stated that he needed to urinate, he was given a milk carton.

95.     During Mr. Heggs's detention, the other individuals that were present in his cell were all transferred to central booking and Mr. Heggs was left behind, alone in the cell.

96.     Upon information and belief, Mr. Heggs was held back due to his mobility disability.

97.     After Mr. Heggs was held at the precinct, he was then transferred to Brooklyn Central Booking.

98.     Officers at the precinct lifted Mr. Heggs onto an unsecured chair with wheels and rolled Mr. Heggs to an ambulette.

99.     Mr. Heggs was then physically lifted by officers and placed on a seat in the vehicle for transport to Brooklyn Central Booking.

100.    At Brooklyn Central Booking, Mr. Heggs eventually received a wheelchair.

101.    At first, Mr. Heggs was handcuffed to a stationary structure at Brooklyn Central Booking.

102.    Eventually, Mr. Heggs was placed in a cell.   The cell did not provide an accommodation for Mr. Heggs to use the toilet.

103.    Again, other detainees were transferred into and out of the cell, while Mr. Heggs remained in custody at Brooklyn Central Booking.

104.    Mr. Heggs was arraigned over twenty-four hours after he was initially brought to the 73rd precinct.

26

105.    Mr. Heggs was then transported by bus (again, not wheelchair accessible) to Rikers Island.  Mr. Heggs's prosthesis was not returned to him until after he arrived at Rikers Island.

106.    Mr. Heggs was held in pre-arraignment custody at the precinct and central booking facilities longer than other similarly situated detainees solely due to his mobility disability.

107.    The delay in releasing Mr. Heggs did not serve any reasonable or administrative purpose and was instead based upon the failure to make reasonable accommodation for his disability and constituted unconstitutional discrimination by defendants.

108.    Mr. Heggs sustained injuries due to Defendant City's actions and omissions, due to the deficient municipal policy of Defendant City, and due to Defendants' decision to deprive Mr. Heggs of an assistive mobility device or reasonable accommodation of his mobility disability.

109.    As a result of Defendants' acts and omissions, Mr. Heggs experienced pain, suffering, mental anguish, humiliation, and was subjected to serious and substantial health and security risks.

### The Experience of Plaintiff Philip Legree

110.    At the time of his arrest, plaintiff Mr. Legree was a fifty-five (55) year old man who was a qualifying individual with a disability as defined under the ADA.  Mr. Legree has required the use of a cane since 2014 due to a workplace injury that required surgery to repair ruptured tendons in both legs.  Mr. Legree is unable to walk more than a few steps without assistive devices.

111.    Due to Mr. Legree's condition, he has difficulty maintaining his balance and cannot walk quickly.  He has difficulty climbing stairs and is at an increased risk of falling and sustaining an injury.

112.    On August 11, 2019, Mr. Legree was arrested by two NYPD officers after a vehicle collision in which he was a driver of a participant vehicle.

113.    Mr. Legree was ordered out of his vehicle, handcuffed behind his back and made to walk to the police vehicle without his cane.

114.    One of the NYPD officers scolded Mr. Legree for his difficulties in entering the police vehicle.

115.    Mr. Legree requested his cane from his car, and one of the officers retrieved the cane and kept it in the front seat with her.

116.    Mr. Legree could not sit straight in the back of the police vehicle and had to lie at an uncomfortable angle with his hands cuffed behind his back.

117.    When Mr. Legree informed officers of his discomfort, they did not respond.

118.    Upon information and belief, at no point did officers alert the precinct that they were transporting an individual with a mobility disability or inquire about the protocol involved in transporting a person with a mobility disability.

119.    The officers transported Mr. Legree to the 49th precinct.

120.    The officers ordered Mr. Legree to exit the vehicle and walk the distance to the precinct.

121.    Mr. Legree requested his cane, but officers refused to provide it to him.

122.    The officers again scolded Mr. Legree for not walking quickly.

123.    Mr. Legree suffered intense pain in his knees as he attempted to walk the distance to the precinct without his assistive device following the uncomfortable transportation.

124.    Once inside the precinct, Mr. Legree was placed in a cell alone for three to four hours.

125.    Mr. Legree was again handcuffed in the back and placed in a police vehicle to be transported to Central Booking, this time with another arrestee.

126.    The ride to Central Booking was approximately twenty-five minutes and again caused Mr. Legree substantial discomfort.

127.    Mr. Legree was forced to walk up stairs without his cane to enter Central Booking and then forced to descend a long staircase, also without his cane, once inside.

128.    Mr. Legree experienced intense difficulty in attempting to navigate the stairs while handcuffed behind his back and without his cane. While descending the long staircase, Mr. Legree had to "shimmy" down the steps while attempting to hold the handrail with his hands cuffed behind his back.

129.    No one asked Mr. Legree if he required accommodation due to his disability.

130.    At his arraignment, the Judge ordered Mr. Legree released on his own recognizance.

131.    Mr. Legree sustained injuries due to Defendants' actions and omissions, due to the deficient municipal policy of Defendant City, and due to Defendants' decision to deprive Mr. Legree of an assistive mobility device or reasonable accommodation of his mobility disability.

132.    As a result of Defendants' acts and omissions, Mr. Legree experienced pain, suffering, mental anguish, humiliation, and was subjected to serious and substantial health and security risks.

**The Experience of Plaintiff Roy Beckford**

133.    On August 9, 2019, NYPD officers arrested Mr. Beckford.

134.    The officers threw Mr. Beckford to the ground and took his cane from him.

135.    Mr. Beckford told Officer Ravi Mooran, "I need my cane to walk.  I can't walk without my cane."

136.    Officer Mooran replied in sum and substance, "you need to figure it out."

29

137.    Officers dragged Mr. Beckford to a police van.

138.    Mr. Beckford was not secured in the police van and had to use his legs to brace himself while the van was in motion, causing significant pain.

139.    Upon arriving at the precinct, Mr. Beckford requested the return of his cane.  His request was refused.

140.    As officers made Mr. Beckford move through the precinct without his assistive device, Mr. Beckford repeatedly experienced weakness in his legs that required him to lean against a desk or the wall, creating a risk and fear of falling and sustaining an injury.

141.    Mr. Beckford was subsequently released with a summons.

**The Experience of Former Plaintiff Baron Walker**[6]

142.    At the time of his arrest, plaintiff Mr. Walker was a fifty-one (51) year old man who was a qualifying individual with a disability as defined under the ADA.  Mr. Walker has used a wheelchair since 1989 due to transverse myelitis, a neurological disorder affecting the spinal cord and resulting in paraparesis and a seizure disorder.  Mr. Walker is unable to walk or stand without assistive devices.

143.    Due to Mr. Walker's disability, he is also only able to sit or hold himself up for short periods of time.  He requires the use of a catheter and urine collection bag and requires accommodation in order to use a toilet to defecate.

144.    On April 10, 2015, the apartment where Mr. Walker lived with his eighty-one (81) year-old mother was raided at approximately 4:30 p.m. by officers of the NYPD.

---

[6] A Stipulation and Order of Settlement and Dismissal as to Baron Walker Only was entered December 21, 2018 (Dkt. # 72).  Accordingly, he is no longer a named plaintiff in this action and the individual NYPD members named in connection with his claims have been dismissed as Defendants.

145.    Mr. Walker was transported to the 79th Precinct where he was held overnight, after which Mr. Walker was transported to Brooklyn Central Booking in the morning and again held until the following day, for a total of over 32 hours.

146.    Upon information and belief, the detainees in Mr. Walker's cell when he arrived were all released or transferred out of the cell at or around midnight on April 10th.  Mr. Walker was left behind due to his disability and was then alone in the cell.

147.    At approximately 1:00 a.m. on April 11, 2015, another group of detainees was placed in the cell with Mr. Walker.  These detainees were also transferred to bookings and processed prior to Mr. Walker's release.

148.    Mr. Walker was ultimately transported to Brooklyn Central Booking at approximately 10:00 a.m. on April 11, 2015.

149.    At Brooklyn Central Booking, NYPD members removed Mr. Walker from his wheelchair and dragged him to a holding cell where they placed Mr. Walker on the concrete floor.

150.    Mr. Walker made several requests to be allowed to remain in his wheelchair and not to be placed on the cement floor.

151.    The Officers at Brooklyn Central Booking informed Mr. Walker, in sum and substance, that they were unable to do anything but put Mr. Walker on the floor, without his wheelchair, for the duration of his confinement.

152.    The floor of the holding cell was filthy and unsanitary, covered with urine, toilet paper, spit, vomit, remnants of prisoner meals, and vermin.

153.    Due to his disability, Mr. Walker was physically unable to lift himself up onto a bench and furthermore would not have been able to hold himself up on any bench, even had he been placed on or near one.

154.    Mr. Walker was unable to stand, walk, or use the restroom.  He was not provided with any accommodation in any way.

155.    The Brooklyn Central Booking Officers failed to place food within Mr. Walker's reach.  Instead, food for detainees was placed all together in a box near the gate of the cell. Mr. Walker was forced to use his hands to drag his body across the filthy floor to access food, risking physical injury.

156.    In order to empty his urine bag, Mr. Walker was forced to use his hands to drag his body across the filthy floor to the toilet, also risking physical injury.

157.    Upon information and belief, Mr. Walker's holding cell at Brooklyn Central Booking was crowded and contained many other detainees when Mr. Walker was placed in the cell.

158.    Mr. Walker is approximately six feet and six inches (6'6") tall and suffers from a condition which results in involuntary spasms of his legs.  Mr. Walker struggled to stay out of the way of inmates and avoid conflict with other detainees from inadvertently making contact as a result of an involuntarily leg spasm.

159.    Due to Mr. Walker's disability, he suffered delay in his processing and release.

160.    Mr. Walker attempted to sleep on the unsanitary cement floor with no bedding or accommodation allowing for sleep.

161.    Upon information and belief, cots and mats are available for detainees to lie down at Brooklyn Central Booking but were not provided to Mr. Walker.  Many hours after arriving at Brooklyn Central Booking, Mr. Walker was finally provided the small seat cushion from his own wheelchair.

162.     Upon information and belief, during the time Mr. Walker was detained staff at Brooklyn Central Booking failed to conduct any cleaning or sanitation of the cell or its floor.

163.     Mr. Walker was denied any accommodation allowing him to move about the cell, to eat, or to use the toilet.

164.     Mr. Walker was held at Brooklyn Central Booking without his wheelchair until immediately prior to his arraignment, when he was dragged and placed in his wheelchair for the purpose of appearing in Court.

165.     Mr. Walker was held in custody longer than other similarly situated detainees solely due to his disability.   The delay in releasing Mr. Walker did not serve any reasonable or administrative purpose and was instead based upon the failure to make reasonable accommodation for his disability and constituted unconstitutional discrimination.

166.     Mr. Walker sustained physical injuries due to NYPD members' actions and omissions, and due to NYPD members' decision to deprive Mr. Walker of his wheelchair, refusal to provide him with an accommodation to move within the holding cell, to access the food brought into the cell, and to use the toilet.   Mr. Walker was forced to remain on the cement floor for the duration of his confinement and subjected him to serious and substantial health risks.

167.     As a result of these acts and omissions, Mr. Walker experienced pain, suffering, mental anguish, and humiliation.

**FIRST CAUSE OF ACTION**
**PURSUANT TO 42 U.S.C. § 12131 *et seq.***
**AMERICANS WITH DISABILITIES ACT**
*(Against All Defendants)*

168.    Plaintiffs repeat and re-allege each of the above paragraphs with the same force as if set forth herein.

169.    Title II of the ADA prohibits a public entity from excluding a person with a disability from participating in, or otherwise benefiting from, a program of the public entity, or otherwise discriminating against a person on the basis of disability. 42 U.S.C. § 12132.  "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

170.     "Public entities" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).   Defendant City is a public entity.

171.    The term "disability" includes a physical disability that "substantially limits one or more major life activities."  42 U.S.C. § 12102(2).  A "qualified individual with a disability" is defined as an "individual with a disability who, with or without reasonable modification to rules, polices, or practices, the removal or architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

172.    Plaintiffs and Class Members are qualified individuals with disabilities within the meaning of the statutes, in that they have impairments which substantially limit one or more major life activities, including their ability to walk.  Plaintiffs and Class Members also reside or are located in New York City and thus are subject to policing and law enforcement activities conducted

34

by Defendant City and through its agency the NYPD, and thus are eligible to participate in and receive the programs, services, activities, and accommodations provided voluntarily or involuntarily by the Defendants attendant to a custodial arrest.

173.    Title II of the ADA requires public entities, including Defendants, to operate each of their programs, services, or activities "so that, when viewed in its entirety, it is readily accessible to and useable by individuals with disabilities."   Title II also requires the features of all public entities' facilities to be accessible under the ADA, including buildings, structures, or sites where facilities are located.

174.    Law enforcement and criminal arrest processing constitutes a vital program, service, or activity provided by Defendants.  Defendants have failed to provide custodial arrestees with mobility disabilities with meaningful access to these programs, services, and activities in violation of the ADA.  Defendants have failed to make reasonable or necessary architectural modifications and ongoing maintenance of facilities to provide meaningful access to Plaintiffs and Class Members.

175.    Defendants City and the Individual Defendants have a duty to comply with ADA interpreting and implementing regulations, including 28 Code of Federal Regulations Section 35.152 "Jails, detention and correctional facilities, and community correctional facilities."  This section "applies to public entities that are responsible for the operation or management of adult … jails, detention and correctional facilities … either directly or through contractual, licensing or other arrangements with public or private entities, in whole or in part, including private correctional facilities."

   a.   Section 35.152 provides that, "public entities shall implement reasonable policies, including physical modifications to additional cells in accordance with the 2010

35

Standards, so as to ensure that each inmate with a disability … is housed in a cell with the accessible elements necessary to afford the inmate access to safe, appropriate housing."

b. Section 35.152 additionally provides that, "Public entities shall ensure that qualified inmates or detainees with disabilities shall not, because a facility is inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of, the services, programs, or activities of a public entity."

176.   Defendants have failed and continue to fail to provide reasonable accommodations to individuals with mobility disabilities; fail to provide vehicle transportation accommodating mobility disabilities; fail to provide reasonable accommodations to allow individuals with mobility disabilities to move or adjust themselves while detained or within holding cells, including accommodations to sit, access food, water, or sanitary supplies, or use the toilet during detention; fail to ensure that toilets are accessible and deny access to self-catheterization kits; subject individuals with mobility disabilities to nonconsensual, unwarranted and unjustified physical contact and physical assault; place them in cells with other non-mobility disabled arrestees; and discriminate against Plaintiffs and Class Members by delaying arrest processing and release, thereby depriving Plaintiffs and Class Members of the rights guaranteed by the ADA and accompanying federal regulation applicable to the confinement of individuals with disabilities.

177.   As a result of Defendants' acts and omissions, Plaintiffs and Class Members were, are, and will continue to be denied the reasonable accommodation or the immediate care required, have their liberty unnecessarily and unreasonably restricted, and otherwise suffer injury and damages including, inter alia, physical and mental pain, suffering, humiliation and mental anguish.

**SECOND CAUSE OF ACTION**
**PURSUANT TO 29 U.S.C. § 794, *et seq.***
**REHABILITATION ACT OF 1973**
***(Against All Defendants)***

178.    Plaintiffs repeat and re-allege each of the above paragraphs with the same force as if set forth herein.

179.    Section 504 of the Rehabilitation Act provides that "[N]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794.

180.    Plaintiffs and Class Members each qualify as an "individual with a disability" as defined by 29 U.S.C. § 705(2)(B) and 42 U.S.C. § 12102(2).

181.    Defendant City, and its agencies, received federal financial assistance for law enforcement and criminal processing related programs and facilities adequate to invoke the coverage of Section 504 at all times relevant herein. 29 U.S.C. § 794(b).

182.    Defendants have failed to comply with, and continue to violate, Section 504 of the Rehabilitation Act, where at all times relevant herein and continuing to the present, they fail to provide reasonable accommodations to individuals with mobility disabilities; fail to provide vehicle transportation accommodating mobility disabilities; fail to provide reasonable accommodations to individuals with mobility disabilities to move or adjust themselves while detained or within holding cells, including accommodations to sit, access food, water, or sanitary supplies, or urinate and defecate during detention; fail to ensure that toilets are accessible and deny access to catheterization kits at the location of confinement; subject individuals with mobility disabilities to nonconsensual, unwarranted and unjustified physical contact and physical assault; place them in cells with other non-mobility disabled arrestees; and discriminate against Plaintiffs

37

and Class Members by delaying arrest processing and release, thereby depriving Plaintiffs and Class Members of the rights guaranteed by the Rehabilitation Act and federal regulation applicable to the confinement of individuals with disabilities.

183.    As a result of Defendants' acts and omissions, Plaintiffs and Class Members were and are denied the reasonable accommodation or immediate care required, have their liberty unnecessarily and unreasonably restricted, and otherwise suffer injury and damages including, inter alia, physical and mental pain, suffering, humiliation, and mental anguish.

184.    The acts of the Individual Defendants were intentional, wanton, malicious, reckless, and oppressive, thus entitling Plaintiffs to an award of punitive damages.

**THIRD CAUSE OF ACTION**
**THROUGH 42 U.S.C. § 1983**
**DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION**
*(Against the Individual Defendants)*

185.    Plaintiffs repeat and incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

186.    By the acts alleged herein, the Individual Defendants, acting under color of state law, in their individual capacities and within the scope of their employment, have deprived Plaintiffs  and Class Members of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, and/or failed to intervene to prevent such deprivations, in violation of rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983, including their right to be free from deprivation of liberty and excessive punishment without due process of law; to be free from unconstitutional conditions of confinement and objectively unreasonable conditions; and to be free from disparate and inhumane treatment and punishment.

187.    As a direct and proximate result of the Individual Defendants' acts and omissions, Plaintiffs and Class Members were denied the immediate medical care they required, had their liberty unconstitutionally and unnecessarily restricted, were subjected to unconstitutional conditions of confinement and unreasonable detainments, and otherwise suffered injury and damages described above, including, inter alia, physical and mental pain, suffering, humiliation and mental anguish.

188.    The acts of the Individual Defendants were intentional, wanton, malicious, reckless, and oppressive, thus entitling Plaintiffs to an award of punitive damages.

**FOURTH CLAIM**
**MUNICIPAL LIABILITY PURSUANT TO *MONELL***
**FOR CONSTITUTIONAL VIOLATIONS THROUGH 42 U.S.C. § 1983**
*(Against Defendant the City of New York)*

189.    Plaintiffs incorporate by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

190.    The pervasive unconstitutional practices of Defendant City are a direct and proximate result of policies, practices and/or customs devised, implemented, enforced and sanctioned by Defendants and supervisory officials whose identifies are presently unknown, with the knowledge that such policies, practices, and/or customs would lead to violations of the Fourth and Fourteenth Amendments.

191.    Those policies, practices, and/or customs include the conduct described herein.

192.    The acts and omissions described above were carried out pursuant to Defendant City's overlapping customs and practices and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the City and its agencies the NYPD and DCAS in their capacities as officials pursuant to customs, policies, usages, practices, procedures

39

and rules of the City and the NYPD, all under the supervision of ranking officers of the NYPD and DCAS.

### Failure to Properly Screen, Train and Supervise Officers

193.    Although fully aware that the work of NYPD and DCAS and other municipal personnel demands extensive training, superior judgment, and close supervision, Defendant City and supervising officials failed to properly screen, train, and supervise employees and agents, including NYPD and DCAS officers, knowing that such failures would result in Fourth and Fourteenth Amendment violations.

194.    The inadequate screening, training and supervision of officers is a direct and proximate cause of the City's rampant unconstitutional detentions of pretrial arrestees with mobility disabilities, Plaintiffs and Class Members.   As a direct and proximate cause of the Defendants' failure to screen, train, and supervise officers, hundreds of individuals with mobility disabilities have been subjected to unconstitutional pre-trial and pre-arraignment detentions.   By failing to properly screen, train, and supervise officers and City employees, the City, the Police Commissioner, and other supervisorial defendants and/or personnel have acted recklessly and with deliberate indifference to the constitutional rights of those with mobility disabilities in the context of custodial arrests and detentions.

### Failure to Monitor and Discipline Officers

195.    The aforementioned widespread abuses are also a direct and proximate result of the failure of the City, the Police Commissioner, and other supervisorial defendants and/or personnel to properly and adequately monitor, discipline, and take necessary corrective action against officers who engage in, encourage, ignore or conceal unconstitutional practices.

196.    The City, the Police Commissioner, and other supervisorial defendants and/or personnel have failed to properly and adequately monitor, discipline and take necessary corrective action against officers, knowing that such omissions would lead to Fourth and Fourteenth Amendment violations.  By such acts and omissions, these Defendants have acted recklessly and with deliberate indifference to the constitutional rights of those with mobility disabilities who would be subject to custodial arrests and pretrial detentions, including Plaintiffs and Class Members.

**Encouraging, Sanctioning and Failing to Rectify Unconstitutional Detentions
of Arrestees with Mobility Disabilities**

197.    With the knowledge that such acts and omissions create a likelihood of Fourth and Fourteenth Amendment violations, the City, the Police Commissioner, and other supervisorial defendants and/or personnel have encouraged its officers and agents with commendations and public praise rather than taking steps to rectify these abuses and unconstitutional practices.

198.    As a direct and proximate result of the above polices, practices, and/or customs, hundreds of people have been, and will be, subject to unconstitutional detentions.  Through such acts and omissions, the City, the Police Commissioner, and other supervisorial defendants and/or personnel have acted recklessly and with deliberate indifference to the constitutional rights of individual who have or will be subject to custodial arrests and pretrial detentions, including Plaintiffs and Class Members.

199.    The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct.  The population of New York City includes almost 180,000 individuals with an ambulatory disability, and approximately 95,000 individuals who use wheelchairs, according to the de Blasio administration Commissioner of the

Mayor's Office for People with Disabilities, Victor Calise.[7] Given the substantial population that

relies upon wheelchairs for mobility, as well as the high number of arrests within the City of New

York, the unconstitutional practices described herein constitute a custom and policy of violating

the rights of detainee individuals with mobility disabilities, including those that rely upon

wheelchairs and other assistive mobility devices, held in precincts and central booking facilities

within the City Of New York.

200.    The existence of the aforesaid unconstitutional customs and policies may be

inferred from repeated occurrences of similar wrongful conduct, as documented in the following

actions filed against the City:

**Unconstitutional Conditions of Confinement for Pre-Arraignment Detainees:**

i.   <u>Cano, et al. v. City, et al.</u>, 13 Civ. 3341 (WFK) (VVP):  Plaintiffs allege Brooklyn
Central Booking subjects detainees to overcrowding, unsanitary conditions, lack of
sleeping space; deprivation of sleep because, *inter alia*, they were not provided beds
and because the lights were on at all times; unusable toilets; sanitation issues with
garbage, urine, feces, and garbage left uncleaned on the floor; infestation of rodents
and insects; crime due to lack of supervision of detainees; inadequate water and food
that cannot be consumed; substantial risk of harm;

ii.   <u>Spinner, et al. v. City of New York, et al.</u>, 01 Civ. 2715, 01 Civ. 8264, 02 Civ. 2899,
02 Civ. 1039 (E.D.N.Y.):  Alleging plaintiffs and numerous other arrestees were held
in filthy, disease-ridden, overcrowded jail cells; cells infested with rodents and roaches
for years; human feces and urine on the floor; cells contained one toilet to be shared by
all detainees with no privacy; lack of clean drinking water; no supervision for violent
criminals sharing cells;

iii.   <u>Darnell v. City of New York</u>, 15 Civ. 2870 (2d Cir. 2017):  The Circuit reviewed the
allegations of unconstitutional conditions of confinement at Brooklyn Central Booking
and stated, "[t]he plaintiffs paint a picture of BCB that is alarming and appalling.  The
plaintiffs testified that they found the conditions at BCB degrading, humiliating, and
emotionally scarring.  One plaintiff testified: "I was not treated in a humane manner.  I
believe if I were a dog, and that if the A.S.P.C.A. was brought in and there was a dog
in that cell, that the police officers, whoever were responsible for the treatment of that

[7] NYC Mayor's Office for People with Disabilities, Accessible NYC: An Annual Report on the State of People Living with Disabilities in New York City at 8, 16 (2014), *available at* http://www.nyc.gov/html/mopd/downloads/pdf/ACCESS_NYC_updated.pdf.

dog in that cell, that they would be brought up on charges."
See Darnell v. Pineiro, 849 F.3d 17, 26 (2d Cir. Feb. 21, 2017).

**Unconstitutionality Treatment of Individuals with Mobility Disabilities in City Custody:**

iv.   Brooklyn Center for Independence of the Disabled v. City of New York, No. 11 Civ. 6690 (S.D.N.Y.):  In November 2013, the Court found the City liable for failing to provide meaningful access to people with disabilities to its emergency preparedness programs and services.

v.   Jose Marles, v. City of New York, et al., 13 Civ. 7667 (S.D.N.Y.):  Order dated September 8, 2016, at Dkt. No. 63, denying summary judgment to defendants on plaintiff's claims pursuant to the ADA and Rehabilitation Acts in connection with plaintiff's post-arrest transport to the 9th precinct.

vi.   Wagner, et al. v. City of New York, et al., 14 Civ. 2521 (S.D.N.Y.):  Order dated September 28, 2015, Dkt. No.60, denying summary judgment to defendants on plaintiffs' claims that they were denied reasonable accommodations for their disabilities and were injured by that failure to accommodate pursuant to the ADA and Rehabilitation Acts.

vii.   Filer v. City of New York, et al., 14 Civ. 5672 (E.D.N.Y.):  Alleging unconstitutional **transport and detainment** of arrestee with mobility disability, including Monell allegations that Defendant City of New York has no written policy in place for the NYPD concerning how its employees transport people who use wheelchairs.

viii.   Stewart v. City of New York, et al. 15 Civ. 7652 (S.D.N.Y.):  Alleging constitutional violations and Monell liability where Defendant City has no written policy in place concerning how its employees reasonably accommodate detainees or arrestees with a disability requiring use of a diaper or catheter.

ix.   Krieg v. City of New York, et al., 15 Civ. 03626 (S.D.N.Y.):  Alleging Monell liability and unconstitutional arrest transport and detainment of plaintiff, who was paralyzed from the waist down, where defendants failed to secure plaintiff in transport, handcuffed plaintiff to exterior bar of holding cell because it was not wheelchair accessible, and denied plaintiff access to self-catheterization supplies.

x.   Disabled in Action, et al. v. The City of New York, et al., 16 Civ. 8354 (S.D.N.Y.): Class action lawsuit pursuant to the ADA and Rehabilitation Act alleging denial of access to programs, services, and reasonable accommodations for individuals with mobility disabilities at **police precincts** in the City of New York, including specific allegations that architectural barriers and other obstacles render precinct inaccessible for those with mobility disabilities.

xi.     Narvaez v. City of New York, 16 Civ. 1980 (GBD) (S.D.N.Y.):     Alleging
        unconstitutional conditions of confinement for pretrial detainees in violation of the
        ADA and at Brooklyn Detention Center.

201.    Defendants have implemented, enforced, encouraged, and sanctioned a policy,

practice and/or custom of subjecting custodial arrestees and pretrial detainees with mobility

disabilities, including Plaintiffs and Class Members, to unconstitutional conditions of confinement

in violation of the Fourth and Fourteenth Amendments to the Constitution.

202.    Defendants acted under color of law and with deliberate indifference to the Fourth

and Fourteenth Amendment rights of the named Plaintiffs and Class Members.  As a direct and

proximate result of the acts and omissions of the Defendants the Fourth and Fourteenth

Amendment rights of the named Plaintiffs and Class Members have been violated.

203.    As a direct and proximate result of Defendants' acts and omissions, Plaintiffs and

Class Members had their liberty unnecessarily and unconstitutionally restricted, and otherwise

suffered injury and damages including, *inter alia*, physical and mental pain, suffering, humiliation

and mental anguish.

204.    As a result of this policy, practice and/or custom, the Defendants have

unconstitutionally and unlawfully detained members of the Damages Class.  As a result of this

policy, practice and/or custom, the Defendants have unconstitutionally and unlawfully detained

and continue to unlawfully detain members of the Injunctive Class.

205.    Only an injunction is certain to end Defendants' unlawful practices.  Defendants

have persisted in carrying out these illegal practices despite numerous complaints, lawsuits, media

attention, and action by the United States Department of Justice, through their representatives

within New York City, and including judicial decisions and United States Agency determinations

44

that Defendants are in violation of the United States Constitution, the ADA, and the Rehabilitation Act.

206.    Upon information and belief, Defendants have agreed to cease or slow these practices and undertake remedial measures in the past, only to continue to engage in a policy, custom and/or practice of noncompliance.

207.    The named Plaintiffs and Class Members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights, liberty, and human dignity, unless Defendants are enjoined from continuing these policies, practices, and/or customs.

208.    As a direct and proximate result of the acts and omissions of the Defendants the named Plaintiffs and Class Members have been deprived of their rights under the Fourth and Fourteenth Amendments to the Constitution and 42 U.S.C. § 1983, and have suffered the injuries and damages described above.

**FIFTH CLAIM FOR RELIEF**
**PURSUANT TO N.Y.C. ADMIN. CODE § 8-101 *et. seq.***
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW**
**(*Against all defendants*)**

209.    Plaintiffs reiterate the above paragraphs as if set forth herein and incorporate such by reference.

210.    The New York City Human Rights Law (NYCHRL) was enacted for the purpose of eliminating "prejudice, intolerance, bigotry, and discrimination."  The NYCHRL provides that it shall be unlawful discriminatory practice for any person, place or provider of public accommodation to discriminate against a person with a disability either directly or indirectly, or

deny such persons of the accommodations, advantages, facilities, or privileges thereof. N.Y.C. Admin. Code § 8-107(4).

211.    Plaintiffs and Class Members have a "disability" as defined by N.Y.C. Admin. Code § 8-102(16)(a) and have "physical impairments."

212.    The City of New York and its agencies are "persons" or "providers" or "covered entities".   N.Y.C. Admin. Code § 8-102(1).   Defendants are "places and providers of public accommodation." N.Y.C. Admin. Code § 8-102(9).  The Individual Defendants are "agents" and "employees" of a public accommodation. N.Y.C. Admin. Code § 8-107(4).   The Police Commissioner is being sued in his official capacity as a chief executive of the City.

213.    Defendants failed, and continue to fail, "to make reasonable accommodation to enable a person with a disability to... enjoy the right or rights in question," as described above. N.Y.C. Admin. Code § 8-107(15).  Defendants have unlawfully discriminated against Plaintiffs and Class Members by failing to accommodate their mobility disability during their arrest, transport, and detention.   Defendants' actions result in systemic discriminatory exclusion in violation of N.Y.C. Admin. Code § 8-107(17).

214.    As a result of Defendants' acts and omissions, Plaintiffs and Class Members were and are denied the reasonable accommodation or immediate care required, have their liberty unnecessarily and unreasonably restricted, and otherwise suffer injury and damages including, *inter alia*, physical and mental pain, suffering, humiliation and mental anguish.

215.    The acts of the Individual Defendants were intentional, wanton, malicious, reckless and oppressive, thus entitling Plaintiffs to an award of punitive damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for relief as follows, including but not limited to:

I.      Enter an order certifying this action as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure in the manner described herein, with the named Plaintiffs as class representative;

II.      Enter a class-wide judgment declaring that Defendants' policy, practice and/or custom in arresting individuals with mobility disabilities and detaining them at New York City pre-arraignment detention facilities, including precincts and bookings, as alleged herein, has violated and continues to violate Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and state and local law;

III.      Enter a class-wide judgment declaring that Defendants' policy, practice and/or custom in arresting individuals with mobility disabilities and detaining them at New York City pre-arraignment detention facilities, including precincts and bookings, as alleged herein, has violated  and continues to violate the Fourth and Fourteenth Amendments to the United States Constitution and that the implementation, enforcement, supervision, and sanctioning by officers is a direct and proximate result of the following practices and/or customs of the City:

a.   Denying Class Members wheelchair accessible transport to and from the arrest processing facility, precinct and/or central booking;

b.   Recklessly removing Class Members from their wheelchairs, often in such in manner constituting recklessness to the risk of harm, and often resulting in physical injury;

c.   Handcuffing Class Members to stationary physical structures, for long periods of their detainment, unreasonably precluding their ability to reposition themselves, avoid

physical strain or injury, and otherwise limiting their mobility and range of motion beyond that of similarly situated custodial arrestees;

d.  Denying Class Members reasonable access to assistive mobility devices during their confinement;

e.  Failing to make reasonable accommodation for Class Members to access to food and water during their detainment;

f.  Housing Class Members in cells or in such manner that there are architectural impediments and obstacles precluding access to toilets or the ability to urinate and defecate, not otherwise present for similarly situated arrestees;

g.  Failing to adequately supervise Class Members during the period of detention or respond to reasonable requests for assistance;

h.  Prolonging the duration of processing and detainment of Class Members beyond that of otherwise similarly situated custodial arrestees, by:

    i.  Transferring all similarly situated arrestees to bookings prior to Class Members.

    ii.  Requiring Class Members to consent to unreasonably prolonged detainment to access the programs, services, activities, and accommodations otherwise provided to similarly situated arrestees.

IV.    Issue an Order for the following injunctive relief:

    1.  Enjoin Defendant City from denying Class Members wheelchair accessible transport to and from the arrest processing facilities, precincts and/or central booking during the period of their custodial arrest;

    2.  Enjoin Defendant City from handcuffing Class Members to stationary physical structures, and thereby unreasonably precluding their ability to

48

reposition themselves, or otherwise limiting their mobility and range of motion beyond that of similarly situated custodial arrestees;

3. Enjoin Defendant City from allowing untrained police officers to forcibly remove Class Members from their wheelchairs for the purpose of detention;

4. Enjoin Defendant City from detaining Class Members in cells or in such locations that there are architectural impediments and obstacles precluding access to toilets or the ability to urinate and defecate;

5. Enjoin Defendant City from denying Class Members access to necessary facilities and equipment to allow for sanitary urination and defecation at the location of confinement;

6. Enjoin Defendant City from prolonging the duration of processing and detainment of Class Members beyond that of otherwise similarly situated custodial arrestees;

V.      Award the named Plaintiffs and members of the Damages Class compensatory damages in amounts that are, just and reasonable, to be determined at trial;

VI.      Award the named Plaintiffs and members of the Damages Class punitive damages, including punitive damages pursuant to the NYCHRL, against the Individual Defendants in an amount to be determined at trial;

VII.      Award the named Plaintiffs and Class Members reasonable attorneys' fees and costs; and

VIII.      Grant such other and further relief as this Court shall find appropriate and just.

Dated:   New York, New York
         [Month] [day], 2021


                                          Respectfully submitted,


                              By:   _____
                                          David B. Rankin
                                          Rebecca Pattiz
                                          Beldock Levine & Hoffman LLP
                                          99 Park Avenue, PH/26th Floor
                                          New York, New York 10016
                                          P: 212-490-0400
                                          E: drankin@blhny.com

                                          Michael L. Spiegel
                                          48 Wall Street, Suite 1100
                                          New York, NY 10005
                                          P: 212-587-8558
                                          E: mikespieg@aol.com

                                          Marc Fliedner
                                          Emma Stern
                                          Disability Rights New York
                                          725 Broadway, Suite 450
                                          Albany, NY 12207
                                          P: 518-512-4850
                                          E: Marc.Fliedner@drny.org

                                          *Attorneys for Plaintiffs*