**EXHIBIT 1**

```
 1  UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
 2  ---------------------------------------------------------------X
    MILAN HEGGS, ROY BECKFORD, and PHILIP LEGREE, Individually
 3  and on behalf of a class of all others similarly situated,
 4                                      PLAINTIFFS,
 5  And                                         17 Civ.03234
    DISABILITY RIGHTS OF NEW YORK,
 6                                      PLAINTIFF
    And
 7  DISABILITY RIGHTS OF NEW YORK
                                        PLAINTIFF,
 8
                    -against-
 9
    THE CITY OF NEW YORK, NEW YORK CITY POLICE (NYPD)
10  COMMISSIONER JAMES P. O'NEILL; (NYPD) COMMISSIONER DERMOT
    F. SHEA; NYPD OFFICER (P.O.) ROBERT BERNHARDT; P.O. MOORAN,
11  P.O. SLATER; JOHN DOE 1-8
12                                      DEFENDANTS.
    ---------------------------------------------------------------X
13
14                      DATE: August 25, 2021
15                      TIME: 9:15 A.M.
16
17
18            EXAMINATION BEFORE TRIAL via video
19  conference of the Plaintiff, ROY BECKFORD, taken by the
20  Defendant, pursuant to an Order, held at the above date and
21  time, before Alexandra Glasgow, a Notary Public of the
22  State of New York.
23
24
25
```

1    A.    My mother's a school crossing guard.
2    Q.    Where does she work?
3    A.    Her post is here in Brooklyn over in the east
4  side.
5    Q.    Do you personally know anybody that works for the
6  NYPD, besides your mom?
7    A.    I've met people along the way.
8    Q.    Do you have any friends that work for the NYPD?
9    A.    Not that I know of.  I don't get into the
10 conversations like that.
11   Q.    You mentioned you have a disability, what is your
12 disabilities?
13   A.    Neurological disorder, traumatic brain injury.  I
14 have issues with my back, my knees, and also my shoulder.
15 I have asthma and vertigo.
16   Q.    What is your neurological disability?
17   A.    Functional neurological disorder.
18   Q.    Can you explain what you understand that
19 diagnosis to mean.
20   A.    From what my doctors told me, that issues are
21 from chronic pain, to weakness, stuff like that.
22   Q.    What type of chronic pain do you experience?
23   A.    Chronic pain throughout my body, throughout my
24 legs, throughout my chest, throughout my arms.  Where the
25 nerves reach.

1  A.  Yes, in 2014.

2  Q.  What was the name of that doctor?

3  A.  There's numerous. Dr. Inna Chernoglaz, who is my

4  primary care, and then there's my neurologist. I can't

5  remember her name right now. When I remember, I will tell

6  you. Oh, my goodness. What was her name? There's my

7  primary care doctor, Inna Chernoglaz. The doctors for my

8  bone, Dr. Drazick. I can't remember the titles, and if I

9  could just remember -- can I look at my phone to see what

10 my doctor's name is?

11 Q.  I'll leave that to your attorney.

12           MR. RANKIN: We can leave a blank in the

13       transcript.

14           MR. TOEWS: Is it Dr. Dolgovina?

15 Q.  What was your primary care physician's name?

16 A.  Dr. Dolgovina.

17 Q.  Do any of those conditions that you mentioned

18 effect your ability to move around?

19 A.  Yes.

20 Q.  How so?

21 A.  Regarding the asthma, I can't run anymore. I

22 can't really do too much extraneous type of movement or

23 activities. I can't move too much without pain without

24 taking a break and same goes for the neurological order and

25 the issues with my knees and backs. I do have a cane I

1  have to walk around for years.  I have a walker at times
2  and at times if the need is for me to use the walker, I
3  have to use the walker.
4      Q.    What are the issues that you have with your
5  knees?
6      A.    Arthritis and bursitis.  I don't know all the
7  medical stuff.  I just know the key things which is
8  bursitis and arthritis and so forth.
9      Q.    Did those affect your ability to walk?
10     A.    Yes.
11     Q.    You mention that you use a cane?
12     A.    Yes.
13     Q.    How often do you use the cane?
14     A.    Every day.
15     Q.    Do you have a prescription for the cane?
16     A.    Yes, I do.
17     Q.    Who prescribed the cane?
18     A.    Dr. Inna Chernoglaz.
19     Q.    Do you ever leave the house without your cane?
20     A.    No.
21     Q.    How often do you use the walker?
22     A.    Whenever it is needed.  It depends on my level of
23  pain and if I have an issue with moving just a few feet,
24  but mainly the walker is used in the house.
25     Q.    When you leave the house, you use the cane?

1    A.    Yes.

2    Q.    What year did you start using the cane?

3    A.    I first received the cane in -- my first cane

4  ever was 2012 and the new metal canes are 2014, that's when

5  I got the prescription.

6    Q.    Are you able to walk without the cane?

7    A.    Only a few feet, probably like 2, 3, 4, 5 feet if

8  I stretch it out, at most, but that's only if there's

9  something for me to stretch on in the house.

10   Q.    Do you have a driver's license?

11   A.    Yes, I do.

12   Q.    Does it have any restrictions?

13   A.    Not that I know of.  I never looked to see if

14 there was.

15   Q.    I'm going to try to show you a document.  I'm

16 going to show my screen.

17             MR. TOEWS:  I would like to have this marked

18        virtually as Defendant's Exhibit A.

19             (Whereupon, a document was marked as

20        Defendant's Exhibit A for identification as of

21        this date by the Reporter.)

22   Q.    You can see the document okay, right?

23   A.    Yes.

24   Q.    It's entitled the third amended class action

25 complaint.  Do you recognize this document?

```
 1   2016.
 2   Q.      That was in Times Square?
 3           MR. RANKIN:  I'm not objecting to this line
 4      of questioning, but --
 5   A.      What was the question?
 6           MR. RANKIN:  If you want to leave the date
 7      of the incident blank, we can fill it in.
 8           MR. TOEWS:  I have it.  I just wanted a
 9      little more information on the 2016 suit against
10      the city.
11   Q.      This is a personal injury you brought?
12   A.      Yes, I guess that's what you call it, personal
13   injury.
14   Q.      And the case settled?
15   A.      No.
16           MR. RANKIN:  It's still pending.
17   Q.      Have you ever been a defendant in a lawsuit
18   before?
19   A.      No.
20   Q.      Is that case where you sue the city that we're
21   talking about, is that the only other lawsuit you were
22   involved with?
23   A.      No.
24   Q.      What were the others?
25   A.      Another was when I was arrested for recording an
```

1  officer.
2     Q.     When was that?
3     A.     I believe that happened in 2016 as well, a few
4  months after they tore my rotator cuff.
5     Q.     I want to make sure. I thought I understood the
6  lawsuit was pending. You have an action in state court
7  where you're alleging personal injury lawsuit surrounding
8  the same arrest, August 9th, 2019?
9     A.     Yes.
10     Q.     And then you had another lawsuit back in 2016,
11  also against the NYPD; is that right?
12     A.     Yes.
13     Q.     Is that one still pending?
14     A.     Two in 2016.
15     Q.     Understood.
16          MR. RANKIN: There's one in state and
17          federal court from 2016. The federal one
18          settled. The state one hadn't.
19     Q.     Those are surrounding the same incidents or two
20  separate incidents?
21     A.     Two separate incidents. One is the rotator cuff
22  and the next one is the arrest recording.
23     Q.     Let's talk about the arrest that gives rise to
24  the case that we're here for today. We talk about your
25  arrest that took place on August 9th of 2019, right?

1  A. Yes.
2  Q. Where did the arrest take place?
3  A. That was in Times Square.
4  Q. What was your purpose for being in Times Square
5  at the time?
6  A. I was there because it was the fifth anniversary
7  for Mike Brown's murder.
8  Q. There was protest going on?
9  A. Yes, I was trying to record it.
10 Q. Why were you trying to record it?
11 A. One because it's history of what's been going on
12 to our community, and two, to record the actions of the
13 officers and their interactions.
14 Q. What time did you arrive in Times Square?
15 A. I don't remember the time.
16 Q. Do you remember --
17 A. I remember it was nighttime. I don't remember
18 the approximate time.
19 Q. How long were you at the protest before you were
20 arrested?
21 A. I was probably there for about in Times Square,
22 probably like a good ten, twenty minutes or so.
23 Q. Can you describe the events that lead to your
24 arrest.
25 A. Yes, I was there recording. The officers were

1  being assaulted by this officer.
2      Q.    How many officers were on the scene?
3      A.    I don't have an account of that.  I know the
4  officers was full of officers.
5      Q.    I think you said there came a time when the
6  officer wanted to take you down?
7      A.    Yes, that was after I asked for the officer's
8  name and badge number.
9      Q.    Did he give you his name and badge?
10     A.    No.
11     Q.    What do you mean when you say they decided to
12 take you down?
13     A.    That's when I felt the hand grab me, grab my arms
14 on both sides, grab my cane, somebody came up and yelled
15 take him, and I got thrown to the ground.
16     Q.    You had your cane with you at the protest?
17     A.    Yes, as I always do.
18     Q.    Who took your cane away?
19     A.    I don't know which officer took my cane because I
20 got swarmed.
21     Q.    What do you mean you got swarmed?
22     A.    I had officers to my front, left, back, right.
23     Q.    Somebody physically took your cane out of your
24 hand or it fell to the ground?
25     A.    They snatched the cane out of my hand.

1  Q. Did you see who took it?

2  A. No, I did not.

3  Q. Do you know what happened to the cane after

4  somebody took it away?

5  A. No, I asked for it.

6  Q. When did you ask for it?

7  A. I asked for that after they slammed me to the

8  ground and dragged me up, I said I needed my cane to walk.

9  I was told tough luck, figure it out.

10 Q. So officers put you in handcuffs?

11 A. Yes, they did.

12 Q. And they put you on the ground and put you in

13 handcuffs while you were on the ground?

14 A. They slammed me to the ground, put their knees on

15 my back legs to put me in handcuffs.

16 Q. What happened next?

17 A. They dragged me up, I said I needed my cane to

18 walk. I was then told by Officer Mooran, tough luck,

19 figure it out, and then they dragged me to the SRG paddy

20 wagon. On the way to the SRG paddy wagon, as soon as we

21 stepped off the street, I passed out. My legs went down.

22 I came to and they brought me to the paddy wagon.

23 Q. When you were handcuffed and they were walking

24 over to the police van, you passed out?

25 A. For a quick second.

1  Q. Did you mean strategic response group, when you
2  said SRG?
3  A. Yes.
4  Q. They took you in handcuffs to the SRG van?
5  A. Yes.
6  Q. Did they place you in the back?
7  A. Yes, they did. They had to help me get into the
8  van.
9  Q. Was there a place for you to sit?
10 A. Yes, they put me to the left side of the van to
11 the front.
12 Q. Was it at that point you asked for your cane?
13 A. I asked for my cane after they basically got me
14 off the ground, after they threw me to the ground, that's
15 when Mr. Mooran said tough luck, figure it out. When they
16 put me into the van, I asked for the cane when I was
17 sitting down.
18 Q. Did any officer tell you that they had your cane?
19 A. No.
20 Q. How long were you in the van?
21 A. I don't know.
22 Q. An hour, more?
23 A. I honestly can't tell you. I don't know. We sat
24 there for a while and then they drove for a while, and then
25 they stopped and got other people in, and the whole time

1  while I was in there, I was not into my seat at all.  That
2  was another thing I had to go through despite the fact of
3  them yanking my cane away.
4      Q.     You were handcuffed with your hands behind your
5  back?
6      A.     Yes.
7      Q.     Seated on a bench?
8      A.     Yes, without a seatbelt.
9      Q.     Did you suffer any injuries during the ride?
10     A.     Injuries or not, it's the fact that I was placing
11 my legs on the seats across from me to keep myself from
12 sliding, but that aggravates the pain that I have from my
13 disabilities.
14     Q.     Were you taken to a police precinct?
15     A.     After they sat there for a while, rode around and
16 picked up other people, they finally took us to the
17 precinct.
18     Q.     Do you know how long you were in the van before
19 you got to the precinct.
20     A.     I don't know.
21     Q.     Tell me what happened when you arrived to the
22 precinct, the van stopped, what next?
23     A.     They had to help me out of the van.  They brought
24 me into the precinct.  I asked about my cane.  Nobody
25 responded to me.  The officers were holding me up.  One

1  officer left my left side and I believe it was Mooran, or
2  his partner, but I believe his partner was holding me on my
3  right side to keep me up.  I said make sure he holds me so
4  I don't fall.  Stood up there for a while.  I don't know
5  how long.  I know it's for a while, and then they brought
6  me to the desk, where the desk sergeant is at.  They took
7  my bag of stuff and started to empty contents in my bag
8  into the trash, took my wallet, counted my money, and then
9  --
10     Q.     Let me slow down just a little bit and take it
11  step by step.  Were you able to walk into the precinct on
12  your own?
13     A.     No, the officers helped me walk.
14     Q.     Did you have your cane at that point?
15     A.     No.
16     Q.     When you entered the precinct, were you asked or
17  told to stand or sit?
18     A.     I wasn't asked anything.  I was told to stand as
19  they held me.
20     Q.     You were told to stand as they, as you said, took
21  a look at your possessions?
22     A.     Yes.
23     Q.     What did you have with you at the time?
24     A.     I had my book bag that had campaign material,
25  personal documents.  I just came from TV signing of Rick

1  Ross.  I had my CD and autographed poster in there.  Just
2  personal stuff and my medication, like my inhaler and so
3  forth.
4      Q.    Did you ask anybody if you could take a seat?
5      A.    I asked is there anyway I could lean on something
6  or sit down.
7      Q.    What did they say?
8      A.    I got no response.  They just held me up.
9      Q.    They were holding you up during this time?
10     A.    Yes.
11     Q.    Did you ask about your cane at the precinct?
12     A.    I told them that I needed my cane again.
13     Q.    What did they say to you?
14     A.    Got no response.
15     Q.    Did you ask for any other type of accomodation?
16     A.    No, I just needed my cane.  That's what I need to
17 walk and that's what I needed.
18     Q.    So you said they went through your backpack and
19 you said they threw some stuff in the trash?
20     A.    Yes, they were taking stuff out and going through
21 the trash.  I asked him why is he doing that, and he
22 continues to do it.
23     Q.    Did they voucher any of your items?  Did they
24 make a list, that sort of thing?
25     A.    No, they took the bag, gave it to the desk

1  was trying to strike up a conversation as I was being held
2  up in the cell.
3      Q.    So you know Police Officer Slater from 2016?
4            MR. RANKIN:  Just to be clear, the confusion
5         on this is our end, Slater is the guy who we have
6         the 2016 New York State lawsuit against.  His
7         name showed up in the caption which we then
8         removed.  That only relates to that 2016 arrest.
9            MR. TOEWS:  Thank you.
10     Q.    Are you familiar with something called Cop Watch?
11     A.    Yes.
12     Q.    What is Cop Watch?
13     A.    Basically anybody, any group that records
14 interaction between the community and cops.
15     Q.    So it's an organization?
16     A.    Cop Watch is people or groups, like Cop Watch is
17 not something that anybody owns, anybody can be cop
18 watcher.
19     Q.    I understand that anybody can watch a cop or
20 video a cop, but is Cop Watch a group that meets, that has
21 some sort of organization or structure?
22            MR. RANKIN:  Over objection.  You can
23         answer.
24     A.    There's groups that have cop watches in them.
25 They call themselves Cop Watch.  There's numerous

1   throughout the city.
2   Q. Are you apart of one of those groups?
3   A. I'm on Cop Watch patrol, yes, I am.
4   Q. Say that one more time.
5   A. I am a Cop Watch patrol unit.
6   Q. What is that?
7   A. Cop watchers that watch the police interaction
8   between community members and the police.
9   Q. What does that involve?
10  A. Basically, recording any interaction between the
11  police and the community, whether you have a phone or
12  whatever type of recording device to record.
13  Q. How many other members are in your --
14          MR. RANKIN: Objection. Is it like
15          membership numbers? What are we doing here? I'm
16          getting nervous.
17          MR. TOEWS: No need to get nervous. I'm
18          trying to understand that Mr. Beckford said it's
19          not an organization, that anybody could be a cop
20          watcher. He said he was a part of a Cop Watch
21          patrol unit. I don't know what that is.
22          MR. RANKIN: I'm fine with a couple general
23          things here. I assume they're relevant. It's
24          your deposition, but.
25          MR. TOEWS: He was arrested while filming

1  cops and he's a member of a Cop Watch patrol
2  unit, so yeah, I want to understand better what
3  that involves.
4      MR. RANKIN: I'm not trying to jump in your
5  deposition. You understand why my blood pressure
6  is rising a little bit, but okay.
7  A. I don't know the number of members. I don't deal
8  with memberships. I go out there. If there's an
9  interaction between the police and the community, I record
10 it.
11 Q. How often do you do that?
12 A. Whenever I'm outside or if I see something
13 through my window.
14 Q. What do you do with the video?
15 A. If it's a video that shows a positive
16 interaction, there's no need for me to keep it. If it's a
17 video that shows an officer doing something wrong, we let
18 the police know about it, file a complaint if need be or I
19 just put it out there so people can know what's going on in
20 our communities.
21 Q. When you say file a complaint, do you mean with
22 the NYPD or anything else?
23 A. Anything, tagging someone on social media who
24 maybe NYPD.
25 Q. Did you file any complaints with respect to this

1  police gave you?
2      A.    Yes.
3      Q.    You see at the bottom statement that this is not
4  your handwriting, right?
5      A.    No, it's not.
6      Q.    You see where it says I am filming?
7      A.    Yes.
8      Q.    Did you give that statement to the police at some
9  point?
10     A.    To be honest, I can't remember.
11     Q.    Taking a look at page 2, do you recognize this
12 portion of Defendant's Exhibit B?
13     A.    Yes, that's the DAT.
14     Q.    So you were given this as well?
15     A.    I believe that was on the other side of it,
16 something like that.
17     Q.    I just want to take a look quickly at the portion
18 of the document about two thirds of the way down in the box
19 that begins with the words factual allegations.
20     A.    Mm-hmm.
21     Q.    I'm going to read to you what I believe that it
22 says, although, I will leave out some words that are
23 difficult to read.  TPO time, place, occurrence, DEF, which
24 I understand to be defendant, came in close contact with me
25 while I was trying to maintain a safety perimeter around a

1   A. Well, they threw me on my shoulder, and kneeled
2  on my back and so forth. When they threw me down, my head
3  hit the steel grate on the ground. I suffered a
4  concussion. The doctor's noted it's a concussion and
5  assault. They had to give me a shot in my shoulder for the
6  pain. They gave me anti-inflammatories.
7   Q. If I understand you correctly, you suffered
8  shoulder pain and a concussion; is that right?
9   A. Yes.
10  Q. Any other injuries?
11  A. That's the ones I went to the hospital with and
12 the ones they took care of.
13  Q. You went to the hospital after released from the
14 precinct?
15  A. I went to the hospital the same morning. So I
16 was released from the precinct early in the morning and I
17 went to the hospital that morning.
18  Q. Who diagnosed you with a concussion?
19  A. The doctor in the hospital.
20  Q. That's at SUNY Downstate in Brooklyn?
21  A. Yes.
22  Q. Did they give you any diagnosis concerning your
23 shoulder?
24  A. No because they just said okay, you have pain,
25 they knew about my shoulder, they gave me a shot for the