# EXHIBIT 2

1

2          UNITED STATES DISTRICT COURT

3          EASTERN DISTRICT OF NEW YORK

4

MILAN HEGGS, ROY BECKFORD and  )

5  PHILIP LEGREE, individually    )

and on behalf of a class of    )

6  all others similarly situated, )

DISABILITY RIGHTS NEW YORK      )

7  and DISABLED IN ACTION,        )

                               )

8                  Plaintiffs,   )

                               ) Civil Action No.

9          -against-            ) 17-CV-03234(RJD)(TAM)

                               )

10  THE CITY OF NEW YORK, et al.,  )

                               )

11                  Defendants.   )

-------------------------------)

12

13

14

15                  REMOTE

16        DEPOSITION OF PHILIP LEGREE

17          Monday, January 31, 2022

18

19

20

21

22

23

24  Reported by:

FRANCIS X. FREDERICK, CSR, RPR, RMR

25  JOB NO. 205234

P. LE GREE

1              P. LE GREE
2     A.   L-A-W-R-E-N-C-E.
3     Q.   Do either of your children live
4  with you?
5     A.   My daughter right now.
6     Q.   Does your son live with you?
7     A.   No.
8     Q.   Where does your son reside?
9     A.   Atlanta, Georgia.
10    Q.   Now, earlier, sir, you gave me
11 your address in the Bronx where you currently
12 reside. How long have you currently resided
13 at that address?
14    A.   Well, I resided here -- I think I
15 moved here in 2016. But -- or 2000 -- was it
16 '16? Might be 2000 -- yeah, '16. But I was
17 living in the same building and I moved to
18 another apartment which you'll see on some of
19 those -- that document with apartment number
20 15G.
21    Q.   I see. So when you moved to your
22 building in 2016 you lived in apartment 15G
23 and at some point thereafter you moved to 6B;
24 is that correct?
25    A.   No. When I moved to my building I

1              P. LE GREE
2  moved -- first I went to -- when I first moved
3  in I went to three different apartments. 6E
4  was my first apartment in 1993. Then I went
5  to 15G. And now I'm back at 6B.
6     Q.   And are all of these three
7  apartments in the same building, sir?
8     A.   Yes, it is. Yes, they are.
9     Q.   So you moved to your current
10 building in 1993.
11    A.   Um-hum.
12    Q.   Do you own or rent your apartment?
13    A.   Rent.
14    Q.   Are there any stairs in your
15 apartment, sir?
16    A.   There's a staircase. But I have
17 elevators.
18    Q.   And do you use the staircase in
19 the building?
20    A.   No. I'm not able to use the
21 staircase. I use the elevator.
22    Q.   And you told me you're currently
23 in apartment 6B. Is that on the sixth floor?
24    A.   Yes.
25    Q.   And at the time that you lived in

1              P. LE GREE
2  apartment 15G in your building did you use the
3  stairs?
4     A.   No. I used the elevator. Fifteen
5  flights is not something you want to climb up.
6     Q.   Does your wife currently live in
7  your apartment?
8     A.   No. She's down south. In
9  Atlanta.
10    Q.   What is your highest level of
11 education, sir?
12    A.   I have two years of college taking
13 up electrical engineering technology.
14    Q.   I just want to make sure I'm
15 taking this down correctly, sir.
16        Did you say electrical engineering
17 and technology was your focus?
18    A.   It's called electrical engineering
19 technology.
20    Q.   I see. And where did you do that
21 two years of college, sir?
22    A.   At Bronx Community College.
23    Q.   Did you attain any degree from
24 Bronx Community College?
25    A.   No. I came on out and I decided

1              P. LE GREE
2  to go to work and take up the job title
3  electrical helper. And then from there I went
4  to signal maintainer.
5     Q.   Other than the two years of
6  college that you spent studying electrical
7  engineering technology, do you have any other
8  vocational training?
9     A.   Well, yeah. I took up electrical
10 in high school. That was my major.
11    Q.   Did you go to high school in New
12 York City?
13    A.   Yes, I did.
14    Q.   Which high school did you go?
15    A.   Chelsea Vocational High School.
16    Q.   And you studied electrical
17 engineering in high school?
18    A.   Yeah, I studied electrical, right.
19    Q.   Do you hold any licenses, sir?
20    A.   Do I hold any licenses?
21    Q.   Yeah. Let me restate that.
22        Do you hold any professional
23 licenses?
24    A.   No. I just -- I went to schooling
25 and I -- I don't know if you -- I guess they

P. LE GREE

BY MS. MARCOCCIA:

Q. Do you know the amount of disability benefits you collected in or about 2020, sir?

A. No, I don't know.

Q. So earlier when you said your disability is your legs, can you be more specific, sir?

A. My patellar ruptured and my quad tendon ruptured. It was a surgical repair. A allograft was added in the left leg. My ability to walk and run like I used to is not there.

Q. And, sir, when you said you had your patellar tendon and your quad tendon repaired, that repair was done at the Hospital for Special Surgery; is that right?

A. Yes. On May 20th, 2014.

Q. Do you use any assistive device?

A. A cane.

Q. When did you start using a cane?

A. After I stopped using the walker I started using the cane at the end of 2015 -- '14. End of 2014.

P. LE GREE

Actually, I'm sorry. Yeah. The end of 2014. Going into 2015.

Q. End of 2014 going into 2015, that's when you started using the cane; is that right?

A. Yeah. They started training me to use a cane when I went from the walker to the cane. In the physical therapy.

Q. And prior to your use of the cane at the end of 2014 into the beginning of 2015, and you mentioned that you used a walker prior to that; is that right?

A. Yeah.

Q. For what period of time did you use a walker?

A. From maybe July, August of 2014 till about December of 2014.

Q. Other than using a walker from in or about July or August of 2014 to about December of 2014 and your use of the cane starting at the end of 2014 and into 2015, have you ever used any other assistive devices?

A. No.

P. LE GREE

Q. Have you ever used any leg braces?

A. Yeah. I had those on when I was in the -- right after they did the surgery they had the braces on my leg.

Q. Have you ever used any leg braces other than immediately after your surgery in 2014?

A. No.

Q. Do you have a prescription for your cane?

A. I didn't know you needed a prescription for a cane. I just have a cane -- I have a cane. I'm sorry. I'm confused. I didn't know you needed a prescription for a cane. Maybe that's one of them high low ones. I just have a regular cane that I walk with.

Q. So no one ever prescribed a cane for you or told you that you should use a cane; is that right?

A. No. The people at Beth Abraham Hospital told me that I would need -- you know, they let me practice with a cane but when I left I left out using the walker. And

P. LE GREE

then gradually as I did physical therapy at Symmetry in Pelham, New York, gradually they was able to get me from the walker to the cane with the physical therapy.

Q. And so did I hear you correctly that you said after your surgery you did physical therapy in Pelham, New York; is that right?

A. I had physical therapy at Beth Abraham in the Bronx about two blocks away from me. And then from there I had physical therapy at Symmetry Physical Therapy in Pelham, New York.

Q. What was the name of the physical therapy facility, sir?

A. Symmetry.

Q. How do you spell that?

A. S-Y -- I might not spell it right. Let me see if I have anything with the name.

(Pause on the record.)

A. I'll get back to you on the proper spelling of that.

Q. That's fine, sir. We can just leave a blank in the transcript and you can

P. LE GREE

1
2     Q.   Okay.  So you stayed there.  You
3  didn't go home after you had your surgery; you
4  went to Beth Abraham.  Is that right?
5     A.   Right, right, right.
6     Q.   Okay.  And at the end of 2014 when
7  you left Beth Abraham you went home and you
8  started to do physical therapy at the Symmetry
9  facility; is that right?
10    A.   Yeah.
11    Q.   Okay.  Thank you for clarifying
12  that.
13        Mr. LeGree, do you use a cane to
14  get around your apartment?
15    A.   Depending on how I'm feeling, but
16  most times I can get around without it because
17  maybe I'm leaning on a wall or something like
18  that.  And a sofa chair and all that.  But I
19  use the cane -- but definitely I do not go
20  outside without the cane.
21    Q.   And about how far are you able to
22  walk without the cane?
23    A.   I don't chance that.  That's
24  like -- in other words, I would not do a block
25  without the cane.  You know, I'm too -- I'm

P. LE GREE

1
2  too shaky with that.
3     Q.   And just for the sake of clarity,
4  you don't -- or strike that.
5        You don't use any assistive device
6  currently other than a cane; is that right?
7     A.   No, that's it.
8     Q.   And since the time that you were
9  doing physical therapy at Symmetry you had not
10  used any assistive device other than a cane;
11  is that correct?
12    A.   That's correct.
13    Q.   So earlier when you referred to
14  using a walker and leg braces, that was just
15  immediately after your surgery in 2014; is
16  that correct?
17    A.   Right.  But now I want you to
18  understand, when I went to -- let me take you
19  through that.  When I came from Beth -- from
20  Hospital for Special Surgery to Beth Abraham,
21  they had my legs in a -- watch you call it --
22  in a wheelchair sticking straight out.  Right?
23  You know, I couldn't even put them down like a
24  person would normally but them down in an
25  wheelchair.  So they were straight out.  So it

P. LE GREE

1
2  took a while because after he performed the
3  surgery, I'm going to say a good three weeks
4  or better, before they were able to go down.
5  And when they went down, they would -- you
6  know, it was painful, very painful.
7        So -- and then when I got to --
8  let me see -- yeah, then I had to go through
9  the procedure of telling me to attempt to
10  stand.  You know?  And at that time when I
11  stood, I didn't -- it had been -- the last
12  time I had stood was the day of the accident,
13  which was on the 27th of March.  And I don't
14  think I stood until -- what was that?  I would
15  say about -- I would say about August when I
16  stood for the first time and then they was
17  giving me therapy in there.
18    Q.   August of 2014?
19    A.   Yeah.
20    Q.   And so August '14 was the first
21  time --
22    A.   It might be -- you know what?  It
23  might be -- say September.  Say September
24  because I didn't leave there till December.
25  But it took me a little while before the --

P. LE GREE

1
2  you know what I mean?  Because, remember, I
3  had just come out of surgery.  And you, you
4  have to -- remember, I was on a bed pan, you
5  know, because I couldn't walk.  I was on a bed
6  pan there at Beth Abraham.
7     Q.   So if I understood you correctly
8  you're saying that was not until August or
9  September of 2014 that you stood for the first
10  time after your surgery?
11    A.   Right.  Stood.  And then sat back
12  down.  And then -- and then they would
13  gradually work in to have me, you know, with
14  the legs, move the legs little by little.
15    Q.   Other than the knee injuries that
16  you described earlier, namely the injury to
17  your quad tendon in your right knee and your
18  injury to your patellar tendon in your left
19  knee, did you sustain any other injuries in
20  March of 2014?
21    A.   No.
22    Q.   Prior to your surgery at Hospital
23  for Special Surgery in or about May of 2014,
24  had you ever had any other surgeries?
25    A.   Prior to leaving -- you mean with

P. LE GREE

1
2     Q.   Is that correct?  Is that when you
3  were arrested by NYPD in August of 2019?
4     A.   Yes.
5     Q.   And can you tell me what you were
6  doing immediately prior to the incident that
7  led to your arrest?
8     A.   Yes.  I was waiting in the car for
9  the police to come.
10    Q.   And what prompted you to wait in
11 your car for the police to come?
12       MS. STERN:  Objection, relevance.
13    You can answer, Mr. LeGree.
14    A.   There was a car stopped short and
15 the car tapped they car.
16    Q.   I'm sorry, sir.  I couldn't quite
17 hear that.  Could you please repeat that?
18    A.   A person stopped short and
19 double-parked and the car tapped their car.
20    Q.   I'm not sure I understand.  Were
21 you involved in some sort of a vehicle
22 accident?
23    A.   Yeah.  It wasn't no big thing.  It
24 was a (audio distortion.)
25    Q.   I'm sorry, sir.  We're losing you.

P. LE GREE

1
2  Could you -- and also we need to get your
3  video back, sir.
4       MS. STERN:  The problem is that
5    when he looks on his phone at your screen
6    the video won't go through anymore.
7       MS. MARCOCCIA:  Okay.  If that's
8    what it is.  Otherwise, I'd like to have
9    the plaintiff witness in view.
10    Q.   But if it's easier for you, Mr.
11 LeGree, to view the document this way, that's
12 fine.
13    A.   Yeah, that's what I want.
14       But for the moment, I'm just
15 asking you in general about -- because if I
16 can direct you to paragraph 112 it refers to a
17 vehicle collision.
18       Do you see that, sir?
19    A.   Yeah.
20    Q.   Okay.  How many vehicles were in
21 involved in the collision?
22    A.   Just two.
23    Q.   And how was your vehicle involved
24 in the collision?
25    A.   It was a tap.  I wouldn't even

P. LE GREE

1
2  call it a collision.  It wasn't even no mark
3  on their vehicle.  It wasn't...
4     Q.   So you would object to the
5  articulation in paragraph 112 of the
6  incident as a collision.  Is that fair?
7     A.   They can use the word collision.
8  It's a tap.  But it wasn't no damage, like,
9  you know, so I guess if you have -- you know,
10 you could hit something and bump it and I
11 guess a person could use the word collision.
12 You know what I mean?  But depending on how
13 involved --
14    Q.   So whose car hit whose?  Were you
15 the vehicle that was hit or was it your
16 vehicle that ran into the other vehicle?
17       MS. STERN:  I renew my objection
18    to this line of questions.  But, Mr.
19    LeGree, you can answer.
20    A.   I mean, really, I don't know.  I'm
21 a little difficult with answering that because
22 I don't know what that has to do with what we
23 talking about at hand.
24    Q.   Well, you don't have to worry
25 about that, sir.  I mean, I ask the questions

P. LE GREE

1
2  and your attorney, if she'd like to interpose
3  any objection and preserve that for the
4  record, she can do that.  But, you know,
5  unless she instructs you not to answer you
6  have to answer the question.  And, frankly, if
7  she did you instruct you not to answer that I
8  think that would be inappropriate.
9     A.   Okay.  Next question.
10    Q.   Right.  So the question was how
11 was your car involved in the collision or the tap
12 as you put it.  I'm just trying to understand
13 how your vehicle was involved in the incident.
14    A.   The person stopped short and the
15 car just tapped it, that's all.
16    Q.   So you're saying the person in
17 front of you stopped short and your vehicle --
18    A.   Yeah, they stopped short and
19 double-parked.
20    Q.   So if I understand correctly, so
21 the vehicle in front of you stopped short and
22 then your car hit the vehicle in front of it
23 in some fashion; is that right?
24    A.   Yes.
25    Q.   And what happened after your

P. LE GREE

1  P. LE GREE
2  vehicle hit the vehicle in front of it?
3      MS. STERN:  Again, note my
4  objection but, Mr. LeGree, you can
5  answer.
6      A.   I don't feel good about rehashing
7  that because I was very upset about what
8  happened.  So I really -- this is more or less
9  like rehashing this incident which has nothing
10  to do with how I was treated by NYPD.
11      Q.   Well, it's part of your claim,
12  sir.  So I'm entitled to ask you about it.
13  I'm asking you about the vehicle collision
14  that is referred to in paragraph 112.  So I
15  would just like -- while I don't have to get
16  into the ins and outs of it I would like to
17  understand -- you've already told me that your
18  vehicle hit a vehicle in front of it in some
19  fashion.  And so if you could please just
20  explain what happened immediately thereafter
21  for me.
22      MS. STERN:  Perhaps let's go off
23  the record briefly.  I'm going to call
24  Mr. LeGree, and we'll go right back on.
25      MS. MARCOCCIA:  Well, I don't

P. LE GREE

1  P. LE GREE
2  really want to do it while my question is
3  pending.  I mean, can he just give me an
4  answer as to what happened immediately
5  thereafter.  These aren't trick
6  questions.  I'm really just trying to
7  understand what's in the Complaint.
8  So --
9      MS. STERN:  I mean, again, as to
10  my objection, it is irrelevant to the
11  point of this claim.  We're just talking
12  about the process of his arrest, not the
13  underlying arrest itself and the offense
14  that led up to it.
15      But, again, Mr. LeGree you could
16  answer.
17      A.   Yeah, I would refrain from
18  answering.  I feel uncomfortable answering
19  that.
20      Q.   Well, I'm sorry, Mr. LeGree.  You
21  can't refrain from answering.  Your lawyer
22  just told you that you have to answer and
23  so -- look, as I said, these aren't trick
24  questions.  I'm not trying to trick you.  I'm
25  just trying to understand what's in the

P. LE GREE

1  P. LE GREE
2  Complaint in regards to what you're claiming.
3  That's all.  And, again, I understand you
4  haven't reviewed this document.  But I just --
5  because this language is in the document I
6  have to ask you about it.
7      So if you could please just --
8  what happened immediately after your car hit
9  the car in front of it?  Did you call -- did
10  someone call the NYPD?
11      A.   Yes.
12      Q.   Did you call NYPD or was it the
13  other person in the other vehicle?
14      A.   The other person did.
15      Q.   And at some point did NYPD appear
16  on the scene?
17      A.   Yes.
18      Q.   And how many officers from NYPD
19  appeared on the scene?
20      A.   Two.
21      Q.   Did you say two, sir?
22      A.   Yes.
23      Q.   And what happened when the two
24  officers appeared on the scene?  Did you talk
25  to either of the officers?

P. LE GREE

1  P. LE GREE
2      A.   Yeah.
3      Q.   What did you say to the officers?
4      A.   They asked me to step out the car.
5  And I told her I had to get my cane.  And when
6  I went to get my cane, because of the way that
7  I walk, she turn around and assumed whatever
8  and then put the handcuffs on me.  You know,
9  so...
10      Q.   I didn't get the full answer.  I
11  don't know if the court reporter did.
12  Otherwise, if you did, Mr. Frederick, if you
13  got it, if you could read it back to me.
14  Otherwise, I'll ask Mr. LeGree to repeat it.
15      THE COURT REPORTER:  His audio was
16  pretty distorted.
17      MS. MARCOCCIA:  Okay.
18      Q.   Mr. LeGree, would you mind
19  repeating that?  It kind of trailed off for
20  some reason.  Mr. LeGree, could you repeat
21  your answer for me and the court reporter so
22  we make sure he takes it down accurately.
23      A.   Yeah.  She asked me to get out of
24  my vehicle.  And I said I had to get my cane
25  but then when I got out, you know, to get my

P. LE GREE

1  
2  cane, which was in the back seat, she turn
3  around and she put the handcuffs on me.
4     Q.   And what happened after the
5  handcuffs were put on you?
6     A.   They took me to the police car and
7  took me to the precinct.
8     Q.   And did the officers take your
9  cane with you when you all went to the
10 precinct?
11    A.   Yeah.  She brought the cane.
12    Q.   And how did you get from your
13 vehicle to the police vehicle?
14    A.   Walking with me with my hands
15 behind my back.
16    Q.   Did you walk with any assistance
17 from the police officer or did you walk on
18 your own?
19    A.   No.  She was holding me.
20    Q.   And after you were in the police
21 vehicle and they took you to the precinct, how
22 did you get from the police vehicle -- well,
23 actually, strike that.
24       Do you remember which police
25 precinct they took you to?

P. LE GREE

1  
2     A.   49th.
3     Q.   And that's in the Bronx, correct?
4     A.   Yes.
5     Q.   And when you got to the 49th
6  Precinct how did you get from the police
7  vehicle inside the precinct?
8     A.   By walking alongside me.
9     Q.   And was it one officer or both
10 officers that walked alongside you?
11    A.   One.
12    Q.   And did that officer help, you
13 guide you into the precinct?
14    A.   The one officer?
15    Q.   Yes, sir.
16    A.   Yeah.
17    Q.   So was there any time that you --
18 from the time that you were in your vehicle
19 and the police arrived to the time that you
20 were at the precinct that you walked on your
21 own without assistance from an officer?
22    A.   No.
23    Q.   And when you were at the precinct,
24 sir, what happened next?  When you got
25 precinct what happened next?

P. LE GREE

1  
2     A.   I had to wait in a cell.
3     Q.   So were you taken to a cell
4  immediately after -- upon entering the
5  precinct.
6     A.   Um-hum.
7     Q.   And were there other people in the
8  cell that you were put in?
9     A.   No.
10    Q.   So you were by yourself?
11    A.   Yes.
12    Q.   And at that point in time did you
13 have your cane with you?
14    A.   No.  They took my sweat pants
15 because they told me that I could use my
16 string in my sweat pants to hang myself so
17 they took them away from me so I was in my
18 underwear.
19    Q.   At any time while you were at the
20 precinct did you ask for your cane?
21    A.   Yes, I asked for my cane.
22    Q.   And who did you ask for your cane?
23    A.   The officer.
24    Q.   The same officer that guided you
25 into the precinct?

P. LE GREE

1  
2     A.   Um-hum.  But they didn't want me
3  to have my cane in the cell because they look
4  at the cane as a weapon.
5     Q.   So the officer told you that she
6  didn't want you to have the cane in your cell
7  because it could be used as a weapon; is that
8  right?
9     A.   Just like they didn't want me to
10 have my sweat pants on because she felt that
11 string that you tie your sweat pants with, she
12 felt that was weapon for me to kill myself.
13    Q.   And this female officer that
14 helped you into the precinct and gave you this
15 information, do you know her name?
16    A.   Tatatone or something like that.
17    Q.   Does the same Theresa Tartarone --
18    A.   That's it.
19    Q.   Is that the name?
20    A.   Yes.
21    Q.   Okay.  And so Officer Tartarone
22 was the officer that helped guide you into the
23 precinct and then also processed the
24 information while you were there; is that
25 right?

P. LE GREE

1
2    A.   That's right.
3    Q.   And while you were in the precinct
4 did you talk any other officer besides Ms.
5 Tartarone?
6    A.   No.
7    Q.   What about the other officer that
8 you said arrived on the scene; was that a male
9 or a female?
10   A.   Female.
11   Q.   And do you know that officer's
12 name?
13   A.   I don't remember her name.
14   Q.   Did you talk to that officer at
15 all?
16   A.   I didn't have no real dialogue
17 with her but that was the one that took my
18 wallet.
19   Q.   And did she say anything to you?
20   A.   We didn't really have no -- too
21 much conversation.
22   Q.   And when you say she took your
23 wallet, do you mean for it to be vouchered?
24   A.   Yeah.
25   Q.   Did you have any other property

P. LE GREE

1
2 with you that was vouchered other than your
3 wallet?
4    A.   My chain.
5    Q.   Anything else?
6    A.   Maybe a ring.
7    Q.   And if you look at paragraph 120,
8 sir, I just scrolled to it.  I could make it
9 larger if you need me to.  So let me know if
10 you can't see it.  But it's on page 28.  It's
11 paragraph 120.
12       So earlier you told me that
13 Officer Tartarone helped guide you and helped
14 you walk from the police vehicle to the
15 precinct and your cell.
16       Paragraph 120, however, says that
17 the officers ordered you to exit the vehicle
18 and walk the distance to the precinct?
19   A.   No, I didn't put that down.  I
20 mean -- no, no.  Exit the vehicle and walk the
21 distance.  Yeah, yeah.  Ordered Mr. LeGree to
22 exit the vehicle and walk the distance to the
23 precinct.  Yeah.  And I walked the distance
24 with her with my hands behind my back.  And
25 her walking behind me up them steps.

P. LE GREE

1
2    Q.   Okay.  But at all times it sounds
3 like Officer Tartarone helped you and kept you
4 steady as you were walking inside the
5 precinct; is that correct?
6    A.   Yeah.  She had it with attitude
7 and had to -- she's shorter than me.  I'm 6-1.
8 You know, so she just -- like I said, I would
9 have felt better with my cane but she was
10 trying to rush me but I was like, Yo, you got
11 my cane, you know, so I couldn't...
12   Q.   But she never let you walk on your
13 own, correct?  She was always there to guide
14 you; is that right?
15   A.   She was there.
16   Q.   And then if I could refer you,
17 sir, another paragraph.  It's paragraph 116.
18 It says: "Mr. LeGree could not sit straight
19 in the back of the police vehicle and had to
20 lie at an uncomfortable angle with his hands
21 cuffed behind his back."
22       Do you see that, sir?
23   A.   Yeah.  That's correct.
24   Q.   And can you elaborate for me what
25 it was that was uncomfortable about sitting in

P. LE GREE

1
2 the police vehicle?
3    A.   I'm 6-1.  My legs, the way they
4 have the back is pushed up I believe
5 deliberately to make it uncomfortable for you
6 back there.  So I was like I said with my
7 knees crunched up against that it was painful.
8 You would have to be able to lay alongside,
9 alongside, sideways in order not to be hurt
10 and crunched up in back of that police
11 vehicle.
12   Q.   During the time that you were the
13 police vehicle did you ever tell either of the
14 officers that you were uncomfortable?
15   A.   Yeah, they know that.  They don't
16 care about that.  I don't know why we acting
17 like this is a mystery.  They don't care.
18   Q.   I'm asking you if you ever
19 communicated that specifically --
20   A.   Yeah, yes, yes.  I'm sorry.  If
21 I'm getting --
22   Q.   And what did you say?
23   A.   They didn't say anything.  They
24 don't care about that.  They don't care about
25 that.

P. LE GREE

1
2      Q.   What did you say, sir?  That's
3  what I'm asking.
4      A.   I said it's uncomfortable back
5  here.  I'm putting myself in here sideways.
6  They were just not caring about it.  They were
7  very non-caring.  And it was like -- and I'm
8  not making this up.  I got no thing against
9  the police.  Actually, I went to the appeal
10  for the last two that was killed.  But these
11  particular ones, they just didn't care.
12  That's what I experienced.  You know.
13      Q.   Prior to the incident that led to
14  you being in the back of this police vehicle,
15  did you sit in the back seat of any vehicle?
16      A.   No.  No, no, no, no, no.
17      Q.   Is it fair to say that, generally
18  speaking, you would perhaps have some
19  discomfort given your size sitting in the back
20  of any vehicle?
21      A.   No, no, no, no, no, no.  No, no.
22  Let's not get into.  I can sit in the back
23  seat of my vehicle and I can be okay.  The
24  back seat of that vehicle, the police vehicle,
25  is designed -- and it'll come out -- is

P. LE GREE

1
2  designed deliberately to turn around and
3  make...
4          (Audio distortion.)
5      Q.   You're cutting out, Mr. LeGree.
6  You're trailing off again.  I didn't get the
7  response.  Could you start over?
8      A.   Yeah.  I said that particular
9  vehicle was designed specifically to make it
10  uncomfortable for the passenger in the back
11  seat, which is more than likely going to be
12  that person that they arrest.  All you have to
13  do is take the measurement.  I know a Ford
14  Explorer and I know what a Ford Explorer is
15  like when it's not a police vehicle.  And I
16  know now with the police vehicle the Ford
17  Explorer is, like -- there's not enough room.
18  And that's a tactic.  That's a tactic.  It
19  will come out.  Like I said --
20      Q.   So, Mr. LeGree, I just want to
21  understand.  So the type of police vehicle
22  that you were in, are you saying it was a Ford
23  Explorer; is that right?
24      A.   Yeah.
25      Q.   And is that -- could you tell me

P. LE GREE

1
2  what type of a vehicle -- is that an SUV?
3      A.   Yeah.  That's an SUV.
4      Q.   And do you know the dimensions of
5  the back?  Did you take any kind of a --
6      A.   Listen to me.  I know the
7  dimensions.  I've been to the Ford dealership.
8  I've sat in the Ford Explorer in the front and
9  in the back.  And when I sat in the back of
10  that Explorer, that is designed deliberately
11  to frustrate and humiliate the person that's
12  the prisoner in the back.
13      Q.   Okay.  I'm going to -- Mr. LeGree,
14  that's not responsive and I'm going to ask
15  that it be stricken -- I'm going to request
16  that be stricken from the record.  That's not
17  what I asked you.
18      A.   Oh, you can stricken it but, you
19  know, you got to remember something.  You're
20  telling me to relive something and I'm
21  reliving it to you.  So I'm not going to be as
22  pleasant about it because they didn't make it
23  as pleasant for me back there.  So I'm just
24  telling you straight up how I feel.  Like I
25  said, I wasn't -- I understand you don't want

P. LE GREE

1
2  to hear it because it's not in the best
3  interest because you're on the other side but
4  I'm just --
5      Q.   No, Mr. LeGree, I want to get
6  your -- Mr. LeGree, let's be clear.  I want to
7  get your accurate testimony but that's not
8  what I asked you and, frankly, you have no
9  basis for saying what you just said.  So
10  what --
11      A.   So you don't want to --
12      Q.   Let me ask you this.  Let me ask
13  you this.  It's my deposition, Mr. LeGree,
14  with all due respect.
15          On what do you base your statement
16  that somehow the police vehicle is designed
17  to -- strike that.
18          At the time of your arrest, sir,
19  you said you're 6 foot 1.  How much did you
20  weigh at the time?
21      A.   317.
22      Q.   And you referred earlier to being
23  in a Ford Explorer on another occasion, not a
24  police vehicle, but another Ford Explorer; is
25  that right?

P. LE GREE

1
2     MS. STERN:  Let's move on if we
3  can.
4     Q.   So, Mr. LeGree, just for the sake
5  of clarity of the record, did you or did you
6  not have more than two shots of cognac on the
7  day that you were --
8     A.   Ma'am, please move on, Rachel.
9  Please move on with that.
10    Q.   Sir, do you -- okay.  Let me take
11 you back to the Complaint for a moment.  If
12 you'll bear with me I'll put that up again on
13 the screen.
14       And you should be able to see in a
15 moment I've put back what I marked earlier as
16 Defendant's Exhibit 1.
17       And do you see there, sir, in
18 paragraph 122 it says -- oh, I'm sorry.  Yes,
19 in paragraph 122 it says "The officers again
20 scolded Mr. LeGree for not walking quickly."
21    Do you see that, sir?
22    A.   Yes, I see that.
23    Q.   Was there a time that the officers
24 scolded you for not walking quickly?
25    A.   Yes.

P. LE GREE

1
2     Q.   And what did they say to you?
3     A.   Come on.  You're not walking quick
4  enough.  That's what they said basically.
5     Q.   And who said that to you?  Which
6  officer?
7     A.   The one that I mentioned her name.
8  Tartarone.
9     Q.   Did the other officer say anything
10 to you?
11    A.   No, because she had driven the
12 other car.
13    Q.   So you never engaged in any
14 conversations with the other officer, correct?
15 Only with Ms. Tartarone, correct?
16    A.   Right.
17    Q.   Now, if I could please direct your
18 attention to paragraph 114, that says, "One of
19 the NYPD scolded Mr. LeGree for his
20 difficulties in entering the police vehicle."
21    Do you see that?
22    A.   Yes.
23    Q.   At any point in time did Ms.
24 Tartarone scold you for having any
25 difficulties in entering the police vehicle?

P. LE GREE

1
2     A.   Yes, she did.
3     Q.   What did she say to you?
4     A.   Told me that I had to get in
5  there, I wasn't getting in there quick enough
6  for her.
7     Q.   And did any of that have to do
8  with the fact that you had been drinking, sir?
9     A.   No.  Had the fact to do with it
10 was too small.
11    Q.   Were you injured at all in the
12 accident prior to the arrest in 2019?
13    A.   No.  It wasn't that type of
14 accident.
15    Q.   And did there come a point in
16 time, sir, where you left the cell in the
17 precinct and went to Central Booking?
18    A.   Yes.
19    Q.   And about how long were you in the
20 cell before you went to Central Booking?
21    A.   I don't remember.
22    Q.   If I could please direct your
23 attention to paragraph 124, the Complaint
24 says: "Once inside the precinct, Mr. LeGree
25 was placed in a cell alone for three to four

P. LE GREE

1
2  hours."
3     Do you see that, sir?
4     A.   Yes.
5     Q.   Do you have a recollection of
6  being in the cell for three to four hours?
7     A.   Yeah, because they got me there
8  about 1 now something.  And I think they took
9  me down there about 5, 6 in the morning.
10    Q.   And when you say took you down
11 there, do you mean Central Booking?
12    A.   That's correct.
13    Q.   And at the time that you -- while
14 you were ten precinct in the cell, did you ask
15 any officer for anything?
16    A.   Where at?
17    Q.   While -- during the time that you
18 were in the precinct in the cell, did you, for
19 example, ask to use the restroom?
20    A.   No.
21    Q.   Did you ask for anyone to do
22 anything else for you?
23    A.   No.
24    Q.   So during the time that you were
25 in the cell at the precinct, did you have any

P. LE GREE

1 do that on your own that I got to ask if you
2 see me and I'm not moving fast enough that you
3 would assist me. So for me to ask that
4 question to me is irrelevant.
5     Q.    Okay. Well, I mean, I appreciate
6 your impression, Mr. LeGree, but I'm asking
7 you if you asked either of the two officers --
8     A.    No, I did not ask for they help.
9     Q.    And once you were out of the
10 vehicle how did you get into Central Booking?
11 Did an officer also -- did Ms. Tartarone again
12 assist you to get into Central Booking?
13     A.    I had to go and go up some steps.
14 And, like I said, just walk alongside me with
15 my hands handcuffed behind by back.
16     Q.    So that was still Ms. Tartarone
17 that guided you into the Central Booking
18 facility; is that right?
19     A.    Um-hum.
20     Q.    And did the other officer stay in
21 the vehicle or did the other officer also go
22 into Central Booking?
23     A.    I don't even remember that.
24     Q.    But do you remember Ms. Tartarone

P. LE GREE

1 helping you into Central Booking, is that
2 fair?
3     A.    Um-hum.
4     Q.    And how did the other gentleman
5 get into Central Booking?
6     A.    I didn't focus on him. I was
7 focused on myself.
8     Q.    Okay. Fair enough.
9         What happened -- so once you were
10 inside Central Booking where did you go first?
11     A.    I guess for a place to get
12 processed. And they just took my information
13 and then I had to go down steps to see the
14 judge which that's where I could have really
15 fell and another -- there was an officer there
16 at the thing that saw me go down the steps
17 with my hands handcuffed behind my back and he
18 turned around and he looked and he shook his
19 head and he turn around and he unhandcuffed my
20 hands from behind my back and put it in front
21 of me. And I told him thank you.
22     Q.    And did Ms. Tartarone remain with
23 you as you navigated the steps to go see the
24 judge?

P. LE GREE

1     A.    She was just there just to be
2 there. I don't know.
3     Q.    Was she still, as you put it
4 earlier, sort of propped up against you,
5 alongside you, guiding you on the stairs?
6     A.    No. Just watching. Just
7 watching. That's all.
8     Q.    And the officer that you just
9 mentioned who rehandcuffed you, did he assist
10 you in any way as you were walking down the
11 stairs?
12     A.    No. He assisted me and he put the
13 handcuffs in front and I think he gave me the
14 cane for the period of time for me to be able
15 to get down the steps properly.
16         And then, you know, right after I
17 got at the bottom then he took the cane back.
18 That's all.
19     Q.    I see. So the officer let you use
20 your cane to navigate the stairs and then --
21     A.    Right. Yeah, that was the one
22 that was there. I guess he was positioned
23 there at Central Booking.
24     Q.    I see. And do you remember that

P. LE GREE

1 gentleman's name?
2     A.    No.
3     Q.    And then what happened you went
4 before the judge?
5     A.    Turned around and I got a -- first
6 I got a lawyer, the lawyer. And next thing
7 you know she let me free. Set me free. I was
8 able to go home that morning. So I was able
9 to -- you know, I got my cane and I was able
10 to get a cab to go home.
11     Q.    So when -- at the time that you
12 were released from NYPD custody, were you
13 given back your belongings that you told me
14 about earlier that were vouchered in addition
15 to your cane?
16     A.    Yes.
17     Q.    Have you ever spoken with former
18 NYPD Commissioner James O'Neil?
19     A.    I don't know who that is.
20     Q.    Have you ever spoken with current
21 NYPD Commission Dermot Shea?
22     A.    No.
23     Q.    Have you ever spoken with a police
24 officer named Robert Bernhardt?

P. LE GREE

1
2 was an officer, a gentleman who uncuffed you
3 and gave you your cane so you could use that
4 to go down the stairs, correct?
5     A.   Yeah.
6     Q.   Just for the sake of clarity, was
7 there any time when you were in the NYPD
8 custody where you had to descend stairs
9 without your cane?
10    A.   No.  It was when they took me to
11 Central Booking.  Well, the other time was
12 when I was going to get into the police car to
13 go down to Central Booking, which those were a
14 few steps.  But they weren't like the ones at
15 Central Booking because they had us basically
16 going down -- up or down a staircase.
17        So that's why, like I said, with
18 my hands being basically handcuffed behind me,
19 and trying to hold onto the handrail, walking
20 with my back against the handrail and going
21 down steps.  And, like I said, he just shook
22 his head and I had to thank him because he
23 knew that that's not right.  They got the man
24 cane right there and the man is coming down
25 the steps with his hands behind his back with

P. LE GREE

1
2 no cane.  You know, he was --
3     Q.   So, Mr. LeGree, I just want to
4 make sure I understand.  So there was that
5 time when you were going down the stairs at
6 Central Booking to see the judge that the
7 officer gave you your cane so you could use it
8 to go downstairs.  Were there other times when
9 you were actually going down any set of stairs
10 while you were in police custody?
11    A.   I told you that was the first time
12 was when they was taking me out because they
13 had a little bit of steps there at the
14 precinct there, at the 49th.
15    Q.   I thought you said you had to go
16 up two steps.  Did you otherwise have to go
17 down any other stairs other than at Central
18 Booking?
19    A.   Yeah, yeah, yeah.  Remember, I had
20 to come up two steps and to leave out from
21 there to go to Central Booking I had to go
22 down two steps.  So...
23    Q.   I just want to make sure I
24 understand all of the instances where you went
25 down steps.  So we've got -- just bear with

P. LE GREE

1
2 me.
3        So we've got the instance where
4 you were at Central Booking and you were going
5 to the judge and you were going down the
6 staircase and the officer uncuffed you and
7 gave you your cane so you could use it to walk
8 down the stairs.
9     A.   Actually, he uncuffed me from
10 behind my back and put the cuffs in front so I
11 could still hold the cane going to down the
12 steps.  You know what I mean?  That's what he
13 did.  And, like I said, I thanked him for it.
14 So he -- like I said, I'm not trying to color
15 that all NYPD were messed up.  You know, he
16 was smart enough to recognize that where the
17 other ones did not care.  Okay?
18    Q.   But were there other instances
19 where you had to go down any set of stairs
20 other than that?
21    A.   No.  That was it.
22    Q.   Okay.  And then in terms of going
23 up stairs I understood you to testify earlier
24 that you just had to -- getting into the
25 precinct you had to go up two steps; is that

P. LE GREE

1
2 right?
3     A.   It was -- yeah, two sets of steps,
4 yeah.
5     Q.   When you say two sets of steps, do
6 you mean two steps or something other than
7 that?
8     A.   Like, you go, and then one two,
9 and then you walk up, maybe like one two, and
10 that's it.
11    Q.   And in that instance where you're
12 walking up those stairs to get into the
13 precinct were you using your cane or not?
14    A.   No.  In that instance my hands was
15 behind my back and they had my cane.
16    Q.   And at that time was Officer
17 Tartarone next to you as you were -- and
18 holding you as you were going in?
19    A.   She was just walking alongside me.
20 That's all.
21    Q.   And did she -- was she
22 physically -- did she hold onto your arm or
23 anything?
24    A.   No.
25    Q.   Did she help up those steps in any

P. LE GREE

1
2  way?
3      A.  She waited for me to take my time
4  to come up those steps.
5      Q.  And you were able to go up those
6  steps on your own?
7      A.  Yeah.  Just took me a little while
8  because I had to take my time, you know.
9  So...
10      Q.  Do you have any steps in your
11  apartment, sir?
12      A.  No, I do not.
13      MS. MARCOCCIA:  Okay.  With that,
14  that's all I have for today, again, just
15  subject to getting the additional medical
16  records and if there's anything in there
17  that we need to ask Mr. LeGree about.
18  And it would just be focused on any other
19  content that we do not have to date.  So
20  with that, we can conclude for the day.
21  And I appreciate your time, Mr. LeGree.
22      (Continued on next page to include
23  jurat.)
24
25

P. LE GREE

1
2
3
4
5      THE WITNESS:  Okay.  Thank you.
6      THE COURT REPORTER:  We're off the
7  record.
8      (Time Noted:      4:43 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

J U R A T

1
2
3  I,          , do hereby certify under
4  penalty of perjury that I have read the foregoing
5  transcript of my deposition taken on          ;
6  that I have made such corrections as appear noted
7  herein in ink, initialed by me; that my testimony as
8  contained herein, as corrected, is true and correct.
9
10  DATED this ____ day of _____, 20 ,
11  at _____,     .
12
13
14
15
16
17  _____
18      SIGNATURE OF WITNESS
19
20
21
22
23
24
25

1
2      C E R T I F I C A T E
3  STATE OF NEW YORK   )
4                      : ss.
5  COUNTY OF NEW YORK  )
6      I, FRANCIS X. FREDERICK, a
7  Notary Public within and for the State
8  of New York, do hereby certify:
9      That PHILIP LEGREE, the witness
10  whose deposition is hereinbefore set
11  forth, was duly sworn by me and that
12  such deposition is a true record of
13  the testimony given by the witness.
14      I further certify that I am not
15  related to any of the parties to this
16  action by blood or marriage, and that
17  I am in no way interested in the
18  outcome of this matter.
19      IN WITNESS WHEREOF, I have
20  hereunto set my hand this 10th day of
21  February, 2022.
22
23
24  _____
25      FRANCIS X. FREDERICK