# EXHIBIT 5

1                   ROBERT HALEY

2    UNITED STATES DISTRICT COURT

3    EASTERN DISTRICT OF NEW YORK

     -------------------------------x

4    ROBERT FILER,

5                   Plaintiff,

6          vs.                    14 Civ. 5672(PKC)(LB)

7    THE CITY OF NEW YORK, DETECTIVE

     CRAIG BIER, DETECTIVE JAMES

8    ZOZZARO, and OFFICER MATTHEW

     VORRARO,

9

                   Defendants.

10   -------------------------------x

11

12       VIDEOTAPED DEPOSITION OF ROBERT HALEY

13              New York, New York

14              July 13, 2016

15

16

17

18

19

20

21

22

23   Reported by:

24   KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25   JOB NO. 110152

ROBERT HALEY

MS. BELLUSCIO:

Q.   Capt. Haley, we're going to move on to matter for deposition 1, arrests.  I'll read you the matter first before we begin.

This is from the notice.  "The methods, policies, programs and procedures of the New York City Police Department, or NYPD, written or otherwise, with respect to the arrest of people who use wheelchairs.  This the includes but is not limited to any programs, policies and procedures regarding the restraint of such individuals during arrest."

I will note before I begin that we broke the notice up into arrests, transport and detention, so this part that we're talking about now would be from the beginning of the encounter until just before transport would begin.

A.   Okay.  Yes.

Q.   Does the NYPD currently have a policy for how people who use wheelchairs are arrested?

A.   The NYPD's policy on the arrest of individuals covers all individuals, whether or not they're in a wheelchair, whether they have any other handicap or not.

ROBERT HALEY

Q.    Are these policies written?

A.    Yes.

Q.    And these policies do not have specific designations for what officers are to do if they encounter someone with a wheelchair?

MR. NOBLE:  Objection.

A.    Can you -- well, let me state this. That someone in a wheelchair, it's a very broad category, in other words, because there may be many different reasons why a person is confined to a wheelchair.

So it would be pretty much impossible to have a written policy covering every little nuance of an arrest when every arrest is different and the -- at the scene of an arrest, the objective is to maintain everyone's safety, the safety of the public, the safety of the subject, and the safety of the officers.

Q.    So it's your testimony that there are no written policies that specifically reference people who use wheelchairs that deviate from these general arrest procedures?

MR. NOBLE:  Objection.

A.    I believe that the policies as written

ROBERT HALEY

that cover everybody are fine as they stand now.

There are in the sections recent additions to

persons with disabilities that have been added,

but in general, the -- the arrest chapter and

the arrest of persons is designed to capture the

most general of terms and to apply it to a

number of circumstances.

Q.    So, Capt. Haley, there are no policies

for the NYPD that specifically address people

who use wheelchairs during arrest?

MR. NOBLE:  Objection.

A.    Nothing is specific with those words

in it to address the arrest of persons in

wheelchairs.  I maintain that the way that it's

written, it covers a broad group of people and

all arrestees.

Q.    Capt. Haley, just to be clear for the

record, we understand that there are general

policies that apply broadly when people are

arrested, and those are for anyone who is

arrested; is that correct?

A.    That's correct.

Q.    And then that there are no written

policies that specifically address any changes

1                   ROBERT HALEY

2   to those policies --

3              MR. NOBLE:  Objection.

4      Q.     -- for people who use wheelchairs?

5      A.     When you say -- could you, in other

6   words, clarify.  When there are no written

7   changes to those policies?

8      Q.     So there are no written policies that

9   specifically address people who use wheelchairs

10  and how the general arrest procedures would be

11  changed because somebody who you are arresting

12  or because the NYPD is arresting uses a

13  wheelchair?

14             MR. NOBLE:  Objection.

15     A.     Section 208-03 makes reference to

16  paragraph 33.  In particular, it gives direction

17  to the desk officer to contact the court section

18  supervisor for instructions regarding the

19  transport of persons in wheelchairs as well as

20  any additional data statement on one of the last

21  pages gives some additional guidelines.

22     Q.     And I do want to take an opportunity

23  to go through some of the patrol guide sections

24  that you mentioned previously in the deposition

25  and the one that you are talking about right

ROBERT HALEY

now, but just to clarify for the record, these

policies are generally for when people are

arrested by the NYPD, and they apply to anyone

who is arrested; is that correct?

A.    Yes.

MR. NOBLE:  Objection.

A.    Yes, that's correct.

Q.    And there are no policies that

specifically address, outside of these -- so

there are no policies outside of these general

arrest procedures that specifically address what

an officer is to do if they encounter a person

who uses a wheelchair?

MR. NOBLE:  Objection.

A.    Just as there are no specific policies

for somebody who is using crutches or for

somebody that's blind or with a guide dog, it's

a similar type of situation.  So you have to

take what's written and apply it to that

situation and apply -- and -- and, you know, at

the scene of an arrest, there's a lot going on

and there are a lot of considerations, and you

generally have an officer and you have a

supervisor there to verify the arrest, and so

ROBERT HALEY

between those persons, they come up with the

best manner to handle the situation.

Q.    But there's nothing in the patrol

guide that's written that would guide the

officers, for example, if they encounter a

person who is blind?

MR. NOBLE:  Objection.

A.    Specifically, there is nothing

written, but it would be nearly impossible to --

to have something to cover, you know, every type

of situation, whether --

Q.    You also mentioned -- excuse me, you

mentioned if there -- a person is using a guide

dog, there is no specific written directive for

a best practice for what the officers are to do,

correct?

MR. NOBLE:  Objection.

A.    While there are procedures in there

for dealing with persons with guide dogs, there

is no specific procedure for dealing with the

arrest of a person with a guide dog.

Q.    Okay.  And so the same is true of a

person who uses a wheelchair, correct?

MR. NOBLE:  Objection.

1                    ROBERT HALEY

2       Q.    The same is true that there are no

3    written policies specifically?

4       A.    There is no specific policy that you

5    could say Patrol Guide Section 208-41, arrest of

6    persons in wheelchairs, no.

7       Q.    Okay.  And there is further no written

8    policy that gives criteria that officers are to

9    consider when they arrest a person with a

10   wheelchair; is that correct?

11             MR. NOBLE:  Objection.

12             You have asked that question several

13        times in different words.

14             MS. BELLUSCIO:  No, that's a different

15        question than what I asked before.  So I

16        asked if there were policies and then I

17        asked if there are criteria that would give

18        an indication about what the officer was to

19        do.  So, specifically, are there policies?

20        And your witness testified no.  I'm asking

21        if there is something else, which would be

22        criteria that officers are to use.

23             MR. NOBLE:  Can you repeat your

24        question then?

25   BY MS. BELLUSCIO:

1                ROBERT HALEY

2      Q.    And there is further no written policy

3  that gives criteria that officers are to

4  consider or follow when they arrest a person who

5  uses a wheelchair; is that correct?

6      A.    There is the section of the patrol

7  guide that deals with special category

8  prisoners, and that would cover a prisoner in a

9  wheelchair.

10     Q.    And what section is that?

11     A.    210-17.

12     Q.    And what does that say?

13     A.    In essence, a special category

14 prisoner is to be guarded and supervised more

15 closely than a general population prisoner.

16 They're to be segregated from the general

17 population, and they're to be afforded and given

18 medical treatment, if necessary, whenever

19 necessary.

20     Q.    So it's your testimony that this

21 section regarding special categories of

22 prisoners, the first thing that this addresses

23 is prisoners that are to be guarded and

24 supervised more closely; is that correct?

25            MR. NOBLE:  Objection.  Do you mean,

1                    ROBERT HALEY

2      first thing, sequentially?

3            MS. BELLUSCIO:  Yes, the first -- so

4      your witness gave a list of categories that

5      are covered by this policy, and I'm merely

6      going through them.

7            MR. NOBLE:  You can just refer to the

8      policy if you have it.

9            MS. BELLUSCIO:  I think we can ask the

10     questions.  We're here to ask the questions

11     today, and your objection should be limited

12     to form.  And there have been quite a few of

13     them, and we would appreciate if you would

14     limit them to form at this point.

15           MR. NOBLE:  That's noted.

16           THE WITNESS:  Well, the --

17     BY MS. BELLUSCIO:

18     Q.    I can ask the question again, Capt.

19     Haley.  We were discussing special category

20     prisoners and that there is a policy that

21     specifically addresses special category

22     prisoners; is that correct?

23     A.    Yes, that's correct.

24     Q.    And the first category is that these

25     prisoners are to be guarded and supervised more

ROBERT HALEY

1

2  closely than a general population prisoner; is

3  that correct?

4          MR. NOBLE:  Objection.

5      A.    I wouldn't say that's not a category.

6  In other words, you have the category of special

7  category prisoners, not to be redundant here,

8  where the prisoner has either, you know,

9  attempted suicide or is despondent or needs

10  medical attention or for some reason should be

11  kept separate, so that those are your

12  categories, and a person in a wheelchair would

13  fall into one of those categories and then the

14  steps to be taken follow.

15      Q.    Okay.  Since we do have a copy of the

16  patrol guide here that was sent to us by your

17  counsel, we will mark this as an exhibit and I

18  would like for us to go through this together.

19      A.    Certainly.

20          (Haley Exhibit 2, Patrol Guide

21          Sections 208-03, 210-04 and 210-17, marked

22          for identification, as of this date.)

23          MR. NOBLE:  Can I get a copy of that,

24      please?

25          MS. BELLUSCIO:  Yes.

1                    ROBERT HALEY

2            MR. NOBLE:  Thanks.

3            Also, I think it would be helpful,

4        since there are page number numbers on the

5        top, just if we could reference those so it

6        makes clear what we're talking about.

7            MS. BELLUSCIO:  Sure.  That makes

8        sense to me as well.

9    BY MS. BELLUSCIO:

10       Q.    Capt. Haley, I have handed you what

11   was marked as Haley Exhibit 2.

12       A.    Yes.

13       Q.    These are several sections of the

14   patrol guide that was forwarded to us by your

15   counsel yesterday.  You mentioned that there are

16   sections of 2010-17 [sic], which is located in

17   the middle of this packet.

18       A.    Those are the last two sheets,

19   actually.

20       Q.    Okay.  Can you point to me where in

21   this section -- so this is 2010-17 [sic], there

22   are three pages -- where this identifies how

23   officers are to use this designation?

24            MR. NOBLE:  Objection.

25       Q.    I'll be more clear.  How does that --

1      ROBERT HALEY

2  this is patrol guide procedure number 2017

3  [sic].

4          How does this relate to your testimony

5  that -- about officers encountering people who

6  use wheelchairs and using this to determine what

7  steps to take?

8          MR. NOBLE:  Objection.

9          Also, I think you said 20-17.

10         MS. BELLUSCIO:  20 -- excuse me.

11     210-17, patrol guide.

12         MR. NOBLE:  And what's the question?

13 BY MS. BELLUSCIO:

14    Q.    The question is how does this

15 illustrate your testimony?  Which section of

16 this are you referring to when you talk about

17 this referencing people who use wheelchairs?

18 Will you walk me through it, please?

19    A.    Yes, under the definition (a),

20 "because of a medical condition or physical

21 disability" would now place this prisoner into a

22 special category designation.

23    Q.    Okay.  So just so I'm clear for the

24 record, this section identifies that somebody

25 who has a medical condition or a physical

1                    ROBERT HALEY

2    disability would be in- -- would be identified

3    as a special category prisoner?

4         A.    Correct, yes.

5         Q.    Correct?

6              Okay.  Is there anything else in this

7    section that talks about -- that you were

8    referring to when you said that this section was

9    relevant to your testimony here today?

10             MR. NOBLE:  Objection.  I just would

11        like to note for the record that the packet

12        marked as Haley Exhibit 2 consists of 25

13        pages and 3 separate patrol guide sections,

14        so I think it would just be helpful if you

15        can specify which section you are referring

16        to.

17             MS. BELLUSCIO:  We are referring to

18        the same section.  It is procedure 210-17 of

19        the patrol guide, which Capt. Haley

20        referenced in his testimony as being a

21        policy relevant to the NYPD's arrest of

22        people who use wheelchairs.

23             MR. NOBLE:  Objection.

24    BY MS. BELLUSCIO:

25        Q.    Capt. Haley, you testified about

ROBERT HALEY

best possible way to do that would be to

front-cuff that person, and that's well within

the supervisor's discretion to allow someone to

be front-cuffed.

    Q.    And how would the supervisor know

about that?

        MR. NOBLE:  Objection.

    Q.    That procedure that would --

    A.    Supervisors know about that based

on -- on training that they receive, based on

experience, and just their knowledge of arrest

processing and how to handle an arrest scene.

        They could also be guided by central

booking supervisors, by contacting them if they

had a question, but there's always somebody

available to guide.

    Q.    Okay.  Are there any procedures about

how a person who uses a wheelchair is searched?

    A.    The procedures for searching a

prisoner would also apply to somebody in a

wheelchair.

    Q.    Are there any written policies about

how people are searched, and that can be any

arrestee?

1                    ROBERT HALEY

2       A.    Yes, that's a section of the patrol

3   guide on frisk field searches.

4       Q.    Frisk field searches?

5       A.    Yes.

6       Q.    Do you know what number that is?

7       A.    It's in 208.  The exact number I don't

8   know, but I could look that up also.

9       Q.    Okay.  And that applies generally to

10  all arrestees?

11      A.    Correct.

12      Q.    Is there anything that references how

13  a person who uses a wheelchair would be searched

14  differently than a general arrestee?

15            MR. NOBLE:  Objection.

16      A.    It specifically does not mention

17  wheelchair, but every person is different.  You

18  know, the time of the year comes into -- there's

19  so many factors that come into the search of a

20  person and to do an adequate field frisk and

21  search, and the key issue with all of these

22  things is obviously safety and it's the safety

23  of the subject as well as the safety of the

24  officers and then the public.

25            And so officers, you know, they

1                    ROBERT HALEY

2   receive training on how to conduct proper frisks

3   in field searches.

4        Q.    And is information about different

5   variables written anywhere, different variables

6   that might change how a search happens?

7        A.    There are many variables, there's so

8   many variables that it pretty much would be next

9   to impossible to -- to include them all,

10  obviously.  There are guidelines and they have

11  to be applied to the situation.

12            So if I have -- whether I have

13  somebody with legs that can walk, somebody

14  without legs at all, I'm only -- I still have to

15  search that person, their entire person.  So it

16  really -- the wheelchair is kind of, you know,

17  not such of a factor as you might think it is in

18  the search.

19       Q.    So it's the NYPD's policy that there

20  is no difference between a person who uses a

21  wheelchair and a person who does not at the time

22  of a search?

23            MR. NOBLE:  Objection.

24       A.    Obviously, there's a difference.

25  However, that person, whether it takes 2 minutes

ROBERT HALEY

1
2  or 20 minutes, in the case of maybe somebody in

3  a wheelchair would take longer, we still have to

4  search that person, and we would do that.

5       Q.    And just to clarify for the record,

6  it's not written anywhere how someone -- how an

7  officer would do that?

8            MR. NOBLE:  Objection.

9       A.    There are just general guidelines

10  written.

11      Q.    And where are those written?

12      A.    It's in the section --

13           MR. NOBLE:  Objection.

14      A.    It's in the section of the patrol

15  guide under Frisk Field Search in 208.

16      Q.    And that, as you testified before, is

17  the general search and frisk procedure?

18      A.    Yes.

19           MR. NOBLE:  Objection.

20           THE WITNESS:  Sorry.

21      Q.    So what would officers do if they

22  encountered a person in a wheelchair and they

23  needed to search them?

24           MR. NOBLE:  Objection.

25      A.    Well, could you give me a scenario?

1              ROBERT HALEY

2      you mean by -- I think you said recurring

3      and regular.

4      A.     I mean --

5             MS. ROSENFELD:  There's no question

6      pending.

7      Q.     Officers -- so, Capt. Haley, I'll ask

8      the question again.  Officers do encounter

9      people in wheelchairs on a recurring basis?

10     A.     Yes.

11     Q.     Thank you.

12            Do officers make a determination about

13     whether the person they are arresting needs a

14     wheelchair?

15            MR. NOBLE:  Objection.

16     A.     It can happen.

17     Q.     Is there a written policy about this?

18            MR. NOBLE:  Objection.

19     A.     Well, there are policies about

20     prisoners who require medical and psychiatric

21     treatment.  I mean, if you say do they need a

22     wheelchair, they need to go to the hospital,

23     they need to be hospitalized because they have a

24     condition, or they don't have a wheelchair now,

25     we have to supply them a wheelchair because they

1    ROBERT HALEY

2    have difficulty walking?  Is that what you're

3    referring to?

4        Q.    No.  I'll rephrase.

5        A.    Okay.

6        Q.    If officers encounter a person who is

7    in a wheelchair, do they make a determination

8    about whether or not that person needs the

9    wheelchair, or does the arrestee determine that

10   that -- that they need their wheelchair?

11            MR. NOBLE:  Objection.

12       A.    It's -- it's -- I think the officers

13   are going to assess with their supervisors the

14   circumstances.  If you have somebody who's

15   driving a car with hand controls, it's probably

16   safe to assume that that person needs a

17   wheelchair, you know.

18            If it's somebody that -- that maybe

19   has a cast on one leg, then, you know, it's not

20   a medical condition or they're not paralyzed,

21   then perhaps that prisoner just needs to use

22   that to -- for some limited mobility but is

23   still capable of standing, then officers would

24   have to, with the supervisors and also with the

25   subject, and if need be, then call EMS or

1                    ROBERT HALEY

2   medical and get some medical advice as well, and

3   that's all available.

4       Q.    And how do -- how do officers on the

5   scene know when to do that, when to call for a

6   supervisor, when to call for EMS?

7           MR. NOBLE:  Objection.

8       A.    They're to call for a supervisor when

9   they effect an arrest, to come to the scene to

10  verify an arrest, and they do.  If a situation

11  where it's an out of an ordinary situation,

12  either multiple arrestees or it's a complicated

13  scene or perhaps somebody with a disability,

14  they would also, similarly, call for a

15  supervisor to help assess the situation and make

16  a determination.

17      Q.    So do arresting officers always call a

18  supervisor if they're arresting someone with a

19  disability then?

20          MR. NOBLE:  Objection.

21      A.    You can never say always.  I can't say

22  always because there are situations where, you

23  know, it's -- it's a hostile situation and they

24  have to get out of there or the supervisor is

25  not available, so in that case, they may not

1    ROBERT HALEY

2  call, or they may call and there would be no

3  supervisor available, but in a majority of

4  times, yes.

5    Q.    Is there a written policy about when

6  officers at the scene are to call for a

7  supervisor.

8    A.    Your printout 208-02, Haley 3, first

9  page, Scope.  I quote, "Uniformed members of the

10  service who have effected an arrest will have

11  the arrest verified by their supervisor, if

12  available, prior to removing the prisoner to the

13  appropriate authorized command/designated arrest

14  facility which has jurisdiction over the

15  arrest."

16    Q.    So this is for -- and again, I'm

17  referring to 28 -- 208-02, Arrest, Haley Exhibit

18  3, this refers to every arrest?

19    A.    Correct.

20    Q.    This is not, if officers encounter a

21  person who is paralyzed, they must call their

22  supervisor to get specific advice about that,

23  correct?

24    MR. NOBLE:  Objection.

25    A.    To me, it's the same thing.  How does

1                    ROBERT HALEY

2  that differentiate?  The person's under arrest.

3  They fall under that arrest category.  They have

4  to call their supervisor.

5       Q.    But the supervisor doesn't always

6  come, correct?

7            MR. NOBLE:  Objection.

8       A.    The only time the supervisor doesn't

9  come is if, as I mentioned earlier, that the

10  scene is a volatile scene, it's hostile, the

11  officers have to get out of there or, you know,

12  things are going to go bad very quickly, or the

13  supervisor is not available, but they're going

14  to always have that arrest verified; and if it's

15  not a supervisor at the scene, then it's the

16  desk officer, and that will be then in the

17  station house or it could also be over the

18  telephone.

19       Q.    And so it's your testimony today that

20  the way a person who uses a wheelchair is

21  handcuffed is determined by the individual

22  arresting officers and their supervisor; is that

23  correct?

24       A.    Yes.

25       Q.    And that the way a person who uses a

ROBERT HALEY

1

2  wheelchair who is arrested by the NYPD is

3  searched is also determined by the individual

4  arresting officers and their supervisor?

5          MR. NOBLE:  Objection.

6     Q.    Is that correct?

7     A.    They follow the guidelines.  They know

8  how to search and what areas to search, and then

9  they apply it to the individual, whether the

10  individual is in a wheelchair or not.

11     Q.    Okay.  And there's no, as we have

12  established, there's no written guidelines that

13  talk specifically about the changes that would

14  be made if the person is in a wheelchair,

15  correct?

16          MR. NOBLE:  Objection.

17     A.    Correct.

18     Q.    And then, lastly, the individual

19  arresting officers and their supervisor

20  determine whether the arrestee who they found in

21  a wheelchair needs their wheelchair, correct?

22          MR. NOBLE:  Objection.

23     A.    Correct.

24     Q.    And that's also not based on any

25  written policy, correct?

1                    ROBERT HALEY

2              MR. NOBLE:  Objection.

3       A.    It's correct.

4       Q.    So the preceding questions were based

5    on NYPD policies and procedures.  I would also

6    like to ask you a couple of questions in your

7    individual capacity.

8              MR. NOBLE:  Objection.

9       Q.    In your individual capacity, have you

10   ever arrested a person who uses a wheelchair?

11             MR. NOBLE:  Objection.

12      A.    No.

13             MR. NOBLE:  Don't -- I mean, I'm

14   objecting to this line of questioning.

15             MS. BELLUSCIO:  Okay.  I think it

16   would be good to take a break at this point.

17             THE VIDEOGRAPHER:  The time is 12:35

18   p.m.  We're off the record.

19             (Luncheon recess.)

20

21

22

23

24

25

1    ROBERT HALEY

2    must make an individualized set of decisions

3    about how to proceed; is that correct?

4            MR. NOBLE:   Objection.

5    A.    It's the officer in conjunction with

6    the supervisor and perhaps maybe another officer

7    on the scene, so it -- that's perhaps how it

8    transpires.

9    Q.    And that -- this applies to how

10   arrestees are handcuffed?

11           MR. NOBLE:   Objection.

12   Q.    Is that correct?

13   A.    Well, they will determine the best

14   method, whether or not the person could be

15   rear-cuffed, could they be rear-cuffed with two

16   sets of cuff, or maybe front-cuffed or not

17   cuffed at all.

18   Q.    Okay.  And it would be fair to say

19   that that would be an individualized

20   determination?

21   A.    Based on -- correct.

22   Q.    And that same would apply to how they

23   conduct a search of a person who uses a

24   wheelchair would be an individualized

25   determination; is that correct?

1                    ROBERT HALEY

2       A.    That is correct.

3       Q.    Okay.  And then, also, how to assess

4   whether or not a person who uses a wheelchair,

5   whether or not they actually need that

6   wheelchair; that's another thing that they

7   assess on an individual case-by-case basis,

8   correct?

9             MR. NOBLE:  Objection.

10      A.    Taking into consideration all of the

11  facts and determining if that person were

12  truthful and being honest, and if they -- if

13  they in fact needed it as opposed to just wanted

14  it or was somehow trying to get some kind of

15  preferential treatment, they would take all of

16  the circumstances into account.

17      Q.    Okay.  And the officers make an

18  individualized choice based on not a written

19  policy, but just --

20      A.    Well, it's --

21      Q.    -- procedures?

22            MR. NOBLE:  Objection.

23            Please wait for the question to end.

24            THE WITNESS:  I'm sorry.

25            MR. NOBLE:  Objection.

1    ROBERT HALEY

2    record is Patrol Guide 208-2 -- -02, there is

3    also another section, and that is called

4    Transporting Prisoners to the Station House?

5        A.    Yes.

6        Q.    Or something along those --

7        A.    Yes.

8        Q.    Okay.  And why don't we start with

9    208-02, which is Exhibit 3.  Can you show me

10   where, if anywhere, it specifically references

11   transporting arrestees who use wheelchairs?

12       A.    It is in number 3 on the first page,

13   "Remove prisoner to precinct of

14   arrest/designated arrest facility and inform

15   desk officer of charges."

16       Q.    Is there a written policy that

17   specifically outlines how officers and NYPD

18   personnel are to transport people who use

19   wheelchairs?

20       A.    While the policy does not specifically

21   mention persons in wheelchairs, it mentions how

22   to transport arrestees, and it would cover

23   persons in wheelchairs.

24       Q.    But it doesn't specifically mention

25   wheelchair users and differences that might

1                    ROBERT HALEY

2    occur in the transport of someone who uses a

3    wheelchair?

4              MR. NOBLE:  Objection.

5         A.    Those words are not specifically

6    written in there, but it does cover them as well

7    as anybody on a bicycle or a skateboard or

8    anything else that would be arrested.

9         Q.    Where does it cover that?

10        A.    We don't have that section with us

11   here.

12             MS. ROSENFELD:  Counsel, do you have

13        that patrol guide section available to use

14        so that we can expedite this deposition?

15             MR. NOBLE:  I don't have that with me,

16        no.

17             MS. ROSENFELD:  For purposes of

18        efficiency, would it be possible to get it

19        and have it used for the deposition right

20        now?

21             Do you have it?

22             MS. NELSON:  No, I don't know that I

23        have it.  I'm looking.

24             MS. ROSENFELD:  We have looked and

25        don't see it quickly available online.

1          ROBERT HALEY

2          MS. NELSON:  Okay.

3          MR. NOBLE:  What's the section?

4          Can we go off the record for a second?

5          THE VIDEOGRAPHER:  The time is 1:38

6     p.m.  We're off the record.

7          (Pause.)

8          THE VIDEOGRAPHER:  The time is 1:45

9     p.m.  We are back on the record.

10   BY MS. BELLUSCIO:

11        Q.    Capt. Haley, does the NYPD have any

12   vehicles that have been designed or retrofit to

13   transport people who use wheelchairs?

14        A.    At the present time, there are no

15   specifically designed vehicles for wheelchair

16   prisoners.  We do have vehicles that can

17   accommodate pretty much any type of prisoner

18   size-wise.

19        Q.    What do you mean by that?

20        A.    In other words -- well, in order to

21   clarify this, are you referring to a vehicle

22   that you can push, you know, a wheelchair into

23   or with a ramp and take the entire wheelchair

24   and the person together?

25        Q.    So, does the NYPD have any vans --

ROBERT HALEY

1

2     A.     Yes.

3     Q.     -- that have -- so the NYPD has vans

4  in which they transport arrestees?

5     A.     Correct.

6     Q.     Do they have any vans that have ramps

7  that roll out that you can roll a person in a

8  wheelchair into the van and transport them?

9     A.     No, not at the present time.

10    Q.     Has the NYPD made any changes to their

11 existing fleet of vans to make those vans

12 accessible to people who use wheelchairs?

13            MR. NOBLE:  Objection.

14    A.     The NYPD is currently in the process

15 of designing all new prisoner transport vans to

16 be used for prisoners at the present time.

17    Q.     So the NYPD is designing new transport

18 vans --

19            MR. NOBLE:  Objection.

20    Q.     -- at this point?

21    A.     That's correct.

22    Q.     Are there plans to have those vehicles

23 be accessible to people who use wheelchairs?

24    A.     My understanding is that there will be

25 certain vehicles allotted in every patrol

1                     ROBERT HALEY

2    borough that would be able to accommodate

3    persons in wheelchairs.

4        Q.    And would those vans have ramps that

5    would roll out --

6             MR. NOBLE:  Objection.

7        Q.    -- to bring a person in a wheelchair

8    into the van?

9        A.    My understanding is that you either

10   have a ramp or a lift.

11       Q.    A ramp or a lift?

12             And how do you know that information?

13       A.    I know this from meetings that the

14   Criminal Justice Bureau has had with the Fleet

15   Services Division.

16       Q.    What's the reason for the NYPD's

17   decision to create a fleet of vehicles that can

18   transport people who use wheelchairs either with

19   a lift or a ramp?

20             MR. NOBLE:  Objection.  So it seems

21        like these are bordering on conversations

22        which happened within the NYPD.  We're

23        concerned that this may be privileged, so we

24        would like an opportunity to confer about it

25        before you ask more questions.

1          ROBERT HALEY

2          MS. BELLUSCIO:  Okay.

3          THE VIDEOGRAPHER:  The time is 1:49

4    p.m.  We are off the record.

5          (Recess.)

6          THE VIDEOGRAPHER:  The time is 2:01

7    p.m.  We are back on the record.

8          MR. NOBLE:  So we have just conferred

9    regarding the last question, which we

10   believe is still pending, and it's our

11   determination that the subject matter of

12   that answer would implicate our privilege,

13   so we're instructing the witness not to

14   answer it.

15   BY MS. BELLUSCIO:

16   Q.    So who was present when you had these

17   discussions about the reason for the NYPD's

18   decision to create a fleet of vehicles?

19   A.    I attended meetings with higher-ups in

20   the NYPD who had already made the decision to

21   explore other types of vehicles for transporting

22   prisoners.  I don't know who in particular made

23   that decision.  However, all I know is that my

24   unit was asked for input on design of vehicles.

25   Q.    And what type of input did you

1                   ROBERT HALEY

2       this fits into and I'm instructing the

3       witness not to answer.

4            MS. BELLUSCIO:  We'll move on, but

5       we'll return to this issue.

6  BY MS. BELLUSCIO:

7       Q.    Before the break, we discussed whether

8  the NYPD has a written policy specific to how

9  officers and NYPD personnel are to transport

10 people who use wheelchairs, and you indicated

11 that there was a section of the patrol guide,

12 and that this -- during the break, you

13 referenced that this was arrest security

14 measures, which is Patrol Guide Procedure Number

15 208-06; is that correct?

16      A.    Yes.

17      Q.    I'm going to mark Patrol Guide

18 Procedure Number 208-206 as Haley Exhibit 4.

19           (Haley Exhibit 4, Patrol Guide

20      Procedure Number 208-06, marked for

21      identification, as of this date.)

22           MR. NOBLE:  Just to clarify, I think

23      the procedure number says 208-06.  I think

24      it might be on the record that it's 208-206.

25           MS. BELLUSCIO:  Oh, I apologize.

1           ROBERT HALEY

2       208-06.

3  BY MS. BELLUSCIO:

4       Q.    And Capt. Haley, you have a copy of

5  the Patrol Guide Procedure Number 208-06 in your

6  hand?

7       A.    Yes.

8       Q.    Is this the procedure that you were

9  referring to in your previous testimony about

10  transporting arrestees who use wheelchairs?

11      A.    Yes.

12      Q.    Can you walk me through which sections

13  of this patrol guide section specifically

14  reference people who use wheelchairs?

15      A.    The entire procedure would apply to

16  any prisoner, whether they were in a wheelchair

17  or not.  So basically the entire -- if you look

18  at the first page, where it's told --

19  "Arresting/Escorting Officer:  When a prisoner

20  is transported in a department vehicle, the

21  prisoner will be rear-handcuffed, placed in the

22  rear seat and secured with a seat belt on.  Seat

23  belts will be used to secure prisoners, when

24  practical, in non-emergency situations."

25           So it's that entire thing, (a) through

1          ROBERT HALEY

2   (e).

3          In addition, it goes further about the

4   use of a vehicle, a RMP, a radio motor patrol

5   vehicle, which is essentially a police car

6   equipped with a safety partition.  It says where

7   the operator of the vehicle should be seated,

8   where the recorder of the vehicle, where the

9   prisoner should be seated, and then has further

10  instructions if you are going to use a

11  12-passenger van to transport prisoners, where

12  the prisoner should be seated in relation to the

13  operator of the vehicle and where the escorting

14  officers will be seated as well.

15     Q.    And so it's your testimony that these

16  guidelines in this patrol guide apply to all

17  arrestees that the NYPD transcripts; is that

18  correct?

19     A.    Yes.

20     Q.    And that there's nothing in Procedure

21  Number 208-06 that specifically references

22  arrestees who use wheelchairs and need to be

23  transported?

24          MR. NOBLE:  Objection.  That was

25      already asked and answered.

1          ROBERT HALEY

2          MS. BELLUSCIO:  I'm clarifying for the

3     record.

4          THE WITNESS:  Yes, that's what my

5     position is.

6     BY MS. BELLUSCIO:

7     Q.    Are there written procedures or

8     guidelines anywhere that direct NYPD officers

9     how they are to transport individuals who use

10    wheelchairs?

11    A.    This is the only section that would

12    cover the transportation of prisoners.  If the

13    prisoner was in a wheelchair or not, it's

14    covered by this.

15    Q.    Okay.  So it's your testimony that

16    there is no other section of the patrol guide

17    that would reference-

18    A.    There is --

19    Q.    -- transport; is that correct?

20    A.    There is no section that specifically

21    references --

22          MR. NOBLE:  Objection.

23    A.    -- transport of prisoners in

24    wheelchairs.

25    Q.    Okay.  Are there any other written

ROBERT HALEY

1  directives that talk about how to transport

2  individuals who use wheelchairs?

3       A.    No.

4       Q.    No operations memos?

5             MR. NOBLE:  Objection.

6       Q.    No operations memos?

7       A.    No.

8       Q.    There's no cheat sheets for new

9  officers that talk about how to transport

10  individuals who use wheelchairs?

11             MR. NOBLE:  Objection.

12             You can answer.

13       A.    I don't know if -- what new officers,

14  if there are cheat sheets.  There's -- there's

15  nothing published by the New York City Police

16  Department directing specifically how somebody

17  in a wheelchair is to be transported.

18       Q.    And there's nothing that outlines

19  criteria other than this section about how

20  arrestees are to be transported?

21             MR. NOBLE:  Objection.

22       A.    That is correct.

23       Q.    And there is nothing that identifies

24  which vehicles are to be used for specific

1                    ROBERT HALEY

2   arrestees?

3              MR. NOBLE:  Objection.

4       A.    Vehicle usage is pretty much a

5   determination of the circumstances of the

6   arrest.  You know, if you have multiple

7   perpetrators, subjects, perhaps a vehicle -- one

8   car, two cars or a van.  So it's an individual

9   basis that that's decided.

10      Q.    And you are much more familiar,

11  obviously, with this patrol guide than I am.  Is

12  what you just talked about with one car, two

13  cars or a van, it being an individual decision,

14  is that anywhere in this section of 208-06?

15             MR. NOBLE:  Objection.

16      A.    No, it's not.

17      Q.    And so how would officers know what

18  type of vehicle to call?

19             MR. NOBLE:  Objection.

20             You can answer.

21      A.    A radio motor patrol car or a police

22  cruiser, whatever you want to call it, is only

23  capable of carrying two, possibly three

24  prisoners in one -- at one time.  So if you had

25  multiple prisoners or you had

1      ROBERT HALEY

2  cross-complainants, you wouldn't even want to

3  put them into the same car.  You would need two

4  different cars.

5          That's the result of experience,

6  that's the result of -- of conferring with your

7  supervisor and just -- just knowledge of how

8  to -- to properly perform your job.

9      Q.    So it's based on individual officer

10  knowledge, not based on any sort of written

11  policy; is that correct?

12          MR. NOBLE:  Objection.

13      A.    I do not believe that there's any

14  specific section that tells you don't do this,

15  don't do that.  It's -- it's based on knowledge

16  and making a determination at the scene.

17      Q.    And so how do officers make that

18  decision?

19          MR. NOBLE:  Objection.

20      A.    They take into consideration all of

21  the factors and all of the variables at the time

22  of arrest; what the offense is; who's committed

23  the offense; how many people are involved; do I

24  have victims; do I have, you know, a hostile

25  crowd.  There's a lot of factors that go in.  Is

1          ROBERT HALEY

2  anybody's safety in jeopardy; do I have to leave

3  the scene quickly; do I have the time to wait

4  for additional vehicles.

5          It's -- there's so many variables that

6  they're purposefully not written into the guide

7  because the guide is just that, a guide.

8      Q.    Okay.  So how about NYPD-sanctioned

9  practices, if a person who is stopped in a

10  vehicle stop is paralyzed and needs to be

11  transported, what are the officers -- what

12  should the officers do in that situation?

13          MR. NOBLE:  Objection.

14          You can answer.

15      A.    So he's stopped in a vehicle and needs

16  to be transported.

17          We're talking just one person?

18      Q.    Sure.

19      A.    Average-sized person?  A larger

20  person?  I mean --

21      Q.    Who uses a wheelchair.

22      A.    Correct.  I mean, if he's stopped and

23  he's seated in a vehicle, the assumption is that

24  he can sit in a vehicle, so if he can sit in his

25  vehicle, he should be able to sit in one of our

1          ROBERT HALEY

2   how the NYPD puts a person who is paralyzed from

3   their chair into a van?

4          MR. NOBLE:   Objection.

5     A.     The procedure to transport prisoners

6   is under the security measures and they have to

7   apply that the best way they can.

8     Q.     And so in applying -- and when you say

9   that, you're referring to Exhibit 4, which is

10   the Patrol Guide Procedure Number 208-06,

11   correct?

12     A.     Yes.

13     Q.     And so this is the section of the

14   guide that the officers apply when they are

15   transporting people who use wheelchairs?

16     A.     Yes.

17     Q.     And there is nothing in here that

18   specifically references people who use

19   wheelchairs, correct?

20     A.     Specifically, no, that is not in

21   there.

22     Q.     Thank you.

23          Do officers transport assistive

24   devices such as wheelchairs along with people

25   who have mobility impairments?

                    ROBERT HALEY

1

2          MR. NOBLE:  Objection.

3     A.     Yes, they do.

4     Q.     Is that written anywhere?

5          MR. NOBLE:  Objection.

6          You can answer.

7     A.     What is written is that the officer

8     has to safeguard the prisoner as well as the

9     prisoner's property.  So any property that a

10    prisoner has, whether it's a wheelchair, a

11    shopping cart, a bicycle, has to go along with

12    the prisoner --

13    Q.     And where is --

14    A.     -- back to the command.

15    Q.     And where is that identified?

16    A.     Well, that's all throughout various

17    sections of the patrol guide.  I would have to

18    sit down with the patrol guide and look to find

19    it for you, but it is in there.

20    Q.     Is it in any of the sections that we

21    have before us today?

22    A.     If you could afford me a moment, it

23    may be.

24          (Document review.)

25    A.     Okay.  If you make reference to

1       ROBERT HALEY

2  Exhibit 2, Patrol Guide 208-03, page 3-4.  I'm

3  sorry, 4 of 14, where it says, number 13, "Give

4  itemized receipt for property temporarily

5  removed from the prisoner which is not to be

6  held in police custody," and then 14, "Ask

7  prisoners if they want any personal property

8  they possess to be vouchered for safekeeping,

9  other than property removed under steps 12 and

10  13," and then you make a command log entry

11  indicating that they either refused the property

12  clerk invoice or they -- or that -- or if there

13  was property, they put the property clerk

14  invoice there.  So when you deal with prisoners,

15  you also deal with their property.

16       Q.    Does it say anywhere in this that

17  property includes an assistive device like a

18  wheelchair?

19       A.    Property includes everything that the

20  prisoner has with them.  If they're a homeless

21  person with 30 shopping bags, it includes 30

22  shopping bags full of items.

23       Q.    So it's fair to say that the section

24  that you pointed out on page 4 of 14 of Patrol

25  Guide 208-03 generally is just a general policy

1                    ROBERT HALEY

2    that applies to all arrestees, correct?

3        A.    Correct.

4        Q.    And there's nothing in here that is

5    specific to mobility devices such as

6    wheelchairs?

7             MR. NOBLE:  Objection.

8        Q.    Correct?

9        A.    There is nothing --

10            MR. NOBLE:  You can answer.

11       A.    -- specific, but it most certainly

12   does apply to that.

13       Q.    Is there a written policy about

14   whether NYPD officers seat-belt arrestees during

15   transport?

16       A.    Yes, there is.

17       Q.    Where is that located?

18       A.    Okay.  If you look at Exhibit 4,

19   Security Measures, if you look at the first

20   paragraph, subdivision (e), it says, "When the

21   seat belt is being secured on the prisoner by a

22   member, the other member will remain on the

23   opposite side of the RPM" -- that's that police

24   cruiser -- "with the rear door open to be

25   tactically able to assist in the event of an

ROBERT HALEY

1

2   you were able to get them into the vehicle in

3   the first place; that is, if they were able to

4   get in and out of a car from a chair themselves,

5   you would afford them the opportunity with

6   assistance to get out of the back of a police

7   cruiser back into a chair and then continue the

8   arrest processing.

9        Q.    And is that written anywhere?

10       A.    It's not written anywhere as far as

11  taking mobile -- people that are mobile out of

12  police cars.  So it's not written anywhere, no.

13       Q.    And what would the procedure be that

14  NYPD officers would use when a vehicle arrives

15  at an NYPD precinct and they need to remove that

16  person who is a wheelchair user from the NYPD

17  vehicle?

18            MR. NOBLE:  Objection.

19            You can answer.

20       A.    Well, the procedure is much in the

21  reverse of the same as entering a vehicle.  The

22  car would pull up to the appropriate entrance

23  where they bring prisoners, and they would, like

24  I mentioned, if the prisoner was able to get --

25  he was driving a vehicle himself, he was able to

1                    ROBERT HALEY

2    get from a chair into a car, from a car into a

3    chair, then we would assist him back into the

4    chair and then continue with the processing in

5    the station house.

6              If we lifted him onto a bench or onto

7    the floor and then onto the bench, then we would

8    have to do the same to put him back into the

9    chair and bring him into the command, the

10   precinct to process the arrest.

11   Q.    And do officers know about these ways

12   to remove people from vehicles based on their

13   own experiences and the experiences of their

14   supervising officers, as with the other areas?

15             MR. NOBLE:  Objection.  Calls for

16        speculation.

17             You can answer.

18   A.    Yes, much in the same way that they

19   know how to place them in vehicles, or they are

20   guided also to some extent by the subject too,

21   who can perhaps guide them.

22   Q.    And what about specifically for

23   removing an arrestee from an NYPD van, what

24   would be the procedure there?

25   A.    I'm not sure if I follow you.  I

1              ROBERT HALEY

2     thought I answered that.

3         Q.    Sure.  So we were talking about

4     vehicles?

5         A.    Right.

6         Q.    And I would assume, as I am sure you

7     would as well, that a person who is paralyzed

8     would be able to perhaps get in and out of a

9     sedan and that their needs might be different if

10    there was a van that they were being removed

11    from.

12            So you mentioned doing it the same

13    way, and then also them directing what they

14    would need to be able to get out of the vehicle.

15            Would that be different if it was a

16    van?  What would the differences be?

17            MR. NOBLE:  Objection to form.

18            You can answer.

19        A.    Well, obviously the van is a higher

20    vehicle and they're already on the seat in the

21    van.  If we helped them up onto that seat from

22    the floor of the van, we would have to help

23    them, support them, place them onto the floor

24    and then from the floor into the chair.

25        Q.    Okay.  And how do officers know to do

1                 ROBERT HALEY

2  that?

3           MR. NOBLE:  Objection.

4           You can answer.

5     A.    If they were at the scene and they

6  put -- that's how they placed him in the

7  vehicle, it would just make sense that they did

8  the same in reverse to help them out of the

9  vehicle.

10     Q.    Okay.  So it would just make sense; it

11  would be based on their experience that day?

12     A.    Or any other experience --

13           MR. NOBLE:  Objection.

14           You can answer.

15     A.    Sorry.

16           Or any other experience that they may

17  have at any other time with persons in

18  wheelchairs.

19     Q.    Okay.  So it would be based on their

20  individual experience rather than a designated

21  procedure by the NYPD?

22           MR. NOBLE:  Objection.

23           You can answer.

24     A.    Correct.

25     Q.    Does the fleet of vans that the NYPD

ROBERT HALEY

questions for this section.

          Is it NYPD policy to use Access-A-Ride
vans to transport people who use wheelchairs?

          MR. NOBLE:  Objection.

          You can answer.

     A.    There is a policy now where
Access-A-Ride vans can be utilized for
complainants and for witnesses and for other
people in wheelchairs.  I do not believe that it
applies to prisoners.

     Q.    Is that a written policy?

          MR. NOBLE:  Objection.

          You can answer.

     A.    Yes, it is.

     Q.    Is it in the patrol guide?

     A.    No, it's not in the patrol guide.

     Q.    Where is it?

     A.    I believe it's operations order --
Operations Order 15 of 2016.

     Q.    When was that issued?

     A.    Recently.  I think it may have just
come into play this June, past June, June 1.

     Q.    Do you have a copy of that with you
today?

1                    ROBERT HALEY

2       A.    That I do not.

3             MS. BELLUSCIO:  We would ask for

4       production of that notice.

5             MR. NOBLE:  The request is noted.

6       Please put it in writing.

7  BY MS. BELLUSCIO:

8       Q.    And just to clarify for the record,

9  this operations order does not affect arrestees?

10            MR. NOBLE:  Objection.

11            You can answer.

12      A.    That's correct.

13      Q.    Thank you.

14            I would like to return to Exhibit 2,

15  patrol guide Arrest, General Processing.  This

16  is procedure number 208-03.  The date issued and

17  date effective on this procedure is June 1,

18  2016, correct?

19      A.    That's correct.

20      Q.    Are there parts of this that are new

21  as of June 1, 2016?

22            MR. NOBLE:  Objection.

23            You can answer.

24      A.    Yes, I believe, in particular, number

25  33 was added and was effective June 1, 2016.

1                    ROBERT HALEY

2        Q.     Anything else?

3        A.     I know for sure that that was.  With

4   regard to anything else in there, I'm not a

5   hundred percent sure.

6        Q.     Why was that added, number 33?

7        A.     That was added to assist supervisors

8   and officers in the field with information as to

9   how to bring and where to bring prisoners who

10  are in wheelchairs down to the court facilities,

11  the central booking locations so they would know

12  what entrances to use, where there was a ramp,

13  where there was an elevator, where there was an

14  ADA-compliant bathroom.

15       Q.     So this is specific to officers that

16  are bringing arrestees to central booking?

17       A.     Correct.

18       Q.     And just to confirm, there is nothing

19  else that is new in procedure number 208-03

20  other than number 33, correct?

21              MR. NOBLE:  Objection.

22              You can answer.

23       A.     Well, just as I go through this and I

24  look at page 11 of 14, Arrests of Persons With

25  Disabilities, that's fairly new.  That may not

ROBERT HALEY

1
2 be the newest thing, but that is fairly new.

3 That hasn't been there for that long.  And the

4 rest has been there for at least a year or so.

5     Q.    When was the Arrests of Persons With

6 Disabilities section added?

7         That would be on page 11 of 14 of

8 Patrol Guide Procedure Number 208-03, Exhibit 2.

9     A.    This is probably within the last year.

10    Q.    And why was this section added?

11        And again, we're referring to page 11

12 of 14, Patrol Guide Procedure Number 208-03,

13 Arrests of Persons With Disabilities, and the

14 question is:  Why was this section added within

15 the past year?

16    A.    Generally, when things are added into

17 the guide, there's an issue that has come up and

18 has to be addressed.  So that would be a type of

19 situation where perhaps there was an instance or

20 two where that would give some more guidance so

21 that was added.  I wasn't part of that revision.

22    Q.    So it would be fair to say that, when

23 confronted with issues in communities such as

24 the disability community, the NYPD sometimes

25 does add policies and procedures to reflect

1                    ROBERT HALEY

2    those issues --

3              MR. NOBLE:  Object.

4        Q.    -- is that correct?

5              MR. NOBLE:  Objection.

6              You can answer.

7        A.    That is correct.

8        Q.    In the case of page 11 of 14, Patrol

9    Guide Procedure Number 208-03, the section

10   Arrests of Persons With Disabilities, which was

11   added within the past year, in the case of this

12   provision, having a written provision for how to

13   deal with people with disabilities was

14   considered helpful to the NYPD, correct?

15             MR. NOBLE:  Objection.

16             You can answer.

17       A.    Yes.

18       Q.    And that's why this section was added,

19   correct?

20       A.    Yes.

21       Q.    Patrol Guide Procedure Number 210-04

22   also has an effective date of June 1, 2016.

23             Can you explain which sections of this

24   procedure, which is again procedure 210-04, are

25   new as of June 1, 2016?

1        ROBERT HALEY

2        MS. NELSON:  Which one?

3    A.    This is --

4    Q.    Prisoners Requiring Medical and

5    Psychiatric Treatment?

6    A.    210-04.

7    Q.    This is part of Exhibit 2.

8    A.    Yes.  Just bear with me one second.

9        If you go to the Additional Data, page

10   6 of 8, that top about the Criminal Justice

11   Bureau is in the section.

12       "Whenever a member of the Criminal

13   Justice Bureau assigned to a Borough Court

14   Section is informed of, or otherwise becomes

15   aware that a prisoner in the custody of that

16   Court Section requires medical/psychiatric/drug

17   addiction attention, that member will

18   immediately notify the Borough Court Section

19   desk officer.  The Borough Court Section desk

20   officer will make a Command Log entry and ensure

21   that medical treatment is provided.  In Borough

22   Court Sections where the Emergency Medical

23   Service is situated, the Borough Court Section

24   desk officer will request the assistance of the

25   assigned Emergency Medical Technicians regarding

ROBERT HALEY

1
2 the prisoner's medical treatment.  However, if
3 it is determined that a prisoner requires
4 medical attention at a hospital emergency room,
5 the supervisor is responsible to ensure that the
6 prisoner is transported immediately for
7 treatment."
8           That top portion there, that's --
9      Q.    So that paragraph that you just
10 read --
11      A.    Yes.
12      Q.    -- is the only new section --
13      A.    Correct.
14      Q.    -- as of June 1, 2016?
15      A.    And there is one additional on the
16 previous page, under Suspected Ingestion of
17 Narcotics/Other Dangerous Substances, the second
18 paragraph:
19           "Whenever a member of the Criminal
20 Justice Bureau assigned a -- whenever a member
21 of the Criminal Justice Bureau assigned to a
22 Borough Court Section observes" --
23      Q.    I'll interrupt you.  You don't have to
24 read the whole thing.  Thank you very much.
25      A.    That's useful.

1          ROBERT HALEY

2     Q.    Is there also -- I'm looking at page 3

3  of 8 of the Patrol Guide Procedure Number

4  210-04, number 25, subsection (b)(1) --

5     A.    You're good.

6     Q.    -- discusses people who use

7  wheelchairs?

8     A.    Yes.

9     Q.    Is that something that was new as of

10  June 1, 2016, also?

11     A.    That coincides with the 208 -- thank

12  you -- 208-03, the wheelchair section in the

13  back with the supervisor conferring, yes.

14     Q.    So that was also new as of June 1,

15  2016?

16     A.    Yes.  Yes.  Yes.  Yes.

17     Q.    And what was the reason for adding

18  that?

19     A.    It would go hand-in-hand with the

20  change to the 208-03 that there had to be a case

21  or several cases where we had prisoners in

22  wheelchairs and some guidance was needed.  So

23  that came to be under the responsibility of the

24  Criminal Justice Bureau for that.

25     Q.    And so, in this case as well, the case

ROBERT HALEY

1  of 25(b) subsection (1), this was also a case

2  where having a written provision for how to deal

3  with people with disabilities was considered

4  helpful by the NYPD, correct?

5          MR. NOBLE:  Objection.

6          You can answer.

7  A.     Yes.

8  Q.     Thank you.  Also within Exhibit 2, the

9  last document, which is Patrol Guide Procedure

10  Number 210-17, Arrest Processing of

11  Pre-Arraignment Prisoners Designated As "Special

12  Category," the date issued and the effective

13  date of this document is May 27, 2016.

14          Can you walk me through which sections

15  of Procedure Number 210-17 were new as of May

16  27, 2016?

17  A.     I believe what they did in this

18  instance was -- one second -- the Prisoners

19  Confined to Wheelchairs or Otherwise Mobility

20  Impaired section.

21  Q.     Where is that?

22  A.     That's page 2 of 3 on the bottom.

23          That would all be considered part of

24  that same revision to the patrol guide.  So

ROBERT HALEY

of 25(b) subsection (1), this was also a case

where having a written provision for how to deal

with people with disabilities was considered

helpful by the NYPD, correct?

          MR. NOBLE:  Objection.

          You can answer.

A.     Yes.

Q.     Thank you.  Also within Exhibit 2, the

last document, which is Patrol Guide Procedure

Number 210-17, Arrest Processing of

Pre-Arraignment Prisoners Designated As "Special

Category," the date issued and the effective

date of this document is May 27, 2016.

          Can you walk me through which sections

of Procedure Number 210-17 were new as of May

27, 2016?

A.     I believe what they did in this

instance was -- one second -- the Prisoners

Confined to Wheelchairs or Otherwise Mobility

Impaired section.

Q.     Where is that?

A.     That's page 2 of 3 on the bottom.

          That would all be considered part of

that same revision to the patrol guide.  So

ROBERT HALEY

1

2    where you find one section that deals with

3    another section, you have to see that the

4    revision makes its way into each section in the

5    appropriate place.

6        Q.    And how are the sections connected in

7    this case with these three new provisions?

8        A.    Well, they're connected in that

9    they -- they put the responsibility onto the

10   borough court section supervisor to -- to help

11   them -- give them direction with lodging and

12   further processing, and then that coincides

13   with, at our facilities, at the court sections,

14   at the central booking locations, you know,

15   where to bring them, where -- what elevators to

16   use, what entrances to use, where there is

17   bathrooms where they will be arraigned, where

18   they will be held, that type of thing.

19       Q.    And so it's the borough court section

20   supervisor that decides --

21       A.    Yes.

22       Q.    -- all of those things?

23            MR. NOBLE:  Objection.

24            THE WITNESS:  I'm sorry.

25            MR. NOBLE:  You can answer or clarify.

1                    ROBERT HALEY

2       A.    Yes, it's the borough court section

3   supervisor.

4       Q.    Is there anything else in Patrol Guide

5   Procedure Number 210-17 that is new as of May

6   27, 2016, or is it only page 2 of 3, the last

7   paragraph, Prisoners Confined to Wheelchairs or

8   Otherwise Mobility Impaired?

9       A.    That, to my knowledge, that is the

10  only change in this.  It's not a large

11  procedure, so it's fairly -- that probably went

12  from two pages to three because of that one

13  addition.

14      Q.    Thank you.

15          MS. ROSENFELD:  Other than the

16      questions which were objected to on the

17      basis of the deliberative process privilege,

18      that concludes the testimony for the section

19      on transport, which was topic 3, and so just

20      to sort of give everybody in the room of

21      sense of how much we have left, we have the

22      topic 4 -- topic 3.

23          THE WITNESS:  3.

24          MS. NELSON:  I think you just finished

25      2, right.

1          ROBERT HALEY

2     Corp. v. U.S. 212 West Law 4018026.

3          So a number of the questions that we

4     asked were factual questions that in no way

5     could contain in their answers anything that

6     would be pre-decisional or deliberative

7     because they are seeking facts, not

8     information about the subject of

9     conversations that Capt. Haley had.

10          So we're going to ask the questions

11     again, and you can instruct him to answer,

12     but I would request that you revisit your

13     objections based on what we believe is the

14     proper application of the deliberative

15     process privilege in this context.

16     BY MS. ROSENFELD:

17     Q.    Capt. Haley, you testified earlier

18     that --

19          MS. NELSON:  Can you give us a second?

20          MS. ROSENFELD:  Sure.

21          (Pause in the proceedings while Ms.

22     Nelson and Mr. Noble confer.)

23     BY MS. ROSENFELD:

24     Q.    Capt. Haley, you testified earlier

25     that vehicles will be introduced in every patrol

ROBERT HALEY

1
2  borough that would be able to transport people
3  who use wheelchairs; is that correct?
4      A.    Yes, that's correct.
5      Q.    And that would be vehicles will be
6  introduced in the future, is that your
7  testimony?
8      A.    Yes.
9      Q.    And those would specifically be
10 vehicles that will be introduced to transport
11 people who are wheelchair users who have been
12 arrested; is that correct?
13     A.    Yes, that's correct.
14     Q.    And there are currently no such
15 vehicles in the NYPD fleet, correct?
16     A.    That is correct.
17     Q.    And you were asked what was the reason
18 for the decision to create a fleet of vehicles
19 that can transport people who use wheelchairs,
20 and your counsel objected to that question on
21 the basis of this privilege.  I'm not asking you
22 the question again.  We've moving toward.
23          How many vehicles will be introduced?
24          MR. NOBLE:  We're going to object to
25     that.  I mean, this is still pre-decisional.

1          ROBERT HALEY

2      I think he's made it clear that this is

3      not -- this is something that hasn't been

4      finalized and that there's still decisions

5      that are being made about what the final

6      product is going to look like.

7          MS. ROSENFELD:  Okay.  I object to

8      your objection, but it's noted for the

9      record.  I'll keep going.  You can keep

10     noting your objections.

11   BY MS. ROSENFELD:

12     Q.    When will these vehicles be

13   introduced?

14     A.    I do not have a timeframe.  You know,

15   sometime in the near future, I believe.  I would

16   say within the year.

17     Q.    Within the calendar year of 2016?

18     A.    We're halfway over the year, right?

19   Yeah, so maybe within 12 months, next 12 months.

20     Q.    Who is in charge of the program to

21   introduce wheelchair-accessible vehicles into

22   the patrol boroughs?

23     A.    The Deputy Commissioner of Support

24   Services.

25     Q.    And who is that person?

1        ROBERT HALEY

2    A.    Robert Martinez.

3    Q.    Is there a specific allocation of -- a

4  budgetary allocation to purchase these vehicles?

5        MR. NOBLE:  Objection.

6        And don't answer that.

7    Q.    When did the NYPD determine that there

8  was a need for wheelchair-accessible vehicles in

9  the patrol boroughs?

10        MR. NOBLE:  Objection.

11        You can answer.

12    A.    I could not tell you specifically when

13  they decided, but I know that the police

14  department, particularly under Commissioner

15  Bratton, is taking a lot of steps to -- to

16  answer the needs of the community.

17        So this would be one of those areas

18  that if there is a need for it, he would explore

19  and look to -- to satisfy that.  So I couldn't

20  give you an exact date, but it's most likely a

21  result of his doing along with Commissioner

22  Martinez.

23    Q.    So the New York City Police Department

24  determined that there was a need for

25  wheelchair-accessible vehicles, correct?

ROBERT HALEY

1
2  are -- relate to this potential plan?
3      A.    At the current time, that's correct, I
4  have not seen any.
5      Q.    What about any -- any draft budgets,
6  anything like that, you haven't seen anything?
7      A.    Not for wheelchair-accessible
8  vehicles.
9      Q.    When the New York City Police
10 Department introduces -- if it introduces these
11 vehicles, will there be an operations order or a
12 patrol guide update that accompany it?
13         MR. NOBLE:  Objection.
14         You can answer.
15     A.    Normally, when something new is
16 introduced, it will start out as a pilot project
17 which will be -- or, pilot program, rather,
18 which will be an operations order, and then if
19 deemed successful, it would expand and then be
20 incorporated into the patrol guide.
21     Q.    Do you know how many people every year
22 who use wheelchairs are arrested by the New York
23 City Police Department?
24     A.    The statistics that I have only go
25 back to February of this current year.

ROBERT HALEY

Q.    So what is the time period of those statistics?

A.    From February -- I'm not sure of the date of February, but February of this year to through June.  I believe there were seven.

Q.    So from February 2016 to June 2016, seven persons who use wheelchairs were arrested by the New York City Police Department?

A.    Yes.

Q.    And is there a reason that you only know the data starting February 2016?

A.    The reason is -- well, when I began to prepare for this, and I only found out about it Friday.  I wasn't at work Friday, so on Monday I tried to get whatever information together that I could get together.

Q.    Where did you find the statistic that it's seven people from February to date?

A.    We are maintaining that in the Criminal Justice Bureau.  My office is maintaining that statistics, those statistics.

Q.    You are actively collecting that?

A.    Yes.

Q.    If you wanted to collect it for

1                    ROBERT HALEY

2   earlier timeframes, could you?

3       A.    It would most likely be an extremely

4   time-consuming, exhaustive effort to search

5   through the -- we have over 200,000 persons

6   arraigned, roughly, a year, but going back to

7   2011, the numbers were double that, you know.

8   So only if that information were recorded in a

9   computer system somewhere would we be able to do

10  that.

11      Q.    Where did you find it for the seven

12  people that you identified just on Monday when

13  you were looking for it?

14      A.    We have given notice to our borough

15  court sections to notify us, the main office,

16  whenever they have somebody in custody who is in

17  a wheelchair.

18      Q.    And you gave -- and that program of

19  notification began in February?

20      A.    That is -- well, I don't know if it

21  began in February or we began a little later.

22  We went back to February, but it most likely

23  began in February.

24      Q.    So, in and around February 2016, your

25  office requested that the borough court

ROBERT HALEY

supervisors notify you if somebody was arraigned

who uses a wheelchair?

A.    That's correct.

Q.    And based on that process, you have

been able to identify seven people since then

who have been arraigned who are wheelchair

users?

A.    Yes.

Q.    And are you also aware that at the

North Infirmary Command on Rikers Island, there

are a number of people detained there who are

wheelchair users?

A.    I'm not aware of that; however, that's

a separate agency.

And they're already incarcerated, I'm

assuming?

Q.    Uh-huh.  Correct.

A.    Right, so...

Q.    Okay.  So you said there was 200,000

people arraigned in 20- --

A.    Probably in 2015.

Q.    '15.

And approximately 400,000 people in

2011?

ROBERT HALEY

A.     Correct.

Q.     Do you plan to keep conducting --
withdrawn.  Do you plan to keep collecting the
statistic about wheelchair users who are
arraigned?

A.     Yes.

Q.     And what is the purpose of NYPD's
collection of that data?

A.     I just know that we were instructed in
the Criminal Justice Bureau to start to keep
track of that so...

Q.     By whom?

A.     I just report to my inspector and to a
chief, so I don't know.  You know, I've been
getting it from one of them, and I know of the
lieutenant who does that, you know, daily or
weekly.  He collects that data or it's called in
to him.

Q.     You have to collect a lot of data,
probably.

       Did you do any investigation into the
circumstances of the arrest, transport, and
detention of those seven people that you
identified between 2015 and now?

1                    ROBERT HALEY

2       Q.    And you may have answered this

3   question.  I apologize.  Where is this bathroom

4   located?

5       A.    It's in a hallway opposite the main

6   holding cell.

7       Q.    And where is the main holding cell

8   located?

9       A.    It's directly behind the desk officer.

10      Q.    Does the 113th Precinct have any

11  written policies about making bathroom

12  facilities available to arrestees who use

13  wheelchairs?

14      A.    All precincts have --

15            I'm sorry.  Could you repeat the

16  question?

17      Q.    Yes.  Does the 113th Precinct have any

18  written policies about making bathroom

19  facilities available to arrestees who use

20  wheelchairs?

21      A.    They would be the same policies that

22  every precinct would have making bathrooms

23  available to any arrestee, whether they're in a

24  wheelchair or not.

25      Q.    And where is that located, that

1                    ROBERT HALEY

2    written policy?

3        A.    Well, every precinct has bathrooms

4    designated for prisoner use, and so in the New

5    York City Police Department, we feed prisoners

6    if they're with us during meal time; if they

7    have to use facilities, we afford them the

8    ability to use the facilities.

9            I don't know that there's so much a

10   written policy anywhere.  That's just the

11   common, you know, etiquette and decency.

12       Q.    So is there a written policy specific

13   to arrestees who use wheelchairs and their

14   bathroom use?

15       A.    It would be the same as any policy who

16   governs a prisoner who is not in a wheelchair.

17           MR. NOBLE:  I'm sorry.  Could we take

18       a quick break?

19           MS. BELLUSCIO:  Sure.

20           THE VIDEOGRAPHER:  The time is the

21       4:54 p.m.  We are off the record.

22           (Recess.)

23           THE VIDEOGRAPHER:  The time is 4:57

24       p.m.  We are back on the record.

25   BY MS. BELLUSCIO:

ROBERT HALEY

Q.    Capt. Haley, before we took a break,
we were discussing the policy of the 113th
Precinct for arrestees who use wheelchairs and
their bathroom use, and it is your testimony
that there is no specific written policy that
governs wheelchair users' use of the bathroom at
the 113th Precinct, correct?

A.    My -- my testimony was that it's the
same policy that governs the use by any prisoner
would also apply to prisoners in wheelchairs.
If they need additional bathroom breaks, they
would be afforded that, and that's pretty much
how it would go.

Q.    And is that written somewhere?

A.    No, it's not written anywhere.

Q.    And how do people know about that
policy?

A.    Well, we have prisoner bathrooms for
prisoner use and, you know, just like we have
bathrooms for non-prisoner use.  So when people
have to go to the bathroom, unfortunately,
prisoners have to ask officers for permission to
use the bathroom, they have to be escorted, but
we escort them.

1          ROBERT HALEY

2       Q.    And then once the detainees at the

3  113th Precinct are escorted, if that person is

4  paralyzed, what is the procedure to make sure

5  that they can use the bathroom?

6       A.    This would be similar to transporting

7  a prisoner at the -- from the scene of arrest to

8  a precinct.  It would depend on the variables,

9  and when you say paralyzed, you know, does the

10  prisoner have good use of his or her arms; is

11  the, you know, the prisoner able to stand or --

12  but naturally, a prisoner would require some

13  assistance from an officer, or if they were able

14  to get -- and they -- I do believe that they can

15  fit the wheelchair inside of that room.  They

16  can get from the wheelchair to the toilet.  They

17  would perhaps not need any assistance.  Depends

18  upon how ambulatory they are.

19       Q.    And you testified before that you

20  didn't take any measurements of these

21  facilities, correct?

22       A.    Correct.

23       Q.    And therefore, it sounds like, as with

24  other matters that we have discussed today, this

25  procedure is based on the individual officer's

ROBERT HALEY

1

2  understanding and experience?

3       MR. NOBLE:  Objection.

4   Q.    As opposed to a written policy?

5       MR. NOBLE:  Objection.

6       You can answer.

7   A.    That is correct.

8   Q.    Are there cameras that record within

9  the 113th Precinct?

10   A.    The cameras in the precinct are

11  surveillance-type cameras, but they don't have

12  recording capability.  So, in other words,

13  they're at the desk position.  The desk officer

14  can look inside the cells and see prisoners in

15  the cells.  That's not recorded.

16   Q.    Why is that?

17   A.    I think, like anything else, as

18  technology becomes available, it gets utilized.

19  A lot of these systems are in the process of

20  being replaced, and they're getting -- all

21  pretty much have been upgraded with cameras and

22  monitors, but prisoners are constantly being

23  supervised and they should be checked at least

24  every 30 minutes in addition to being visible on

25  the video screen in front of the desk so that if

ROBERT HALEY

a prisoner were attempting suicide or were in

distress, there's an officer who typically is

like a cell attendant would, you know, render

assistance, where the desk officer would see it

and call to an officer to go in there so that

there has never really, I think, been any

necessity to record these instances.

Q.    Okay.  Are there surveillance cameras

elsewhere in the 113th Precinct?

A.    When I went to the 113th, I just

looked at the arrest processing area and the

prisoner bathroom and such.  So there may be,

but I don't know.

Q.    Are there any plans for renovations

for the 113th Precinct?

A.    To my knowledge, no.

Q.    When was the last renovation at the

113th Precinct?

A.    I'm not able to answer that question.

I do not know.

Q.    Where does the 113th Precinct detain

people who use wheelchairs?

A.    It would be -- it would depend upon

how many prisoners were in the 113th Precinct at

1          ROBERT HALEY

2    the time.  If they were occupying the main

3    holding cell, then the prisoner in a wheelchair

4    could be detained outside that main holding cell

5    but within the room that houses that holding

6    cell.  That's one possible place.

7        Q.    And what if the person needs

8    wheelchair needed to be there overnight for

9    processing, where would they detain that person

10    then?

11        A.    You have to make a distinction between

12    overnight and processing, because overnight,

13    frequently, if you commit a crime at 10 o'clock

14    at night, you're going to be there overnight.

15    Whether or not -- no prisoner is going to be

16    given, let's say, a bed and allowed to sleep

17    because they're part of this processing process.

18            So they would either be seated -- most

19    prisoners would be seated on a bench inside the

20    cell, or it was a prisoner in a wheelchair, it

21    would most likely be in the wheelchair, in his

22    wheelchair or her wheelchair.

23        Q.    And that's even if the processing -- I

24    think I'm using that correctly -- if the -- so

25    that would even be if the processing took almost

ROBERT HALEY

1

2  40 hours?

3          MR. NOBLE:  Objection.

4          You can answer.

5          It's not totally clear to me what

6  you're asking.

7      A.   Yes, well, it's a rare case when the

8  processing takes that long.  It does happen in

9  certain instances.  I would equate it to maybe a

10  prisoner sitting on the bench in the holding

11  cell for nearly 40 hours as well.  I mean, it's

12  uncomfortable, it's not the ideal situation, but

13  unfortunately, it happens.

14      Q.   Are the people who did not use

15  wheelchairs that you just mentioned who are

16  detained in the larger holding cell, are they

17  handcuffed for the time that they're in that

18  holding cell?

19      A.   No.

20      Q.   Are the wheelchair users who are

21  detained outside of the holding cell, are they

22  handcuffed for the period that they're in the

23  113th Precinct?

24      A.   Any prisoner that would not be in a

25  cell that would -- and that would include a

ROBERT HALEY

1
female prisoner not in that main holding cell or

2
a juvenile in the juvenile room, would be

3
handcuffed -- one hand, at least -- to a rail

4
that is attached to the wall.

5
    Q.    And just to clarify for record, so

6
that's any prisoner who was not detained in a

7
holding cell would be handcuffed, one hand, at

8
least, to a rail that is attached to the wall,

9
is that correct?

10
    A.    Yes.

11
    Q.    And that is no matter how long the

12
individual is detained at the precinct; is that

13
correct?

14
    A.    Yes, that is correct.

15
    Q.    How high up is the rail on the wall

16
that the arrestees are attached to?

17
    A.    It's between 36 and 40 inches.

18
    Q.    Did you measure that?

19
    A.    No.

20
    Q.    Is it consistent with NYPD policy to

21
have an arrestee who uses a wheelchair attached

22
to the wall outside of a holding cell?

23
    A.    I'm not sure if I --

24
    Q.    Sure.  I can rephrase.

ROBERT HALEY

Is it consistent with NYPD policy for an individual NYPD precinct to detain an arrestee who uses a wheelchair outside of a holding cell and have them handcuffed to a wall for their period of detention?

A.    If that's the only place available to secure that prisoner and keep that prisoner under observation, then that would be consistent.

Q.    And who makes the decision as to where an individual arrestee who uses a wheelchair is detained at the 113th Precinct?

A.    Well, at the time, that would be the desk officer.

Q.    And that's not based on any written policies, correct?

A.    Written policies, you would have to infer from how we house prisoners that you have to keep males and females separated, juveniles and adults separated, and so you're not always afforded with the luxuries of having that many cells.  And sometimes you have a lot of prisoners, you know, and so that would maybe be part of that decision to have somebody, you

1                    ROBERT HALEY

2    know, handcuffed to a rail.

3            And in certain cases, if I may offer

4    this, in the 113th Precinct, the -- there is

5    another -- the cell area with the individual

6    cells for overnight lodging, there is a large

7    area there that is open that you could put a

8    detainee in a wheelchair in that area as well.

9        Q.    Would you say that it would be

10   preferable to put an arrestee who uses a

11   wheelchair in either the main wall -- I'll

12   rephrase.

13           Would it be preferable to put an

14   arrestee who uses a wheelchair in the main

15   holding area as opposed to chained to the rail

16   outside of the holding area?

17           MR. NOBLE:  Objection.

18           You can answer.

19       A.    If there were no prisoners and you

20   could afford to use that main holding cell for

21   one prisoner, and that prisoner was a

22   wheelchair-bound prisoner, then that would be

23   ideal.  However, if you had three or four males

24   and security concerns, it's more practical to

25   put them in the one cell where you could ensure

1                    ROBERT HALEY

2   period of time.  And being that there are so

3   many variations and variables, and I don't know

4   the specifics of this case, I could not, you

5   know, speak to that, but what I can tell you is

6   that it is atypical to have any prisoner

7   handcuffed to a rail in excess of that many

8   hours.

9        Q.    Capt. Haley, how do arresting officers

10  determine whether to provide medical or other

11  attention to people who use wheelchairs who

12  enter the 113th Precinct?

13       A.    Based on the situation.  If it were

14  readily apparent that they needed medical

15  attention.  They're also -- when any prisoner is

16  brought into a New York City Police Department

17  facility for arrest processing, they're asked by

18  the desk officer, the desk officer assesses

19  their physical condition, and if they need or

20  it's determined that they need medical

21  treatment, if a prisoner requests medical

22  treatment, in my experience, that prisoner

23  receives medical treatment if they request it.

24       Q.    And what if they don't request it, how

25  do officers at the 113th Precinct determine

ROBERT HALEY

1

2    whether a person needs medical treatment?

3        A.    Like I mentioned, the desk officer

4    would be the person to make an assessment of the

5    physical condition of that prisoner and then

6    note that also in the command log with the entry

7    along with the prisoner's pedigree information.

8        Q.    And how do they make that

9    determination?

10       A.    That determination is based on -- on

11   their observation of the prisoner, the

12   prisoner's demeanor, the prisoner's, you know,

13   attentiveness, their -- whatever signs there

14   are, that that prisoner can also answer

15   questions as well.  So it's more of a common

16   sense standard.

17       Q.    So it's more of a common sense

18   standard than, say, a written policy, would that

19   be correct?

20            MR. NOBLE:  Objection.

21            You can answer.

22       A.    That's correct.

23       Q.    Does the 113th Precinct have medical

24   personnel on-site?

25       A.    Adjacent to the 113th Precinct is the