**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

MILAN HEGGS, ROY BECKFORD and PHILIP
LEGREE, *individually and on behalf of a class of*
*all others similarly situation*,

Plaintiffs,

and

DISABILITY RIGHTS NEW YORK,

Plaintiff,

and

DISABLED IN ACTION,

Plaintiff,

- against -

THE CITY OF NEW YORK, NEW YORK CITY
POLICE (NYPD), COMMISSIONER JAMES P.
O'NEILL; NYPD COMMISSIONER DERMOT
F. SHEA; NYPD OFFICER (P.O.) ROBERT
BERNHARDT; P.O. MOORAN, P.O. SLATER;
JOHN DOES 1-8,

Defendants.

No. 17-CV-03234 (RJD)(TAM)

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................................................................ii

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS ...........................................................................................3

    I.     The Plaintiffs .................................................................................................3
         a.  Milan Heggs ......................................................................................3
         b.  Roy Beckford ....................................................................................5
         c.  Philip Legree .....................................................................................6
         d.  Disabled In Action ............................................................................7
         e.  Disability Rights New York...............................................................8

    II.    The Experiences of Putative Class Members ...............................................8
         a.  Precincts City-wide are Inaccessible for Arrest Processing ...................9
         b.  No Central Booking Facilities are Accessible ......................................11
         c.  Individuals Arrested with Mobility Disabilities have Limited Access to Vans with Wheelchair Lifts..................................................12
         d.  Department Polices and Procedures are Largely Silent with Regards to Individuals with Mobility Disabilities................................14
         e.  The Department fails to provide disability awareness trainings to officers. ......................................................................................17

    III.   Plaintiffs' Proposed Classes ........................................................................19

ARGUMENT ...............................................................................................................20

    I.     Declaratory-Injunctive and Damages Classes Should be Certified as the Requirements of Rule 23 Have Been Met .........................................20
         a.  Legal Standard ....................................................................................20
         b.  Plaintiffs' Proposed Class Meets the Requirements of Rule 23 ...........21

    II.    The Identities of Class Members Are Readily Ascertainable ....................31
    III.   A Declaratory-Injunctive Class Is Proper Under Rule 23(b)(2) ...............32
    IV.   A Damages Class Is Proper Under Rule 23(b)(3) .....................................33

CONCLUSION.............................................................................................................35

# TABLE OF AUTHORITIES

**CASES**                                                                                      **PAGE(S)**

*Abdell v. City of New York*, No. 05–cv-8453 (RJS) (JCF), 2009 U.S. Dist. LEXIS 42719 (S.D.N.Y. May 5, 2009) ................................................................................................................. 26

*Ackerman v. Coca-Cola Co.*, No. 09 CV 395 (DLI)(RML), 2013 U.S. Dist. LEXIS 184232 (E.D.N.Y. July 17, 2013) ..................................................................................................... 21

*An v. City of N.Y.*, 16 Civ. 5381 (LGS), 2017 U.S. Dist. LEXIS 84364 (S.D.N.Y. June 1, 2017)26

*Armstrong v. Davis,* 275 F.3d 849 (9th Cir. 2001) ....................................................................... 23

*Baffa v. Donaldson*, 222 F.3d 52 (2d Cir. 2000).......................................................................... 25

*Barnes v. United States*, 68 Fed. Cl. 492 (2005).......................................................................... 23

*Brecher v. Republic of Argentina*, 806 F.3d 22 (2d Cir. 2015).................................................... 31

*Bronx Indep. Living Servs. v. Metro. Transp. Auth.*, 16 cv 5023 (ER), 2021 U.S. Dist. LEXIS 59672 (S.D.N.Y. Mar. 29, 2021) ...................................................................................... 28

*Butler v. Suffolk Cty.*, 289 F.R.D. 80 (E.D.N.Y. 2013)................................................................. 22

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007)............................................................................................... 21, 22

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017) .............................................................................................................................. 27

*Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167 (2d Cir. 2021)............................................ 27

*Denney v. Deutsche Bank, A.G.,* 443 F. 3d 253 (2d Cir. 2006) .................................................... 21

*Disabled in Action v. City of NY*, 437 F. Supp 3d 298 (S.D.N.Y. 2020) ...................................... 11

*Durr v. Slator*, 558 F. Supp. 3d 1 (N.D.N.Y. 2021) ..................................................................... 20

*East Texas Motor Freight Sys. v. Rodriguez*, 431 U.S. 395 (1977).............................................. 26

*Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012)................................................. 26, 31

*Foti v. NCO Fin. Sys.*, 04 Civ. 00707 (RJS), 2008 U.S. Dist. LEXIS 16511 (S.D.N.Y. Feb. 19, 2008) ............................................................................................................................. 23

*Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979) ...................................................... 29

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ............................................................... 27

ii

*Hughes v. Ester C Co.*, 317 F.R.D. 333 (E.D.N.Y. 2016) ............................................................ 33

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977) ............................................. 27

*In re Drexel Burnham Lambert Group*, 960 F.2d 285 (2d Cir. 1992) .................................... 24, 30

*In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31 (E.D.N.Y.1997) ................................. 25

*In re Methy Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 209 F.R.D. 323 (S.D.N.Y.2002). 32

*Kurtz v. Costco Wholesale Corp.*, 818 Fed. Appx. 57 (2d Cir. 2020) ......................................... 20

*Ligon v. City of New York*, 288 F.R.D. 72 (S.D.N.Y. 2013)........................................................ 26

*Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM) (PK), 2022 U.S. Dist. LEXIS 93924 (E.D.N.Y. May 25, 2022) ............................................................................................ 34

*Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997) ................................................................. 22

*McBean v. City of N.Y.*, 228 F.R.D. 487 (S.D.N.Y. 2005) ......................................................... 33

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215 (2d Cir. 2008) ................................................. 21

*Mental Hygiene Legal Serv. v. Cuomo*, 609 F. App'x 693 (2d Cir. 2015) ................................. 27

*Nat'l Motor Freight Ass'n v. United States*, 372 U.S. 246 (1963) ............................................. 29

*People United for Children, Inc. v. City of N.Y.*, 214 F.R.D. 252 (S.D.N.Y. 2003).................... 27

*Raymond v. N.Y. State Dep't of Corr. & Cmty. Super.*, 2022 U.S. Dist. LEXIS 5522 (N.D.N.Y. 2022) .................................................................................................................................... 22

*Roach v. T.L. Cannon Corp.*, 778 F.3d 401 (2d Cir. 2015) ........................................................ 34

*Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001) ............................. 24, 32

*Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974)............................... 26

*Schwab v. Philip Morris USA, Inc.*, 449 F.Supp.2d 992 (E.D.N.Y.2006).................................. 30

*Shariar v. Smith & Wollensky Rest. Group*, 659 F.3d 234 (2d Cir. 2011)................................. 21

*Stinson v. City of New York*, 282 F.R.D. 360 (S.D.N.Y. 2012) ............................................. 22, 26

*Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70 (2d Cir. 2015)...................................... 22

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196 (2d Cir. 2008) ............................................................................................................................................ 21

iii

*TransUnion MLLC v Ramirez*, 141 S. Ct. 2190 (2021) .................................................................. 29

*Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011) ........................................................................ 22

*Westchester Indep. Living Ctr. v. State Univ. of N.Y., Purchase Coll.*, 331 F.R.D. 279 (S.D.N.Y. 2019) ........................................................................................................................................ 25

*Williams v. N.Y.C. Transit Auth.*, 171 A.D.3d 990 (2nd Dept. 2019).......................................... 20

## STATUTES AND RULES

29 U.S.C. § 794e ............................................................................................................................ 29

42 U.S.C. § 12102 .......................................................................................................................... 26

42 U.S.C. § 15041 et seq................................................................................................................. 8

42 U.S.C. § 15043 ...................................................................................................................... 8, 29

42 U.S.C. § 1983.............................................................................................................................. 2

42 U.S.C. §§ 10805 ....................................................................................................................... 29

Americans with Disabilities Act, Title II ............................................................................. *passim*

Fed. R. Civ. P. 23 ................................................................................................................. *passim*

N.Y.C. Admin. Code § 8-102 ........................................................................................................ 26

N.Y.C. Admin. Code § 8-107 ........................................................................................................ 20

New York City Human Rights Law...................................................................................... *passim*

The Rehabilitation Act § 504 ............................................................................................... *passim*

## PRELIMINARY STATEMENT

More than a half century since the passage of the New York City Human Rights Law (hereinafter "NYCHRL"), and more than thirty years after the enactment of the Americans with Disabilities Act (hereinafter "ADA"), the City of New York ("the City") and the New York City Police Department (hereinafter "NYPD," or "the Department") remain noncompliant with the NYCHRL and ADA, making the arrest process critically, and unconstitutionally, dangerous for individuals with mobility disabilities.

Plaintiffs Milan Heggs, Roy Beckford, and Philip Legree, who each have mobility-based disabilities, were treated less well than arrestees without such disabilities and were subjected to disparate and discriminatory treatment while detained in the custody of Defendants the City and NYPD in violation of the NYCHRL, the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and their Constitutional rights. Together with Disabled in Action ("DIA") and Disability Rights New York ("DRNY"), a non-profit civil rights membership organization committed to ending discrimination against people with disabilities and an independent non-profit corporation, respectively, Plaintiffs seek to represent individuals with mobility disabilities who were subjected to disparate and discriminatory treatment in their detainment and arrest processing while involuntarily held by the City and the NYPD. In New York City, individuals with mobility-based disabilities are treated less well during custodial arrests in comparison to others similarly situated; have drastically limited access to services while being transported and at many local precincts and central bookings, including but not limited to basic services supporting essential human needs; and are subjected to degrading and dehumanizing treatment throughout the process.

Every year thousands of individuals with mobility disabilities are arrested by the NYPD. Dkt. No. 124, Third Amended Compl. ("TAC") at ¶¶ 49-50. During arrest, they are frequently forcibly separated from their assistive mobility devices and prosthetics. *Id.* ¶ 5. Following this separation, they are frequently handcuffed to stationary structures and forced to remain immobilized on hard surfaces for hours without the ability to stand, walk, or stretch. *Id.* When transported to holding facilities at a precinct or central booking, they are moved in wheelchair-inaccessible vehicles, lifted and carried by untrained NYPD officers, and dropped by the same untrained personnel, often suffering physical injuries as a result. *Id.* ¶ 6. The situation is no better at the central booking holding facilities run by the City, in which they are crammed into cells without their assistive mobility devices and prosthetics, often made to sit on filthy, vermin-infested concrete floors, and forced to use non-compliant toilets (if they can even manage to get themselves to the toilet). *Id.* ¶¶ 102, 152, 156, 176. Additionally, detainees with mobility disabilities are, on average, held in custody longer than other similarly situated detainees based solely on Defendants failure to make reasonable accommodations. *Id.* ¶ 3. This does not just happen in isolated incidents due to the inexperience, negligence, recklessness, or intent of members of the NYPD, such as the individual named defendants – Defendants have implemented, enforced, and encouraged a practice and/or custom of subjecting custodial arrestees and pretrial detainees with mobility disabilities, including Plaintiffs and putative class members, to unconstitutional conditions of confinement. *Id.* ¶ 7.

This is all in clear violation of the New York City Human Rights Law, Title II of the ADA, Section 504 of the Rehabilitation Act of 1973, and the rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. It is the result of a cognizable policy or custom implemented by Defendants. Defendants have failed to properly

screen train, supervise, monitor, and discipline officers regarding arrestees with mobility disabilities; encouraged and sanctioned unconstitutional detentions of arrestees with mobility disabilities; and created unconstitutional conditions of confinement for pre-arraignment detainees with mobility disabilities.

Class certification is appropriate because there is an objectively identifiable class of all persons with mobility disabilities who were taken into police custody pursuant to a custodial arrest and processed through a precinct or central booking facility in New York City and who were treated less well than similarly situated individuals and denied disability accommodations from February 3, 2015 through the present. These class members are reasonably ascertainable, common questions of law and fact predominate, and numerosity is easily satisfied. The named class representatives and class counsel, all lawyers with considerable experience in this practice area, have all demonstrated their adequacy in this litigation and beyond. Declaratory and injunctive relief are necessary to force Defendants to abide by the NYCHRL, the ADA, Section 504, and the United States Constitution.

STATEMENT OF FACTS

**I.    The Plaintiffs**

**A.    Milan Heggs**

Milan Heggs has required the use of a wheelchair and/or prosthesis for the past two and a half decades due to a gunshot wound in which a bullet became inoperably lodged in or near his spine in 1995 when he was 15 years old. (Rankin Dec. Ex. 3, Heggs Dep. 21:25-23:20).[1] He has since been classified as an L3 paraplegic. (Ex. 3, Heggs Dep. at 21:24-22:2; 100:14-17). He cannot stand without his leg braces. (Ex. 3, Heggs Dep. at 101:16-19). Heggs has been arrested numerous

---

[1] All references in this document to exhibits are to the Rankin Declaration.

times. (Ex. 3, Heggs Dep. at 86:20-25).

Heggs was arrested just after midnight on April 30, 2015 by NYPD officers after a car accident in Brooklyn in which he was driving a participant vehicle. (Ex. 3, Heggs Dep. at 18:3-8; 31:3-20). He was first taken by ambulance to a hospital for treatment for injuries sustained in the accident. (Ex. 3, Heggs Dep. at 91:21-92:5). When he was released from the hospital two days later into the custody of the NYPD, he was denied access to his leg braces. (Ex. 3, Heggs Dep. at 49:9-21). Instead, he was released from the hospital in a wheelchair. NYPD officers removed him from the wheelchair and transported him from the hospital to the 73rd precinct in an NYPD patrol vehicle that was not wheelchair accessible. (Ex. 3, Heggs Dep. at 50:11-19). Arriving at the precinct, he was rolled inside on an office chair with wheels, and once in a cell, he was denied access to his wheelchair or leg braces. (Ex. 3, Heggs Dep. at 53:19-55:3). Officers later rolled Heggs out of the cell in the same office chair to get his photo and fingerprints taken, before rolling him back again. (Ex. 3, Heggs Dep. at 57:21-58:11). Heggs spent two days at the 73rd precinct, sleeping on a filthy floor. (Ex. 3, Heggs Dep. at 59:11-14; 75:17-24). Since he had no way to ambulate to, or stand at, the toilet at the precinct, Heggs was forced to use a milk carton to relieve himself. (Ex. 3, Heggs Dep. at 66:25-67:14). When Heggs objected to this degrading treatment, an officer at the precinct candidly told him "we're just not designed for wheelchairs." (Ex. 3, Heggs Dep. at 74:2-11). After two days, he was transported from the precinct to Central Booking by ambulette. (Ex. 3, Heggs Dep. at 60:24-61:14). When leaving the precinct, he was provided with a wheelchair for the first time since leaving the hospital. (Ex. 3, Heggs Dep. at 60:24-61:25).

After Heggs arrived at Central Booking, he was eventually put into a cell in his wheelchair. (Ex. 3, Heggs Dep. at 65:24-66:2). Heggs was at Central Booking for two days, where a corrections officer told him that he would be waiting for a long time for appropriate transportation to transport

him from Central Booking to Rikers Island. (Ex. 3, Heggs Dep. at 80:21-81:17).

**B.    Roy Beckford**

Plaintiff Beckford was arrested in Times Square by NYPD officers on August 9, 2019 while recording the arrest of a protester on the fifth anniversary of the murder of Michael Brown in Ferguson, Missouri. (Ex. 1, Beckford Dep. at 22:23-23:13). He suffers from a functional neurological disorder, which causes chronic pain throughout his body, and he requires a cane or walker to walk. (Ex. 1, Beckford Dep. at 12:11-25; 14:17-16:1). He is only able to walk a few feet without his cane, which he has a prescription for. (Ex. 1, Beckford Dep. at 15:15-16:9). During the arrest, officers took Beckford's cane from him, throwing him to the ground. (Ex. 1, Beckford Dep. at 25:11-25). After he was slammed to the ground, when Beckford told officers that he needed his cane to walk, he was told by defendant Officer Mooran, in sum and substance, "tough luck, figure it out." (Ex. 1, Beckford Dep. at 26:3-22; 27:12-17). He was then dragged by officers to a police van, passing out momentarily in the process. (Ex. 1, Beckford Dep. at 26:16-25). Unsecured in the police van, with his hands handcuffed behind his back, Beckford needed to use his legs to brace himself while the van was in motion, causing him significant pain. (Ex. 1, Beckford Dep. at 27:20-28:13).

At the precinct, Beckford requested officers return his cane, but the officers ignored him. (Ex. 1, Beckford Dep. at 28:21-29:9). He asked if he could sit down or at least lean on something, but the officers continued to ignore him. (Ex. 1, Beckford Dep. at 30:4-8). Officers then forced Beckford to move through the precinct without his assistive device and placed him in a holding cell, before releasing him with a desk appearance ticket. (Ex. 1, Beckford Dep. at 30:23-31:1; 42:11-16). The next day Beckford saw a doctor and was diagnosed with a concussion from being unsecured in the van by a NYPD officer. (Ex. 1, Beckford Dep. at 44:13-21). Beckford had been

arrested previously for filming NYPD officers. (Ex. 1, Beckford Dep. at 21:24-22:4). Beckford continues to film interactions between arrestees and the police, which exposes him to the likelihood of future arrest. (Ex. 1, Beckford Dep. at 38:12-40:24).

### C. Philip Legree

Plaintiff Philip Legree has been forced to use a cane since 2014 when he suffered ruptured tendons in both legs while at work for New York City Transit. (Ex. 2, Legree Dep. at 54:7-25). Legree is unable to walk more than a few steps without his cane. (Ex. 2, Legree Dep. at 86:11-87:2; 43:18-21).

On August 11, 2019, Legree was involved in a minor traffic collision. (Ex. 2, Legree Dep. at 126:10-19; 129:20-24). Two officers arrived at the scene and asked Legree to get out of his car. (Ex. 2, Legree Dep. at 132:23-133:9). Legree told the officers that he needed to get his cane, and when he reached back to get it, an NYPD officer handcuffed him and took him to a police vehicle and then the 49th precinct. (Ex. 2, Legree Dep. at 133:18-135:2). During the drive, Mr. Legree was forced to sit scrunched up and at an uncomfortable angle in the backseat of the police vehicle, and his complaints of discomfort were ignored by the officers. (Ex. 2, Legree Dep. at 140:24-141:25; 143:5-144:3). Officer Tartarone ordered Legree to walk into the precinct, including up a set of stairs, without the use of his cane and with his hands cuffed behind his back. (Ex. 2, Legree Dep. at 139:21) Officer Tartarone also scolded him for not getting into the police vehicle quickly enough and for not walking quickly enough. (Ex. 2, Legree Dep. at 166:23-167:8; 167:23-168:6). At the precinct, Legree was placed in a cell and denied access to his cane. (Ex. 2, Legree Dep. at 136:3-137:4). He was there for several hours before being taken to Central Booking. (Ex. 2, Legree Dep. at 169:5-12). At Central Booking, an officer let Legree use his cane to navigate a staircase, but he was otherwise forced to walk without his cane or assistance from officers. (Ex. 2, Legree Dep. at

174:10-176:19; 241:11-242:9). At his arraignment, Legree was released on his own recognizance. (Ex. 2, Legree Dep. at 177:4-11).

### D.    Disabled In Action

Plaintiff Disabled In Action ("DIA") is a nonprofit civil rights membership organization that since 1970 has been committed to ending discrimination against people with disabilities. Ryan Aff. ¶ 3. Its objectives include promoting the ability of persons with disabilities to live independently and working to support the passage of laws that affirm and defend the rights of people with disabilities. *Id.* ¶ 13. DIA has expended substantial time and resources on advocacy work in New York City, and has also participated in legal actions against New York City. *Id.* ¶ 14. For example, in 2016 DIA sued the City, alleging that the NYPD's 77 precincts were inaccessible to members of the public in wheelchairs and thus noncompliant with the ADA. *Id.* ¶ 16. The court granted plaintiffs partial summary judgment, finding the City liable for discrimination against people with mobility disabilities due to the extensive inaccessibility of the public side of precincts and the lack of sufficient accommodations to address these barriers. *Id.* ¶ 17. "Plaintiffs have presented ample evidence that persons with mobility disabilities cannot meaningfully access a host of NYPD services and programs that are currently provided in inaccessible stations. That is enough to establish liability." *Disabled in Action v. City of NY*, 437 F. Supp 3d 298, 311 (S.D.N.Y. 2020). DIA is largely constituted by, and is directed by, people with disabilities. *Id.* ¶ 4. Its members include residents with mobility disabilities living and working throughout the five boroughs and certain of these members could be, and indeed have been, arrested in New York City. *Id.* ¶¶ 7-8. Defendants' actions and inactions described herein have had a detrimental effect on both DIA's members – who have been arrested and continued to face arrest in New York City while attending demonstrations and engaging in civil disobedience – and the organization itself, as it has affected

the sort of events and demonstrations DIA is able to encourage its members to attend. *Id.* ¶¶ 8-9, 12.

### E. Disability Rights New York

Disability Advocates, Inc. is an independent non-profit corporation organized under the laws of the State of New York. Clune Aff. ¶ 2. It does business and has sued under the name Disability Rights New York (DRNY). *Id.* ¶ 3. Under the Developmental Disabilities Assistance and Bill of Rights Act (DD Act), Congress gives significant federal funding to states for services to individuals with disabilities provided the state establishes a Protection and Advocacy (P&A) system that meets certain specified conditions. 42 U.S.C. § 15041 et seq. DRNY is New York State's P&A system. N.Y. Exec. Law § 558(b). As the P&A for the State of New York, DRNY is the recipient of eight federal grants which mandate particular areas of advocacy. *Id.* ¶ 6. Through receipt of these federal funding streams, DRNY is specifically authorized to pursue legal, administrative and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals with disabilities. 42 U.S.C. § 15043(a)(2)(A)(i). Accordingly, DRNY investigates allegations of abuse and neglect of persons with disabilities and engages in individual and systemic litigation. *Id.* ¶ 8.

## II. Experiences of Putative Class Members

According to research published in the American Journal of Public Health, people under age 28 with disabilities are 44 percent more likely to be arrested than those without disabilities.[2] Due to Defendants' non-compliance with the NYCHRL, ADA, and Section 504 – decades after

---

[2] Erin J. McCauley, "The Cumulative Probability of Arrest by Age 28 Years in the United States by Disability Status, Race/Ethnicity, and Gender," American Journal of Public Health 107, no. 12, pp. 1977-1981 (December 1, 2017), https://ajph.aphapublications.org/doi/epub/10.2105/AJPH.2017.304095. A Cornell University study affirms that individuals with disabilities of all ages face arrests at disproportionately high levels. See, Cornell University, People with Disabilities More Likely to be Arrested, SCIENCEDAILY.COM (Nov. 30, 2017), www.sciencedaily.com/releases/2017/11/171130150418.htm.

their enactment—people with mobility disabilities continue to be subjected to disparate treatment from arrest to arraignment. To date, the Department has purportedly made just five of its 76 precincts accessible to people with mobility disabilities – just over 6 percent. (Ex. 10, AccessibleNYPD 8/2021 at HEGGS008622). Individuals with mobility disabilities face arrest processing delays as a result of being siphoned through one of these few purportedly remediated precincts, while individuals with mobility disabilities arrested in the Bronx and Queens, where no precincts have yet been remediated, face the hazards of inaccessible precincts – the same hazards putative class members faced everywhere in New York City before these limited remediations. Moreover, no matter the borough in which an individual with a mobility disability is arrested, central booking facilities—the buildings where individuals under arrest first see a judge—remain inaccessible and individuals with mobility disabilities arrested in the Bronx and Queens face disproportionately longer arrest processing times due to delays in access to vans with wheelchair lifts. [3] The Department's Patrol Guide remains remarkably silent regarding policies and procedures for processing the arrests of individuals with mobility disabilities, the Department fails to provide disability awareness training to its officers, and also demonstrates a lack of meaningful engagement with members of the disability community.

### A. Precincts City-wide are Inaccessible for Arrest Processing.

Areas at a precinct utilized for arrest processing include, but are not limited to, precinct entrance walkways and steps, holding cells, interrogation rooms, doorways, hallways, drinking fountains, and bathrooms. (Ex. 20, HEGGS001050 – 83; Ex. 5, Filer Haley Dep. at 232:17-236:7; 237:22-239:13). According to architectural surveys conducted by Defendants, virtually every

---

[3] Plaintiffs do not contend that the vans and the few purportedly remediated precincts are sufficient, but note that even if they were, they were not available throughout the class period, nor are they currently available to all arrestees.

precinct contains numerous non-ADA compliant structural and physical elements. *Id*. For individuals with mobility disabilities facing arrest processing in inaccessible precincts, the Department's non-compliance creates a substantial danger.

In fact, as mentioned above, allegedly just 6.6 percent of the Department's precincts have been made accessible to people with mobility disabilities. (Ex. 7, HEGGS005000-01). This is despite the Department's remediation plan as described in AccessibleNYPD, first issued by the Department in 2019 to describe steps to eliminate stationhouse barriers to ADA compliance. (Ex. 9, AccessibleNYPD 2019). In AccessibleNYPD, the Department committed to making 16 precincts, "at least two per borough," throughout the City fully accessible for arrest processing (hereinafter "designated accessible precincts"). (Ex. 9, AccessibleNYPD 2019 at 6; Ex. 8, HEGGS001756). Five of these precincts were in Manhattan, four were in Brooklyn, four were in Queens, two were in the Bronx, and one was in Staten Island. (Ex. 9, AccessibleNYPD 2019 at 6). At the time the Department issued AccessibleNYPD in 2019, remediation of the designated accessible precinct in Patrol Borough Brooklyn South and Patrol Borough Brooklyn North was complete. (Ex. 9, AccessibleNYPD 2019at 8). Remediation of architectural barriers at the remaining 14 designated accessible precincts were scheduled to begin in May 2018. (Rankin Dec. Ex. 9, AccessibleNYPD 2019 at 10). The last designated accessible precinct to receive remediation was scheduled to begin remediation in June 2019. (Ex. 9, AccessibleNYPD 2019 at 10). The end of 2021 was the purported completion date for remediation of all designated accessible precincts. (Ex. 9, AccessibleNYPD 2019 at 10; Ex. 10, AccessibleNYPD 8/2021 at HEGGS008620).

Yet, to date, the Department purportedly has completed remediation of just three additional designated accessible precincts City-wide,—one each in Patrol Borough Manhattan North, Patrol Borough Manhattan South, and Patrol Borough Staten Island. (Ex. 7, HEGGS005000-01). To date,

the Department has failed to remediate any precincts in the Bronx or Queens. Officers in these boroughs "who arrest individuals with mobility disabilities will process arrests in the precinct of arrest," which means these arrestees will face inaccessible buildings for arrest processing. (Ex. 7, HEGGS005000-01; Ex. 10 AcessibleNYPD 2021 at HEGGS008622). Upwards of 50,000 people are arrested each year in the Bronx and Queens, collectively, making the Department's failure to meet its deadline all the more concerning.[4] Meanwhile, individuals with mobility disabilities arrested in all other boroughs are siphoned through just one designated, and purportedly accessible, precinct for that patrol borough, inevitably leading to delays in arrest processing times for those who must be transported to these precincts.

The Department reissued AccessibleNYPD in 2021, revising the timeline for remediation of its designated accessible precincts and asserting "all 16 [will be] completed by the end of 2026." (Ex. 10, HEGGS008620). In this document, the Department claimed the pandemic was the source for the five-year delay. (Ex. 10, HEGGS008620). However, the Department originally committed to commence remediation of all 16 designated accessible precincts by June 2019—nearly nine months before the start of the pandemic in the U.S. (Ex. 9, AccessibleNYPD 2019 at 10). This excuse therefore rings hollow. Furthermore, since the 1990s, the City and NYPD have been required to identify what facilities, programs, activities, and services were not accessible and make them accessible – more than thirty years later this still has not happened. *Disabled in Action v. City of NY*, 437 F. Supp 3d 298 (S.D.N.Y. 2020).

**B.     No Central Booking Facilities are Accessible.**

Central booking, or borough court, is the last location individuals are brought to during the

---

[4] The numbers were higher before the COVID-19 pandemic. Arrest statistics are available via the New York State Division of Criminal Justice Services, https://www.criminaljustice.ny.gov/crimnet/ojsa/arrests/index.htm. (Last visited September 17, 2022).

arrest process and is where individuals are arraigned in front of a judge. NYPD, *Criminal Justice Process*, https://www1.nyc.gov/site/nypd/services/victim-services/criminal-justice-process.page (last visited Aug. 22, 2022). Individuals remain in the Department's custody until their arraignment. *See id*. These facilities are provided by New York City and maintained and managed by the Department of Citywide Administration Services (DCAS). *See* Judiciary Law § 39. A number of time-consuming procedural events take place prior to an individual's arraignment at a central booking facility, including an interview with the Criminal Justice Agency, possible interrogation by a member of the District Attorney's Office, case discussions with hired or assigned defense counsel, and a waiting period in various holding cells. *Id*. Areas within central booking used to conduct these events include, but are not limited to, holding cells, interview booths, interrogation rooms, doorways, hallways, bathrooms, and arraignment courtrooms. (Ex. 21, HEGGS005307-22; Ex. 4, Heggs Haley Dep. at 158:5-159:8). As Plaintiffs experienced, numerous structural and physical elements of central booking facilities in each of the five boroughs are not accessible. (Ex. 21, HEGGS005307-22).

**C.    Individuals Arrested with Mobility Disabilities have Limited Access to Vans with Wheelchair Lifts.**

Data from the Mayor's Office for People with Disabilities and the United States Census American Community Survey conducted in 2014 indicate that approximately 180,000 to 500,000 non-institutionalized New York City residents have a mobility disability. (TAC ¶ 49). Yet before 2018, the Department had no method for safely transporting individuals with mobility disabilities to precincts for arrest processing. (Ex. 4, Heggs Haley Dep. 164: 17-22; Ex. 5, Filer Haley Dep. at 121:8-123:4;   123:11-124:13;   135:7-139:23;   139:24-142:7;   171:20-174:24;   *See*   Ex.   6, HEGGS001751). In March 2018, the Department established a pilot program, providing for vans with wheelchair lifts to transport individuals arrested whose mobility disability necessitates the

use of a wheelchair or scooter. (Ex. 4, Heggs Haley Dep. at 197:10-198:9; Ex. 5, Filer Haley Dep. at 124:14-126:14; 201:24-204:22; Ex. 6, HEGGS001751) However, this pilot program only existed in Brooklyn and the Department continued to transport individuals arrested in all other boroughs in inaccessible vehicles. (Rankin Dec. 6, HEGGS001751; Ex. 4, Heggs Haley Dep. at 198:21-25). The Department committed itself to expanding the pilot program to all other boroughs no later than mid-2019. (Ex. 9, AccessibleNYPD 2019 at 8). However, expansion City-wide faltered until April of 2020. (Ex. 7, HEGGS005000).

Despite the purported City-wide expansion of accessible transportation, individuals with mobility disabilities under arrest in Queens and the Bronx continue to be treated less well than their peers without such disabilities. (*See* Ex. 10, HEGGS008622). Because no precincts have been remediated in either borough, the Department does not operate accessible vans in these boroughs. (Ex. 10, HEGGS008622). As such, "uniformed members of the service requiring ADA compliant vans with wheelchair lifts in the confines of Queens . . . and the Bronx [must] . . . request ADA compliant transportation" from another borough. (Ex. 10, HEGGS008622). This inevitably leads to longer arrest processing times for individuals with mobility disabilities arrested in Queens and the Bronx.

Notably, the Department's relatively new and severely flawed method of transporting individuals with mobility disabilities under arrest contrasts starkly with the Department's program for providing accessible transportation for complainants, victims, and witnesses with disabilities. (Ex. 6, HEGGS001751-53). The Department established a program providing for accessible transportation for complainants, victims, and witnesses long before any comparable program was envisioned for individuals facing arrest; the Department runs it through the Metropolitan Transportation Authority's (MTA) Access-a-Ride Program. (Ex. 4, Heggs Haley Dep. at 203:22-

205:6; Ex. 5, Filer Haley Dep. at 189:3-190:12; Ex. 6, HEGGS001751-53). However, it should be noted that the Access-a-Ride Program is rife with problems itself.

### D. Department Policies and Procedures are Largely Silent with Regards to Individuals with Mobility Disabilities.

Despite the sizable portion of New Yorkers with mobility disabilities, few Department policies and procedures even consider people with mobility disabilities. (*See* Ex. 4, Heggs Haley Dep. At 42:13-43:6; Ex. 5, Filer Haley Dep. At 62:20-65:7; 65:22-67:22; 67:23-68:5). The invisibility of the mobility disability community in the eyes of the Department is exemplified by the Department's lack of a uniform method of recording when an individual with a physical—or other—disability is arrested. (*Id.*; *See* Ex. 12, NYPD Patrol Guide, Proc. No. 208-03 Arrests – General Processing (Oct. 7, 2020); Ex. 13, NYPD Patrol Guide, Proc. No. 208-05 Arrest – General Search Guidelines (July 1, 2020); Ex. 15, NYPD Patrol Guide, Proc. No. 210-17 Arrest Processing of Pre-Arraignment Prisoners Designated as "Special Category" (May 27, 2016); Ex. 16, NYPD Patrol Guide, Proc. No. 212-104 Interaction with Hearing Impaired Persons (July 1, 2020)). There is also no method of recording whether an individual requires the use of durable medical equipment or adaptive equipment, whether durable medical equipment or adaptive equipment was invoiced, or whether legally prescribed medication was invoiced. *Id.*

As a result of motion practice, Defendants produced thousands of pages of NYPD arrest documentation from 2015 to 2020 containing key words that indicated the arrest was potentially of a person with a mobility disability. Plaintiffs reviewed these documents and identified 2,380 arrests of individuals with mobility disabilities. (Ex. 17, Arrest Spreadsheet; Ex. 4, Heggs Haley Dep. At 17:10-18:17; 20:10-25; 21:8-22; 22:2-20; 29:17-21; Ex. 5, Filer Haley Dep. At 62:20-65:7; 209:21-211:10; 211:11-213:5).

The Department documents its policies and procedures for uniformed officers and civilian staff members in its Patrol Guide and Operations Orders. (Ex. 5, Filer Haley Dep. At 62:20-65:7; s*ee also* Brown v. City of NY, 798 F.3d 94, 101 [2d Cir 2015]). The Patrol Guide's origins date back to 1812 when a list of rules and regulations were adopted by De Witt Clinton, then mayor of New York City. John Jay Library, https://guides.lib.jjay.cuny.edu/nypd/procedure (last visited Sept. 1, 2022). In 1993, the Department created what most closely resembles the current Patrol Guide. *Id.* Despite this long history, the Patrol Guide only began mentioning accommodations for individuals with mobility disabilities as late as 2016, more than a quarter of a century after the enactment of the ADA, when discussing making Department vehicles ADA-compliant. (Ex. 21, HEGGS002260-62; Ex. 5, Filer Haley Dep. at 190:14-199:3; *cf.* Ex. 16, HEGGS002263). In large part, the Department continues to process the arrests of individuals with mobility disabilities in a manner nearly identical to those without mobility disabilities. (Ex. 4, Heggs Haley Dep. at 67:14-19; Ex. 5, Filer Haley Dep. at 62:20-65:7; 65:22-67:22; 245:9-246:22; *see generally,* NYPD Patrol Guide, Proc. No. 208-03 (Exs. 11 & 12); 208-05 (Ex. 13); 210-17 (Ex. 16) ; 212-104 (Ex. 15)).

The Patrol Guide makes minimal references to policies or practicing pertaining to the arrests of individuals with mobility disabilities. *Id*. We understand the totality of references to people with mobility disabilities in the patrol guide to be as follows:

1) In P.G. 210-17, issued in May 2016, Desk Officers are directed to confer with the central booking supervisor prior to transporting an arrestee with a mobility disability to central booking. (Ex. 4, Heggs Haley Dep. at 115:24-116:7; Ex. 5, Filer Haley Dep. at 65:8-65:21; Ex. 21, HEGGS002260-62);

2) Also pursuant to P.G. 210-17, officers are directed to designate arrestees "special category" when an arrested individual has a physical disability or if there is "any reason that would lead one to believe placing prisoner in general pop may pose safety risk or health concern." (Ex. 21, HEGGS002260; Ex. 4, Heggs Haley Dep. 47:2-6; Ex. 5, Filer Haley Dep. at 69:2-74:4; 197:9-199:3).

3) In P.G. 208-03, issued in April 2019, officers are directed to make a "reasonable attempt"

to notify a relative or friend of the arrest of an individual with a mobility disability. (Ex. 11, HEGGS001922);

4) In P.G. 208-05, issued in July 2020, arresting officers are directed to ask an arrestee with a mobility disability whether it is safe to move or be removed from a "wheelchair, scooter, etc.," prior to the commencement of a search. (Ex. 13; HEGGS005324; Ex. 5, Filer Haley Dep. at 92:20-95:18; 114:9-115:2; 237:22-239:13; 239:14-242:8). If safe, the officer is directed to move the individual to an "appropriate seating area" to search the individual and device separately. *Id*. If not safe, the officer is directed to handcuff the individual behind their back and order the individual to remain seated in their device while the officer searches the individual and device. *Id*.

5) In cases when an arrestee with a mobility disability is taken to a hospital during the arrest process, P.G. 210-04, issued in September 2018, directs desk officers to provide hospital staff with the name of and, in some cases, physical prescription medication that was in the possession of the arrestee with a mobility disability at the time of their arrest. (Ex. 14, HEGGS002256).

6) P.G. 221-02, issued in June 2016, directs officers to consider whether lack of compliance is the result of an arrestee's inability to comply "resulting from factors including . . . physical limitation" rather a deliberate attempt to resist. (Ex. 18, PG 221-02).

As the first of these was not added until May 2016, many of the putative class members were processed before any of these sections were added to the Patrol Guide.

Included in the minimal mentions of individuals arrested with mobility disabilities, the Patrol Guide advances several policies with detrimental consequences for individuals with mobility disabilities. P.G. 210-04 specifically states officers are not required to accept or invoice medication delivered to the precinct by relatives or household members of an arrestee with a mobility disability for the purpose of providing it to the arrestee. (Ex. 14, HEGGS002258). This is despite the fact that some medications are necessary for people with mobility disabilities, such as conditions caused by neurological problems that medication can address.

Additionally, the arrest process generally involves separating an individual from durable medical equipment, assistive technology, or adaptive devices in the individual's possession at the time of their arrest. (Ex. 5, Filer Haley Dep. at 103:12-109:3; 157:23-160:12; *See generally,* Ex. 22, HEGGS002074-77). Following equipment invoicing, individuals with physical disabilities do

16

not have access to their equipment throughout the arrest process. *Id*. This puts individuals with mobility disabilities at an increased risk of harm while being brought to and from the precinct, traversing within holding cells and around the precinct, including to use the bathroom, and at the hands of other arrestees, particularly those without disabilities, being held in the same cell as those with disabilities. (Ex. 3, Heggs Dep. at 67:2-75:12; Ex. 1, Beckford Dep. at 27:4-29:8). Additionally, assistive devices are not brought with the individual to central booking.[5] (Ex. 4, Heggs Haley Dep. at 25:6-26:14; 27:12-25; 28:11-16). Thus, when an individual with a mobility disability is released from central booking, the person does not have access to their durable medical equipment. *See id*. Policies like this one put the safety of individuals with mobility disabilities at risk throughout the arrest process.

It is clear the Department falls short in providing directives to its officers, even by its own standards. Last year, when the Department issued its latest version of AccessibleNYPD, it stated "the Department *will* implement a policy that requires that interior paths of travel and clearances are routinely checked by Department staff for any barriers to access . . . [w]hen remediation to the hub precincts are completed." (Ex. 10, HEGGS008626*, emphasis added*). The Department continued, "[i]t is anticipated that this policy will be developed and implemented concurrent with the completion of construction of the [designated accessible precinct] sites." (Ex. 10, HEGGS008626). As discussed *supra*, remediation of five designated purportedly accessible precincts have been completed. Yet, to date, the Department has issued no such directive.

### E. The Department Fails to Provide Disability Awareness Trainings to Officers.

As of August 2021, the Department purportedly committed to "create and revise . . . training curricula as necessary to accomplish the steps outlined in [AccessibleNYPD] . . . continue

---

[5] *See* NYPD Return of Property (Other Than Vehicles), https://www1.nyc.gov/site/nypd/services/vehicles-property/return-of-property.page (last visited Aug. 22, 2022).

training its employees about the requirements of the ADA and how those requirements impact their law enforcement duties, and will also ensure training is conducted on any new or revised Department policies related to the ADA." (Ex. 10, HEGGS008632). However, much of this training does not appear to have been implemented until in or around 2018 (Ex. 10 at HEGGS008633), and the Department's training plan is devoid of trainings on disability awareness. Given the spectrum of disabilities and the frequency members of the Department interact with members of the community with disabilities, the need for disability awareness education is paramount. Disability awareness trainings alleviate uncertainty, promote confidence, foster more appropriate interactions, and create a safer environment for members of the Department and arrestees with disabilities. A disability awareness training that sensitizes while educating is critical to give members of the Department the ability to appropriately, without hesitation or apprehension, address matters relating to people with mobility disabilities.

Two examples of disability-adjacent trainings implemented well after 2015, and which lack any element of disability awareness education, include trainings following alleged precinct remediation and a training to become certified to operate vans equipped with wheelchair lifts. According to the Department, "[a]fter completion of the remediation of the [designated accessible] precincts . . . widespread training has been conducted throughout the accessible locations within each existing precinct building. (Ex. 10, HEGGS008633). However, as discussed above, just five of the Department's 76 precincts allegedly received remediation by 2021, and the remediation is not set to be completed until 2026. Therefore, the "widespread training" the Department claims it provided appears to be restricted to the small fraction of its force with tours in these five precincts over the course of little more than the past year.

The Department's Operations Order 34, issued on April 10, 2020, requires training to be

provided in all patrol boroughs to an "appropriate amount of uniformed members of the service to operate Department ADA compliant vans" as needed over a 24-hour continuum. (Ex. 7, HEGGS005000-03). According to the Department, this amounted to just 3.02 percent of uniformed members of the Department receiving the Department's Wheelchair Lift Operation Endorsement training. (Ex. 19, HEGGS001741). Moreover, while training is required for "operation" of the vans, no training is required for officers "required to ride in [accessible] van[s] and provide assistance when needed," thus leaving a critical segment of the force without training. (Ex. 7, HEGGS005001-02).

### III.  Plaintiffs' Proposed Classes

Plaintiffs seek to certify a declaratory-injunctive class and damages class consisting of:

**All persons with mobility disabilities who were taken into police custody pursuant to a custodial arrest and processed through a precinct or central booking facility in the City of New York from February 3, 2015, continuing to the present.**

Dkt. 124, ¶ 48. The injunctive class is represented by Plaintiffs Heggs, Beckford, Legree, DIA, and DRNY. The damages class is represented by the individual Plaintiffs Heggs, Beckford, and Legree.

As described below, these proposed classes meet the requirements of Rule 23(a) and (b)(2) and (3). The identities of class members are readily ascertainable, primarily through NYPD records. Numerosity is easily satisfied, as there are at least hundreds of class members. Plaintiffs have established that the class has a common contention capable of a class-wide resolution. Class Plaintiffs' claims are typical of those of the class as all arrestees are subjected to the same policies or lack of policies and training, and both class Plaintiffs and class Counsel have shown themselves to be adequate to pursuing the claims of the class.

## I. DECLARATORY-INJUNCTIVE AND DAMAGES CLASSES SHOULD BE CERTIFIED AS THE REQUIREMENTS OF RULE 23 HAVE BEEN MET

### A. Legal Standard

The NYCHRL provides that it shall be unlawful discriminatory practice for any person, place or provider of public accommodation to either directly or indirectly discriminate against a person with a disability, or deny such persons the accommodations, advantages, facilities, or privileges of a public accommodation. N.Y.C. Admin. Code § 8-107(4). It is "construed broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Williams v. N.Y.C. Transit Auth.*, 171 A.D.3d 990, 992 (2nd Dept. 2019). Title II of the ADA prohibits any public entity from discriminating against qualified individuals with disabilities "in the provision or operation of public services, programs, or activities," *Tennessee v. Lane*, 541 U.S. 509, 517 (2004), and "requires police officers to provide reasonable accommodations to arrestees and that any threatening or exigent circumstances should be considered when determining the reasonableness of the proposed accommodation." *Durr v. Slator*, 558 F. Supp. 3d 1, 32 (N.D.N.Y. 2021). Section 504 of the Rehabilitation Act also provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The NYCHRL, ADA, and Section 504 all apply to the period from arrest to arraignment. *Williams v. City of N.Y.*, 121 F. Supp. 3d 354, 363 (S.D.N.Y. 2015).

"To proceed with a class action, a plaintiff must satisfy four prerequisites under Rule 23: numerosity, commonality, typicality, and adequacy." *Kurtz v. Costco Wholesale Corp.*, 818 Fed. Appx. 57, 60 (2d Cir. 2020) (citing Fed. R. Civ . P. 23(a)). Certification of a declaratory-injunctive

class is governed by Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. *See Denney v. Deutsche Bank, A.G.,* 443 F. 3d 253, 270 (2d Cir. 2006). Rule 23(b)(2), which applies to class actions seeking declaratory or injunctive relief, requires that the defendants' actions are "generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Plaintiffs seeking to certify a damages class must satisfy the four requisites of Rule 23(a) and the requirements of Rule 23(b)(3): "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008). "[T]he preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 202 (2d Cir. 2008). "The Second Circuit has emphasized that Rule 23 should be given liberal rather than restrictive construction and has shown a general preference for granting rather than denying class certification." *Ackerman v. Coca-Cola Co.*, No. 09 CV 395 (DLI)(RML), 2013 U.S. Dist. LEXIS 184232, at *28 (E.D.N.Y. July 17, 2013) (internal quotation marks omitted).

### B. Plaintiffs' Proposed Class Meets the Requirements of Rule 23

### i. Numerosity is Easily Satisfied

"The numerosity requirement in Rule 23(a)(1) does not mandate that joinder of all parties be impossible – only that the difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 244 (2d Cir. 2007). If the putative class has more than forty members, numerosity is presumed. *See Shariar v. Smith & Wollensky Rest. Group,* 659 F.3d 234, 252 (2d Cir. 2011). For injunctive relief, it is "not only proper, but preferred," that a

class includes potential future class members. *Butler v. Suffolk Cty.*, 289 F.R.D. 80, 99 (E.D.N.Y. 2013).

Defendants have already produced information indicating that at least 2,380 arrests in the period from 2015 to 2020 involved individuals with mobility disabilities. (Ex. 17, Arrest Spreadsheet). This easily satisfies numerosity, even without considering class members whose mobility disability was not recorded in NYPD paperwork and future class members.[6]

### ii. Plaintiffs' Putative Class Rests on a Common Contention Capable of Class-Wide Resolution

Plaintiffs' putative class rests on a common contention: Defendants have policies, practices, or customs – or have failed to institute policies – throughout New York City that result in the failure to make reasonable accommodations for arrestees with mobility disabilities as required by law. "'The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact.'" *Cent. States*, 504 F.3d at 244 (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)).

> Commonality requires the plaintiff to demonstrate that the class members "have suffered the same injury." Their claims must depend upon a common contention . . . . That common contention, moreover, must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Wal-Mart Stores v. Dukes*, 564 U.S. 338, 349-50 (2011) (quoting *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 157 (1982)); *accord Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70, 80 (2d Cir. 2015); *Raymond v. N.Y. State Dep't of Corr. & Cmty. Super.*, 2022 U.S. Dist. LEXIS 5522 *9 (N.D.N.Y. 2022). However, commonality does not mandate that all class members make identical claims and arguments, only that common issues of fact or law affect all class members. A court

---

[6] Defendants refused to concede that numerosity is satisfied.

may find a common issue of law even though there exists some factual variation among class members' specific grievances. *Stinson v. City of N.Y.,* 282 F.R.D. 360, 369 (S.D.N.Y. 2012). Commonality is generally satisfied where "the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis,* 275 F.3d 849, 868 (9th Cir. 2001); *see also Barnes v. United States*, 68 Fed. Cl. 492, 496 (2005).

The central factual and legal issues in this case are common to the class. The putative class rests on a common contention: the failure of the Defendants to make reasonable accommodations for arrestees with mobility disabilities. In other words, the class consists of "individuals who share a common experience that forms the basis of the lawsuit." *Foti v. NCO Fin. Sys*., 04 Civ. 00707 (RJS), 2008 U.S. Dist. LEXIS 16511, at *9 (S.D.N.Y. Feb. 19, 2008).

Some of the other legal questions common to the class include, but are not limited to:

- Whether the City engages in a policy, practice, and/or custom of forcibly removing individuals with mobility disabilities from their wheelchairs, and/or denying individuals with mobility disabilities reasonable access to assistive mobility devices, while being transported to and between and while in custody at precincts or central booking facilities.
- Whether the City engages in a policy, practice, and/or custom of handcuffing individuals with mobility disabilities to stationary physical structures for long periods of their detainment.
- Whether the City engages in a policy, practice, and/or custom of forcibly removing individuals with mobility disabilities from their wheelchairs without consent and in a reckless manner constituting a deliberate indifference to the risk of actual physical injury.
- Whether the City unreasonably prolongs or extends the detention of individuals with mobility disabilities beyond that of otherwise similarly situated arrestees without mobility disabilities.
- Whether the City fails to make reasonable accommodation for individuals with mobility disabilities to access food and water during their detainment and/or lacks or fails to enforce a policy ensuring such reasonable accommodation.
- Whether the City fails to make reasonable accommodation for individuals with mobility disabilities to urinate and defecate at the location of their confinement and/or lacks or fails to enforce a policy ensuring such reasonable accommodation.
- Whether the City's failure to make reasonable accommodations for individuals with mobility disabilities during custodial arrests is in violation of Title II of the ADA, and Section 504 of the Rehabilitation Act.

- Whether the City's treatment of individuals with mobility disabilities during custodial arrests amounts to an unreasonable seizure and/or unconstitutional conditions of confinement in violation of the Fourth and Fourteenth Amendments to the United States Constitution.
- Whether the City, New York City Police Commissioner, and other supervisory defendants, supervising officials, and/or personnel, have knowingly and deliberately failed to screen, train, supervise, monitor, and discipline officers, and whether those failures have resulted in and will continue to result in the unconstitutional conditions of confinements of class members.
- Whether the City, the New York City Police Commissioner, and other supervisory defendants, supervising officials, and/or personnel, sanctioned and/or deliberately failed to rectify unconstitutional practices and customs, and whether such acts and omissions have resulted in and will continue to result in constitutional violations by officers and City employees against class members.
- Whether the City's treatment of individuals with mobility disabilities during custodial arrests is discriminatory in violation of the NYCHRL.

These common questions of law and fact flow from the polices, practices, and customs enacted and implemented by Defendants. Defendants' policies, practices, and customs with regard to the custodial arrest and confinement of individuals with mobility disabilities constitute a unitary scheme in which Defendants refuse to comply with the NYCHRL, ADA, and Section 504 and detain Class members in unconstitutional conditions.

Each of the individual Plaintiffs experienced such treatment firsthand. Plaintiff Heggs was denied access to mobility devices at various stages of the arrest process, was forced to urinate in a milk carton since he was unable to use the toilet, and spent more time in central booking as a result of his mobility disability. *Supra* at 4-5. Plaintiff Beckford was stripped of his mobility device at arrest and was kept from him until he was released at the precinct. *Supra* at 5. Plaintiff Legree's cane was also taken from him at arrest and he was only given access to it again to navigate stairs at central booking. *Supra* at 6.

### iii. Plaintiffs' Claims Are Typical of the Putative Class Members' Claims

Rule 23(a)(3)'s typicality requirement is met because the class representatives' claims are "typical of those of the class," "each class member's claim arises from the same course of events,

and each class member makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 291 (2d Cir. 1992); *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001). When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims. *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993). "[T]ypicality may be presumed where the nature of the relief sought is injunctive and declaratory." *Westchester Indep. Living Ctr. v. State Univ. of N.Y., Purchase Coll.*, 331 F.R.D. 279, 293 (S.D.N.Y. 2019).

Each of the class representatives' claims arise from the same basic facts as the claims of every other class member, and rest on the same legal bases: they are persons with mobility disabilities subjected to custodial arrest. While their experiences were not identical, each class representative has a mobility disability and Defendants failed to treat them as well as non-mobility disabled people at various points during the period from arrest to arraignment. *Supra* at 3-7. Because declaratory and injunctive relief are available, the typicality requirement is satisfied.

### iv.  Plaintiffs and Plaintiffs' Counsel Will Adequately Represent the Class

#### 1.  Individual Plaintiffs

Rule 23(a)(4)'s adequacy-of-representation requirement is generally met where the class representative's interests are not antagonistic to the interest of the class members, and proposed class counsel are "qualified, experienced and able to conduct the litigation." Fed. R. Civ. P. 23(a)(4); *see Baffa v. Donaldson*, 222 F.3d 52, 60 (2d Cir. 2000). In the Second Circuit, courts generally only deny class certification based on the adequacy of class representatives "in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in

credibility that they are likely to harm their case." *In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 47 (E.D.N.Y.1997). The adequacy requirements are satisfied.

The individual Plaintiffs have the same interests as, and no conflict of interest with, members of the class. Each individual plaintiff has a disability as defined by the NYCHRL and ADA. N.Y.C. Admin. Code § 8-102(16); 42 U.S.C. § 12102(2). Each has sustained the same general injury as the damages class members as a result of the City's failure to accommodate their disability in violation of the ADA; the violation of their Fourth and Fourteenth Amendment rights as a result of their mobility disabilities; and discrimination under the NYCHRL. And each seeks injunctive relief for himself and the class for their mobility disabilities to be accommodated in a reasonable fashion by Defendants in the event of arrest and/or transportation to a NYPD precinct or Central Booking. *See East Texas Motor Freight Sys. v. Rodriguez*, 431 U.S. 395, 403 (1977); *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 217 (1974). Beckford continues to engage in the practice that got him arrested in this instance – recording police officers making arrests – and for which he has been arrested in the past, thus exposing him to the potential of future arrest, while Heggs has been arrested on several occasions. (Ex. 1, Beckford Dep. at 21:24-22:4; 38:12-40:25; Ex. 3, Heggs Dep. at 86:20-25). This makes the risk of future injury "real and immediate, not conjectural." *Ligon v. City of New York*, 288 F.R.D. 72, 81 (S.D.N.Y. 2013); *Floyd v. City of New York*, 283 F.R.D. 153, 170 (S.D.N.Y. 2012); *An v. City of N.Y.*, 16 Civ. 5381 (LGS), 2017 U.S. Dist. LEXIS 84364, at *15–16 (S.D.N.Y. June 1, 2017); *see also, e.g., Stinson*, 282 F.R.D. at 382; *Abdell v. City of New York*, No. 05–cv-8453 (RJS) (JCF), 2009 U.S. Dist. LEXIS 42719, at *17 (S.D.N.Y. May 5, 2009) (finding standing for injunctive relief for plaintiffs who intended to participate in demonstrations and plead evidence of NYPD policy of improper enforcement of disorderly conduct laws in connection with protests). Each individual plaintiff

demonstrated at their respective depositions that they testified credibly and have familiarity with their lawsuit. *Supra* at 3-7. Thus, Heggs, Beckford, and Legree are each adequate class representatives for both the damage and injunctive classes.

### 2.    DIA

"Organizations like [DIA] may have standing in one of two ways: by establishing so-called 'associational' or 'representational' standing to sue on behalf of its members, or by establishing that it was directly injured as an organization." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). A membership organization has standing to sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Mental Hygiene Legal Serv. v. Cuomo*, 609 F. App'x 693, 695 (2d Cir. 2015) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 1977)). "In order for an association to demonstrate that it is entitled to sue on its own behalf for injuries that it has sustained, it must satisfy the same standing test that applies to individuals by demonstrating actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision. Courts have held that an association has standing to sue on its own behalf if defendants' actions reduce membership dues or other contributions the organization would otherwise collect." *People United for Children, Inc. v. City of N.Y.*, 214 F.R.D. 252, 262 (S.D.N.Y. 2003) (internal citations omitted). "[W]here an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." *Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363,

365 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide housing counseling and referral services—with a consequent drain on the organization's resources—there can be no question that the organization has suffered the requisite injury in fact."). A court ruled DIA had standing to represent an injunctive class on behalf of its members in another matter in this Circuit. *See Bronx Indep. Living Servs. v. Metro. Transp. Auth.*, 16 cv 5023 (ER), 2021 U.S. Dist. LEXIS 59672, at *8 (S.D.N.Y. Mar. 29, 2021).

DIA qualifies to sue on behalf on both its members and itself. DIA is directed by people with disabilities and its members include residents with mobility disabilities living and working throughout the five boroughs. Certain of these members have been arrested in New York City. Ryan Aff. ¶ 8. DIA members have been arrested on multiple occasions at demonstrations and protests in New York City, at times while conducting civil disobedience. Ryan Aff. ¶ 9. Considering the numbers of individuals with mobility disabilities arrested throughout the five boroughs each year (*see supra* at 14), they will also be arrested in the future and suffer degrading disparate treatment from Defendants. This is particularly true as a DIA member continues to perform civil disobedience and thus faces a high likelihood of arrest. Ryan Aff. ¶ 9. Other members of DIA have expressed fears of exercising their First Amendment rights at demonstrations due to fear of being arrested, due to the treatment of people with mobility disabilities in custody. Collins Aff. ¶ 5. As such, one or more members of DIA would have standing to sue in their own right.

DIA also has standing to sue as an organization for injuries that it itself has suffered as a result of Defendants. First, due to the disparate treatment of persons with mobility disabilities during arrest and in custody, DIA has not encouraged its members to attend various protests and demonstrations in support of its mission, as it fears that its members could face mistreatment if arrested. Ryan Aff. ¶ 12. Defendants have thus directly frustrated DIA's mission. Defendants'

actions and omissions have also injured DIA directly in the form of diversion of its resources and frustration of its mission, as it must expend significant resources to continue to advocate for its constituents who have been or could be harmed by Defendants' policies and practices. Ryan Aff. ¶¶ 14-18. A favorable decision would provide redress of those injuries.

### 3. DRNY

DRNY has statutory standing, bestowed by Congress, to further its mandated duties as the Protection & Advocacy (P&A) system of New York State. Congress may, "by legislation, expand standing to the full extent permitted by Art. III." *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100-120 (1979); *see also Nat'l Motor Freight Ass'n v. United States*, 372 U.S. 246, 247 (1963) (appellants had standing where statute authorized representation of members who were aggrieved by the contested order). The Developmental Disabilities Assistance and Bill of Rights Act of 1975 ("DD"), Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), and the Protection and Advocacy of Individual Rights (PAIR) Acts require that DRNY, as the P&A system, have authority to pursue legal, administrative, and other appropriate remedies to enforce the rights of people with disabilities. 42 U.S.C. § 15043(a)(1), (a)(2)(A)(i); 42 U.S.C. §§ 10805(a)(1)(B), 10801(b)(2)(A); 29 U.S.C. § 794e(a)(1). When the DD Act was amended in 1994, Congress reviewed the statute's authorization for P&As to sue and determined that "no statutory fix is necessary because the current statute is clear that the P&A systems have standing to pursue legal remedies to ensure the protection of and advocacy the rights" of people with disabilities. S. Rep. No. 103-120 at 39 (1993), reprinted in 1994 U.S.C.C.A.N. 164, 202-03.

Here, the named Plaintiffs and putative class suffer injury in the form of discriminatory treatment as a result of Defendants' actions, and a favorable decision would provide redress of those injuries, as Defendants would be enjoined from continuing to violate the rights of arrestees

with mobility disabilities. *See* TAC at 47-49. This is sufficient to establish Art. III standing and therefore DRNY's statutory standing. *TransUnion MLLC v Ramirez*, 141 S. Ct. 2190 (2021) (To establish standing, a plaintiff must allege, (1) a concrete and particularized, actual or imminent injury in fact; (2) a causal connection between Defendants' conduct to the alleged injury; and (3) a likelihood that a favorable decision would redress said alleged injury).

### 4. Class Counsel

Proposed class counsel have the requisite experience, qualifications, and ability to conduct the litigation on behalf of the class. *See In re Drexel Burnham Lambert Group*, 960 F.2d at 291. Rule 23(g)(1)(A) sets forth criteria the Court "must consider" in deciding whether to appoint the proposed class counsel:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and
> (iv) the resources that counsel will commit to representing the class.

The adequacy of class counsel is satisfied "where the class attorneys are experienced in the field or have demonstrated professional competence in other ways, such as by the quality of the briefs and the arguments during the early stages of the case." *Schwab v. Philip Morris USA, Inc.*, 449 F.Supp.2d 992, 1106 (E.D.N.Y.2006).

Named Plaintiffs' counsel are highly experienced in complex class actions and have prosecuted numerous class actions. (Rankin Dec. ¶¶ 2-3; Spiegel Aff. ¶¶ 11-18). Beldock Levine & Hoffman, LLP ("BLH") attorneys have litigated a number of class action lawsuits against the City of New York, including, but not limited to: *El Sayed v City of New York*, No. 18-cv-10566 (SDNY) (injunctive claims, including a revised Patrol Guide policy, resolved on June 11, 2021); *Syed v City of New York*, No. 16-cv-04789 (SDNY 2016) (class certified on February 15, 2019);

*McLennon v City of New York*, No. 14-cv-6320 (E.D.N.Y. 2014) (injunctive claims resolved on March 3, 2020); *Floyd v City of New York*, No. 08-cv-1034 (S.D.N.Y) (currently in remedial stage); *Daniels v City of New York*, 198 FRD 409, 418 (S.D.N.Y. 2001); and *MacNamara v City of New York*, 275 FRD 125, 154 (S.D.N.Y. 2011). (Rankin Dec. ¶ 2) Attorneys at BLH have litigated many hundreds of civil rights claims against the City of New York, many of which pertained to the NYPD's policies and practices and have a breadth of knowledge of the NYPD issuing summons in an unlawful pattern that is demonstrative of racially biased enforcement. (Rankin Dec. ¶ 3)

The detailed declarations of Plaintiffs' counsel – all experienced civil rights attorneys who have litigated class action lawsuits – explain why they have satisfied each of these considerations. The Court has had the opportunity to judge the competence of counsel in asserting the claims in this case by reviewing their filings and observing their participation in hearings on various issues. Counsel have demonstrated that they have the resources and expertise to prosecute this action. (Rankin Aff. ¶ 3)

## II.    The Identities of Class Members are Readily Ascertainable

Courts in this circuit recognize an "implied requirement of ascertainability in Rule 23." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015). "[T]he touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* "A class is ascertainable when defined by objective criteria that are administratively feasible and when identifying its members would not require a mini-hearing on the merits of each case." *Id.* at 24-25. The ascertainability requirement is less stringent in cases seeking injunctive relief, and "[b]oth the Second Circuit and numerous district courts in the circuit have approved of class definitions

without precise ascertainability under Rule 23(b)(2)." *Floyd*, 283 F.R.D. at 171.

The identities of the class members are readily ascertainable. The class is defined solely by objective criteria: individuals with mobility disabilities subjected to custodial arrest by the NYPD after February 3, 2015. As the City testified, officers at Central Booking are required to note any time an arrestee arrives with a wheelchair or other mobility device. (Rankin Decl. Ex. 4, Heggs Haley Dep. at 16:3-17:3). NYPD has already demonstrated that it keeps statistics of arrestees in wheelchairs. (Ex. 23, HEGGS004997-98). Thus far in discovery the City has produced approximately 2,380 NYPD Omniform Arrest Reports that state in one form or another that the person arrested had a mobility disability, *e.g.* were a wheelchair user, used a prosthetic device to assist mobility, had an amputated leg, etc. Additional class members are ascertainable if they meet two simple requirements: (1) that they were subject to a custodial arrest in New York City since February 3, 2015; and (2) that at the time of the arrest they had a mobility disability.

### III. A Declaratory-Injunctive Class is Proper under Rule 23(b)(2)

In addition to meeting the requirements of Rule 23(a), a declaratory-injunctive class is appropriate under Rule 23(b)(2) since "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." This requirement is normally met where a blanket policy is applied uniformly to an entire class. *In re Methy Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 209 F.R.D. 323, 341 (S.D.N.Y.2002). Certification under 23(b)(2) is appropriate where "the positive weight or value [to the plaintiffs] of the injunctive or declaratory relief sought is predominant." *Robinson*, 267 F.3d at 164. In the Second Circuit, this means that, "a district court should, at a minimum, satisfy itself of the following: (1) even in the absence of possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or

declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits." *Id.* "Indeed, where plaintiffs seek institutional reform in the form of injunctive relief, certification under Rule 23(b)(2) is usually appropriate." *McBean v. City of N.Y.*, 228 F.R.D. 487, 501 (S.D.N.Y. 2005).

All of these factors favor Plaintiffs here. There can be no question that Plaintiffs are seeking to certify a class to challenge a blanket policy of the City that has been applied uniformly to an entire class, i.e. arrestees with mobility disabilities. Plaintiffs, particularly the organizational plaintiffs, have a vested interest in ending the discriminatory practices of the City at issue in this litigation, and would bring this suit even in the absence of monetary damages.[7] The injunctive and declaratory relief sought – including but not limited to enjoining the City from denying class members wheelchair accessible transport to and from precincts and/or central booking, handcuffing class members to stationary physical structures, transporting class members using untrained police officers and in vehicles subjecting them to unnecessary dangers, holding class members in facilities that do not accommodate their mobility disability, and denying class members access to sanitary facilities for urination and defecation – is both reasonably necessary and appropriate for these discriminatory practices to end.

## IV. A Damages Class is Proper under Rule 23(b)(3)

A party seeking certification of a Rule 23(b)(3) damages class must show that "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Hughes v. Ester C Co.*, 317 F.R.D. 333, 343-44 (E.D.N.Y. 2016) (citing Fed. R. Civ. P 23(b)(3)). "Predominance is satisfied if resolution of some of the legal or

---

[7] Plaintiffs DIA and DRNY are not seeking monetary damages.

factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (internal quotation marks omitted). For superiority, there are four factors for the court to consider:  "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Magtoles v. United Staffing Registry, Inc.*, No. 21-CV-1850 (KAM) (PK), 2022 U.S. Dist. LEXIS 93924, at *28 (E.D.N.Y. May 25, 2022).  Courts have found that Rule 23(b)(3) class actions are "particularly desirable ... where it is likely the *only* device by which many of the proposed class members – who may have limited resources and lack familiarity with the legal system – could obtain relief," as well as where the "action has already progressed substantially through the discovery process on factual issues common to the class." *Id.* at *29 (internal citations omitted).

Predominance and superiority are both present here. Beyond any minor factual issues unique to each individual Plaintiff's case, the core issue for class members is whether Defendants are in violation of NYCHRL, the ADA, and the Rehabilitation Act in their treatment of arrestees with mobility disabilities. A class action here is also the superior vehicle for adjudicating Plaintiffs' claims. A large portion of the putative class members are incarcerated or indigent, or both, which makes a class action the best mechanism to obtain relief.  Fact discovery is largely complete, with only depositions remaining, and Plaintiffs are unaware of any other class members pursuing similar claims.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court to issue an order certifying the proposed damages class and declaratory-injunctive class.

Dated:    New York, New York
        September 19, 2022

                    Respectfully submitted,

By: _____
David B. Rankin
Jeffrey F. Kinkle
Beldock Levine & Hoffman LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
P: 212-277-5825
E: drankinl@blhny.com

Michael L. Spiegel
48 Wall Street, Suite 1100
New York, NY 10005
P: 212-587-8558
E: mikespieg@aol.com

Emma Noftz Stern
Disability Rights New York
25 Chapel Street, Suite 1005
Brooklyn, NY 11201
P: 929-545-0387
E: Emma.Stern@drny.org

*Attorneys for Plaintiffs*