UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X
MILAN HEGGS, ROY BECKFORD,
PHILIP LEGREE, DISABILITY RIGHTS
NEW YORK, DISABLED IN ACTION,

                              Plaintiffs,

          -against-

THE CITY OF NEW YORK, NEW YORK
CITY POLICE (NYPD) COMMISSIONER
JAMES P. O'NEILL, NYPD
COMMISSIONER DERMOT F. SHEA,
NYPD OFFICER ROBERT BERNHARDT,
NYPD OFFICER RAVI MOORAN, and
JOHN DOES, 1–8,

                              Defendants.
----------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
17-CV-3234 (DG) (TAM)

**TARYN A. MERKL**, United States Magistrate Judge:

          This case raises concerning allegations regarding how individuals with mobility

impairments are treated by the New York City Police Department ("NYPD")

throughout the arrest and booking process. Plaintiffs seek to bring the case as a class

action on behalf of all "persons with mobility disabilities who were taken into [NYPD]

custody pursuant to a custodial arrest[] and processed through a precinct or central

bookings facility" between 2015 and the present. (Third Amended Complaint ("TAC"),

ECF No. 124, ¶ 48.) Plaintiffs estimate that over 2,000 people with mobility disabilities

were arrested during the relevant time period. (*See* Arrest Data, ECF No. 171-18; *see also*

Mem. in Supp. of Mot. for Class Certification ("Supp. Mem."), ECF No. 171-29, at 14,

22.) Plaintiffs further allege that they suffered common injuries that violated various

federal and local laws. Notwithstanding the grave and troubling allegations in the

complaint and Plaintiffs' credible, articulated fears concerning possible mistreatment in

the event of future arrests, for the following reasons, the Court finds that Plaintiffs have failed to establish Article III standing with respect to their claims to injunctive relief on behalf of the class, and that certification of a damages class is not warranted because the common issues in the case do not predominate over the myriad factual questions affecting individual potential class members. Accordingly, the Court respectfully recommends that Plaintiffs' motion for class certification be denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This putative class action, brought by Plaintiffs Milan Heggs, Roy Beckford, Philip Legree, Disability Rights New York, and Disabled In Action, against Defendants The City of New York, NYPD Commissioner James P. O'Neill, NYPD Commissioner Dermot F. Shea, NYPD Officer Robert Bernhardt, NYPD Officer Ravi Mooran, and several Doe Defendants, was initially filed on May 30, 2017. (*See* Complaint ("Compl."), ECF No. 1; *see also* TAC, ECF No. 124.) Plaintiffs allege claims arising under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.* (TAC, ECF No. 124, ¶ 7; *see id.* ¶¶ 168–215.) On February 2, 2023, Plaintiffs filed a motion for class certification, which the Honorable Diane Gujarati referred to the undersigned magistrate judge for a report and recommendation. (*See* Mot. for Class Certification, ECF No. 171; Feb. 10, 2023 ECF Referral Order.)

### I.  Factual Background

The gravamen of Plaintiffs' claims centers around allegations that, "[i]n New York City, individuals with mobility-based disabilities experience disparate treatment pursuant to custodial arrests in comparison to others similarly situated; have drastically limited access to services at many local precincts and in central booking and while

being transported, including . . . basic services supporting essential human needs; and are subjected to degrading and dehumanizing treatment." (TAC, ECF No. 124, ¶ 4.)[1] Plaintiffs Heggs, Beckford, and Legree are individuals with mobility disabilities, and each has experienced degrading treatment after arrest by the NYPD. (*See generally* TAC, ECF No. 124, ¶¶ 81–141.) Their accounts are set forth more fully below.

Plaintiff Disability Rights New York ("DRNY") "is an independent non-profit corporation" and the recipient of "significant federal funding . . . for services to individuals with disabilities." (Supp. Mem., ECF No. 171-29, at 8.) DRNY alleges that it "is a Protection and Advocacy system . . . as that term is defined under" relevant federal law; it asserts that DRNY is "authorized to pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of individuals with disabilities." (*See* TAC, ECF No. 124, ¶¶ 22–23, 35 (citing 42 U.S.C. § 15043(a)(2)(A)(i) and N.Y. Exec. Law § 558(b)).)

Plaintiff Disabled in Action ("DIA") "is a nonprofit civil rights membership organization . . . consist[ing] primarily of, and . . . directed by, people with disabilities," including "residents with [mobility] disabilities throughout New York City."[2] (TAC, ECF No. 124, ¶¶ 15–16.) DIA brings suit to redress its own injuries, as well as those of its members. (*See id.* ¶¶ 19–21.)

---

[1] The Court recites the facts as alleged in the Third Amended Complaint ("TAC"). As explained below, however, the Court relies on the evidence Plaintiffs submit in support of class certification in determining whether certification should be granted. *See Calvo v. City of New York*, No. 14-CV-7246 (VEC), 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017).

[2] As far as the Court is aware, none of the individual named Plaintiffs are members of DIA. None of Plaintiffs' filings indicate otherwise, and counsel indicated at oral argument on July 24, 2023, that at least Beckford, the named Plaintiff on whom they rely to establish standing as the injunctive relief claims, is not a member. (*See* Tr. of Oral Arg., ECF No. 187, at 6:9–22.)

### A. Milan Heggs

Milan Heggs "has required the use of a wheelchair and/or prosthesis for approximately twenty years due to a gunshot wound in which a bullet became inoperably lodged in or near his spine." (*Id.* ¶ 81.) Heggs is an "L3 paraplegic" and "is unable to walk or stand without an assistive device." (*Id.*) He is "only able to sit or hold himself up for short periods of time" and "requires an accommodation in order to use a toilet." (*Id.* ¶ 82.)

Heggs was involved in a motor vehicle collision on April 30, 2015, and was subsequently arrested by NYPD officers. (*Id.* ¶ 83.) Due to the collision, Heggs was "removed from his vehicle by emergency services personnel and transported . . . to a hospital for treatment." (*Id.* ¶ 84.) "Upon his release from the hospital, . . . Heggs was transported in a wheelchair out of the hospital to a NYPD patrol vehicle," "was removed from the wheelchair[,] and [was] placed handcuffed into the patrol car." (*Id.* ¶¶ 85–86.) Plaintiffs allege that Defendant Bernhardt "was responsible, in part for . . . Heggs's care and confinement." (*Id.* ¶ 89.)

Officers transported Heggs to the 73rd precinct, where Heggs "was placed on a bench in a cell without his wheelchair or prosthesis," or "any form of assistive mobility device." (*Id.* ¶¶ 90–91.) Without his assistive devices, Heggs was unable use the restroom, and when "Heggs stated that he needed to urinate, he was given a milk carton." (*Id.* ¶¶ 93–94.) Heggs also shared the cell with "non-mobility disabled inmates" and "was left vulnerable to attack." (*Id.* ¶ 92.) These other inmates were eventually transferred to central booking, leaving Heggs "behind, alone in the cell." (*Id.* ¶ 95.) Plaintiffs allege that "Heggs was held back due to his mobility disability." (*Id.* ¶ 96.)

Heggs was ultimately transferred to Brooklyn Central Booking. (*Id.* ¶ 97.) Specifically, "[o]fficers at the precinct lifted . . . Heggs onto an unsecured chair with

wheels and rolled [him] to an ambulette," at which point Heggs was "physically lifted by officers and placed on a seat in the vehicle." (*Id.* ¶¶ 98–99.) Heggs received a wheelchair on arrival to Brooklyn Central Booking and was initially "handcuffed to a stationary structure" before being placed in a cell. (*Id.* ¶¶ 100–01.) As before, "[t]he cell did not provide an accommodation for . . . Heggs to use the toilet," and "other detainees were transferred into and out of the cell." (*Id.* ¶¶ 102–03.) "Heggs was arraigned over twenty-four hours after he was initially brought to the 73rd precinct." (*Id.* ¶ 104.) "Heggs was then transported by bus (again, not wheelchair accessible) to Rikers Island," where his prosthesis was returned to him. (*Id.* ¶ 105.)

### B. Philip Legree

Philip Legree "has required the use of a cane since 2014" and "is unable to walk more than a few steps without assistive devices." (*Id.* ¶ 110.) "[H]e has difficulty maintaining his balance[,] . . . cannot walk quickly," has "difficulty climbing stairs[,] and is at an increased risk of falling and sustaining an injury." (*Id.* ¶ 111.)

Similar to Heggs, Legree was arrested by NYPD following a motor vehicle collision, which occurred on August 11, 2019. (*Id.* ¶ 112.) "Legree was ordered out of his vehicle, handcuffed behind his back[,] and made to walk to the police vehicle without his cane." (*Id.* ¶ 113.) "One of the NYPD officers scolded Mr. Legree for his difficulties in entering the police vehicle," and, after obtaining Legree's cane from the vehicle, "kept it in the front seat with her." (*Id.* ¶¶ 114–15.) "Legree could not sit straight in the back of the police vehicle and had to lie at an uncomfortable angle with his hands cuffed behind his back." (*Id.* ¶ 116.) Although "Legree informed officers of his discomfort, they did not respond." (*Id.* ¶ 117.)

Legree was taken to the 49th precinct, where he was ordered to walk from the vehicle without the use of his cane. (*Id.* ¶¶ 119–21.) "The officers again scolded [him] for

not walking quickly," and "Legree suffered intense pain in his knees as he attempted to walk the distance to the precinct without his assistive device following the uncomfortable transportation." (*Id.* ¶¶ 122–23.) "Legree was [then] placed in a cell alone for three to four hours." (*Id.* ¶ 124.)

Officers again handcuffed Legree behind his back and "placed [him] in a police vehicle to be transported to Central Booking, this time with another arrestee." (*Id.* ¶ 125.) Legree experienced "substantial discomfort" during the "approximately twenty-five minute[]" trip. (*Id.* ¶ 126.) Upon arrival, "Legree was forced to walk up stairs without his cane to enter Central Booking and then forced to descend a long staircase . . . once inside." (*Id.* ¶ 127.) "Legree experienced intense difficulty in attempting to navigate the stairs" and "had to 'shimmy' down the steps while attempting to hold the handrail with his hands cuffed behind his back." (*Id.* ¶ 128.) "No one asked Mr. Legree if he required accommodation due to his disability." (*Id.* ¶ 129.) Legree was later "released on his own recognizance" at his arraignment. (*Id.* ¶ 130.)

### C. Roy Beckford

Roy Beckford has "required the use of a cane since 2014, due to a nerve degenerative disease." (*Id.* ¶ 14.) He "is unable to walk or stand without assistive devices." (*Id.*)

As set forth in the complaint, Beckford was arrested by NYPD officers on August 9, 2019.[3] (*Id.* ¶ 133.) During this arrest, "officers threw Mr. Beckford to the ground and took his cane from him." (*Id.* ¶ 134.) "Beckford told Officer Ravi Mooran, 'I need my cane to walk. I can't walk without my cane,'" to which "Officer Mooran replied in sum

---

[3] Although the TAC alleges that Beckford was arrested on August 9, 2019, the arrest paperwork submitted in support of Plaintiffs' motion for class certification appears to reflect September 9, 2019. (*See* Ex. 26 in Supp. of Mot. for Class Certification, ECF No. 185-4.)

and substance, 'you need to figure it out.'" (*Id.* ¶¶ 135–36.) Officers then "dragged Mr. Beckford to a police van." (*Id.* ¶ 137.) "Beckford was not secured in the police van and had to use his legs to brace himself while the van was in motion, causing significant pain." (*Id.* ¶ 138.)[4]

"Upon arriving at the precinct, Mr. Beckford requested the return of his cane," but his request was denied. (*Id.* ¶ 139.) "As officers made Mr. Beckford move through the precinct without his assistive device, Mr. Beckford repeatedly experienced weakness in his legs that required him to lean against a desk or the wall, creating a risk and fear of falling and sustaining an injury." (*Id.* ¶ 140.) Beckford was later "released with a summons." (*Id.* ¶ 141.)

## II.  Procedural History

### A.  Initial Proceedings

Former Plaintiff Baron Walker filed this action against Defendant City of New York and several Doe Defendants on May 30, 2017, originally as an individual action, based on his alleged unlawful treatment following his arrest. (*See* Compl., ECF No. 1.) Walker, who has used a wheelchair since 1989, alleged claims arising under the ADA and the Rehabilitation Act, as well as a § 1983 claim against the Doe Defendants and a *Monell* claim against the City, based on alleged mistreatment during his arrest, post-arrest confinement, and arrest processing. (*Id.* ¶¶ 15, 18–44; 45–59.) Mid-discovery,

---

[4] The Court notes that, in Plaintiffs' motion in support of class certification, they assert that Plaintiff Beckford was later diagnosed with a concussion that was caused by his "being unsecured in the van by a NYPD officer." (Supp. Mem., ECF No. 171-29, at 5 (citing Beckford Dep., ECF No. 171-2, at 44:13–21).) In the deposition excerpt provided in support of the motion, however, Beckford did not testify that the transportation was the source of his concussion. Rather, in testimony that appears to describe the manner of his arrest, he stated: "Well, they threw me on my shoulder, and kneeled on my back and so forth. When they threw me down, my head hit the steel grate on the ground. I suffered a concussion. The doctor's [sic] noted it's a concussion and assault." (Beckford Dep., ECF No. 171-2, at 44:1–5; *see also id.* at 44:13–21 (confirming diagnosis of concussion, with no testimony as to possible causation).)

Walker filed an amended complaint on February 2, 2018, naming several other individual Defendants, including then-NYPD Commissioner James P. O'Neill. (*See* First Amended Compl. ("FAC"), ECF No. 19.) For the first time, Walker also included class allegations similar to those set forth in the operative complaint. (*See* FAC, ECF No. 19, ¶¶ 22–34; *see also* TAC, ECF No. 124, ¶¶ 48–68.) A few months later, on June 22, 2018, Walker moved to compel class discovery. (*See* Mot. to Compel, ECF No. 51.)

While that motion remained pending, Plaintiffs Walker, Heggs (then a putative class member), and DRNY filed a letter on August 2, 2018, wherein Heggs and DRNY moved to intervene, and the three Plaintiffs requested leave to further amend the complaint. (*See* Mot. to Intervene, ECF No. 60.) The motion to intervene was granted on August 8, 2018, and leave to amend was later granted on October 11, 2018. (*See* Aug. 8, 2018 ECF Order; Oct. 11, 2018 ECF Order.) Accordingly, Walker, Heggs, and DRNY filed a second amended complaint on October 18, 2018, further naming NYPD Officer Robert Bernhardt — who had been involved in Heggs' April 30, 2015 arrest — as a Defendant. (*See* Second Amended Complaint ("SAC"), ECF No. 64; TAC, ECF No. 124, ¶ 89.) In addition to the causes of action raised in the prior pleadings, the second amended complaint alleged a claim under the NYCHRL. (*See* SAC, ECF No. 64, ¶¶ 166–72.)

In the meantime, Defendants had issued Walker an offer of judgment under Rule 68 on July 20, 2018. (*See* Resp. to Mot. to Intervene, ECF No. 61; Defs.' Offer of J., ECF No. 61-1.) Walker filed an acceptance of Defendants' offer of judgment on October 22, 2018, days after Plaintiffs filed the second amended complaint. (Notice of Acceptance, ECF No. 65.) Walker was therefore dismissed as a party Plaintiff on December 21, 2018. (*See* Order of Dismissal, ECF No. 72.)

8

Plaintiffs filed a renewed motion to compel class discovery on January 25, 2019. (*See* Mot. to Compel., ECF No. 76; *id.* at 3 (explaining that, in light of the judgment issued as to Walker, Defendants asserted that Plaintiffs were required to re-serve their discovery requests).) On March 11, 2019, the Honorable Cheryl L. Pollak issued an order granting Plaintiffs' motion to compel in part and denying it in part. (*See* Mar. 11, 2019 Order, ECF No. 81.) Judge Pollak directed Defendants to produce various arrest records "indicat[ing] whether an arrestee has a mobility disability" for the period of February 3, 2015, to March 11, 2019 (the date the Order was issued). (*Id.* at 6, 11; *see id.* at 12 (ordering the parties to meet and confer to "propose a methodology for narrowing the search parameters," to the extent conducting the records search would be burdensome).) Judge Pollak further directed Defendants to produce documentation of civilian complaints and internal investigations pertaining to individuals with mobility disabilities. (*Id.* at 13–14.)

Plaintiffs filed a letter on November 24, 2020, indicating that, with Defendants' consent, Plaintiffs intended to file yet another amended complaint, this time naming additional class representatives. (*See* Mot. for Leave, ECF No. 121, at 2.) Plaintiffs ultimately filed the TAC, which remains the operative complaint, on May 20, 2021. (*See* TAC, ECF No. 124.) As contemplated, the TAC identified Beckford, Legree, and DIA as additional party Plaintiffs. (*See id.*) Several previously-identified defendants no longer appeared in the TAC, having previously been dismissed on July 8, 2020, per a stipulation of dismissal filed on July 6, 2020. (*See* Stip. of Dismissal, ECF No. 111; Order of Dismissal, ECF No. 112. *Compare* TAC, ECF No. 124, *with* SAC, ECF No. 64.) However, the TAC further named then-NYPD Commissioner Dermot F. Shea, and Officer Ravi Mooran (who was involved in Beckford's 2019 arrest) as Defendants in this

action.[5] (*See* TAC, ECF No. 124, ¶¶ 41, 43, 135–36.) The TAC set forth claims substantially similar to the prior pleading. (*See id.* ¶¶ 168–215.)

## B. Motion for Class Certification

Following reassignment of this case to the undersigned magistrate judge on June 7, 2021, Plaintiffs "request[ed] a pre-motion conference to discuss [their] anticipated class certification motion." (June 28, 2021 Pre-Mot. Conf. Letter, ECF No. 135.) The Honorable Raymond J. Dearie denied Plaintiffs' request on June 29, 2021, instead directing the parties to submit a proposed briefing schedule for the anticipated motion. (*See* June 29, 2021 ECF Order.) No proposed briefing schedule was filed for over a year, and the parties continued to engage in class discovery.

The parties later discussed the issue of class certification at status conferences before the Court. (*See* Sept. 22, 2021 ECF Minute Entry and Order; June 24, 2022 ECF Minute Entry and Order.) On July 20, 2022, the parties submitted a proposed briefing schedule for the class certification motion, which Judge Dearie adopted the following day. (*See* Mot. for Leave, ECF No. 156; July 21, 2022 ECF Order.) After several requested extensions, the parties filed the fully-briefed motion on February 2, 2023. (*See* Mot. for Extension, ECF No. 158; Mot. for Extension, ECF No. 163; Mot. for Class Certification, ECF No. 171; Supp. Mem., ECF No. 171-29; Opp'n to Mot. for Class Certification ("Opp'n Mem."), ECF No. 172; Reply in Supp. of Mot. for Class Certification ("Reply"), ECF No. 173.) In support of their motion, Plaintiffs submitted several exhibits, including deposition transcripts, affidavits, declarations, and other materials produced during discovery. (*See* Exs. to Mot. for Class Certification, ECF No. 171-1 to 171-28.)

---

[5] The TAC also named one "Officer Slater" as a Defendant. (*See* TAC, ECF No 124.) Plaintiffs' claims against Officer Slater were subsequently dismissed. (*See* Notice of Voluntary Dismissal, ECF No. 127; Stip. of Dismissal, ECF No. 128.)

Having been reassigned this case as of October 31, 2022, the Honorable Diane Gujarati thereafter referred Plaintiffs' motion to the undersigned magistrate judge on February 10, 2023. (*See* Oct. 31, 2022 ECF Reassignment Order; Feb. 10, 2023 ECF Referral Order.) On July 13, 2023, the Court scheduled a motion hearing for July 24, 2023. (*See* July 13, 2023 ECF Scheduling Order.) Counsel appeared at the scheduled hearing, along with several Plaintiffs, during which the court heard oral argument and took the motion under advisement. (*See* July 24, 2023 ECF Minute Entry and Order; *see also* Tr. of July 24, 2023 Mot. Hearing ("Tr. of Oral Arg."), ECF No. 187.)

## DISCUSSION

Plaintiffs move for certification of a Rule 23(b)(2) declaratory-injunctive class and a Rule 23(b)(3) damages class, defined as follows: "All persons with mobility disabilities who were taken into police custody pursuant to a custodial arrest and processed through a precinct or central booking facility in the City of New York from February 3, 2015, continuing to the present." (*See* Supp. Mem., ECF No. 171-29, at 19.) For the reasons set forth below, the Court recommends denying Plaintiffs' motion for class certification.

## I.  Third Amended Complaint

The nature and breadth of Plaintiffs' claims are critical to the Court's consideration of Plaintiffs' motion. The Court therefore begins by summarizing the causes of action alleged in the TAC, as well as the requested relief. (TAC, ECF No. 124, ¶¶ 168–215, pp. 46–49.)

Plaintiffs' first cause of action, under Title II of the ADA, is expansive and sweeps in a wide range of allegations. (*See id.* ¶¶ 168–77 (citing 42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of

a public entity, or be subjected to discrimination by any such entity.")).) The thrust of

the claim is that, because the "criminal arrest processing" conducted by Defendants

qualifies as a service, program, or activity by a public entity under Title II, Defendants

are required under the ADA to make criminal processing accessible to those with

mobility disabilities.[6] (*Id.* ¶¶ 172–74.) Plaintiffs allege several ways in which Defendants

have not complied with the ADA's requirements. Specifically, Plaintiffs assert that

Defendants have failed "to make reasonable or necessary architectural modifications

and ongoing maintenance of facilities"; "to provide vehicle transportation

accommodating mobility disabilities"; "to provide reasonable accommodations to allow

individuals with mobility disabilities to move or adjust themselves while detained or

within holding cells" or to provide "accommodations to sit, access food, water, or

sanitary supplies, or use the toilet during detention"; and "to ensure that toilets are

accessible" or to provide "access to self-catheterization kits." (*Id.* ¶¶ 174, 176.) Plaintiffs

further allege that Defendants "subject individuals with mobility disabilities to

nonconsensual, unwarranted and unjustified physical contact and physical assault;

place them in cells with other non-mobility disabled arrestees; and discriminate [against

them] by delaying arrest processing and release" compared to non-disabled

individuals. (*Id.* ¶ 176.)

Plaintiffs' second cause of action, brought under the Rehabilitation Act, largely

parallels their claim under Title II. (*See id.* ¶¶ 178–84 (citing 29 U.S.C. § 794(a) ("No

otherwise qualified individual with a disability . . . shall, solely by reason of her or his

---

[6] Many courts have held that the provision of reasonable accommodations is required
because arrest and post-arrest processing and transportation each constitute a "'service,'
'program,' or 'activity'" under Title II of the ADA and the Rehabilitation Act. *See, e.g., Morales v.
City of New York*, No. 13-CV-7667 (RJS), 2016 WL 4718189, at *7 (S.D.N.Y. Sept. 7, 2016)
(collecting cases).

disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .")).) They allege that the City "receive[s] federal financial assistance for law enforcement and criminal processing related programs" and that, therefore, the City must make those programs accessible to individuals with mobility disabilities. (*Id.* ¶¶ 179, 181.)

The third cause of action sets forth a § 1983 claim against Defendants Bernhardt, Mooran, and the Doe Defendants (the "Individual Defendants"). (*See id.* ¶¶ 185–88 (citing 42 U.S.C. § 1983); *see also id.* ¶ 41 (identifying the Individual Defendants).) Plaintiffs allege that the Individual Defendants violated Plaintiffs' and class members' Fourth and Fourteenth Amendment rights, "including their right[s] to be free from deprivation of liberty and excessive punishment without due process of law; to be free from unconstitutional conditions of confinement and objectively unreasonable conditions; and to be free from disparate and inhumane treatment and punishment." (*Id.* ¶ 186.) Plaintiffs allege that these violations occurred because they "were denied . . . immediate medical care," "had their liberty unconstitutionally and unnecessarily restricted," and "were subjected to unconstitutional conditions of confinement and unreasonable detainments." (*Id.* ¶ 187.)

Plaintiffs' fourth cause of action, also brought under § 1983, alleges a *Monell* claim against the City. (*See id.* ¶¶ 189–208.) A *Monell* claim asserts "a violation of rights result[ing] from the '[municipality's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Here, Plaintiffs identify three alleged unconstitutional policies or customs by the City: (1) the City's failure to properly screen, train, and supervise

officers, resulting in "rampant unconstitutional detentions of pretrial arrestees with mobility disabilities"; (2) the City's failure "to properly and adequately monitor, discipline[,] and take necessary corrective action against officers, knowing that such omissions would lead to Fourth and Fourteenth Amendment violations"; and (3) the City's "encourage[ment] [of] its officers and agents with commendations and public praise," notwithstanding their alleged "abuses and unconstitutional practices." (*Id.* ¶¶ 194, 196–97; *see id.* ¶¶ 193–98.)

Plaintiffs' fifth cause of action states a claim under the NYCHRL and is alleged against all Defendants, including the NYPD Commissioner in his official capacity. (*See id.* ¶¶ 209–15 (citing N.Y. Admin. Code § 8-107(15), (17) (generally requiring reasonable accommodations for, and prohibiting discrimination against, individuals with disabilities)).) Like their claims under Title II and the Rehabilitation Act, Plaintiffs allege that Defendants violated the NYCHRL "by failing to accommodate [Plaintiffs'] mobility disabilit[ies] during their arrest, transport, and detention." (*Id.* ¶ 213.) Plaintiffs further allege that "Defendants' actions result in a systemic discriminatory exclusion." (*Id.*)

The TAC also sets forth a broad array of requested relief, much of which is declaratory in nature. (*See id.* at 47–49.) Plaintiffs request "a class-wide judgment declaring that Defendants' policy, practice[,] and/or custom[s]" violate the ADA, the Rehabilitation Act, the Fourth and Fourteenth Amendments, and "state and local law." (*Id.* at 47–48.) Plaintiffs further request an order enjoining several of the City's alleged practices, including the following: (1) "denying Class Members wheelchair accessible transport to and from the arrest processing facilities, precincts and/or central booking during the period of their custodial arrest;" (2) "handcuffing Class Members to stationary physical structures, and thereby unreasonably precluding their ability to reposition themselves, or otherwise limiting their mobility and range of motion beyond

14

that of similarly situated custodial arrestees;" (3) "allowing untrained police officers to forcibly remove Class Members from their wheelchairs for the purpose of detention;" (4) "detaining Class Members in cells or in such locations that there are architectural impediments and obstacles precluding access to toilets or the ability to urinate and defecate;" (5) "denying Class Members access to necessary facilities and equipment to allow for sanitary urination and defecation at the location of confinement;" and (6) "prolonging the duration of processing and detainment of Class Members beyond that of otherwise similarly situated custodial arrestees." (*Id.* at 48–49.) Lastly, Plaintiffs request compensatory and punitive damages. (*Id.* at 49.)

## II. Declaratory-Injunctive Class

Plaintiffs move for certification of a declaratory-injunctive class under Rule 23(b)(2), which permits certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

Defendants contend that "Plaintiffs have failed to establish standing to seek [the types of] prospective relief" requested in the TAC; Defendants therefore argue that the Court should deny certification of the proposed Rule 23(b)(2) class. (Opp'n Mem., ECF No. 172, at 24; *see id.* at 24–30.) Whether Plaintiffs have established Article III standing with respect to their claims to prospective relief and whether certification should be granted under Rule 23(b)(2) are, of course, separate inquiries. Defendants are correct, however, that "a class action cannot be sustained without a named plaintiff who has standing." *Amador v. Andrews*, 655 F.3d 89, 99 (2d Cir. 2011). Only once "standing is

satisfied . . . will the inquiry shift to a class action analysis." *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) (quotation marks omitted). The Court therefore begins with the question of whether Plaintiffs have established standing to seek prospective relief. Because the Court concludes that Plaintiffs have failed to establish standing in this respect, the Court ends its inquiry there and does not determine whether class certification is otherwise merited under Rule 23(b)(2).[7]

### A.  Legal Principles

Article III standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury

---

[7] Although the Court declines to engage in a full review of the Rule 23 factors as to Plaintiffs' proposed injunctive relief class in light of the standing concerns discussed *infra*, the Court does note that the sheer breadth of Plaintiffs' claims raise significant questions about the cohesiveness of the injunctive relief class Plaintiffs propose and whether Plaintiff Beckford shares commonality and typicality with the putative class. Given the myriad ways mobility disabilities can present and be accommodated, the wide array of assistive devices available, the number of precincts in New York City, and the infinite range of possible circumstances under which NYPD personnel could determine that they have probable cause to place a person with a mobility disability under arrest, it is understandable that Plaintiffs would attempt to seek broad relief that could apply to all circumstances. But Beckford's specific claims do not allege injury in fact vis-à-vis all the various harms Plaintiffs seek to remedy. For example, as discussed herein, Plaintiff Beckford uses a cane; his suitability as the lead Plaintiff in a class for all "persons with mobility disabilities" who were arrested by the NYPD over a period of eight or more years is far from clear. (TAC, ECF No. 124, ¶ 48.) There is no evidence in the record from which to infer that Beckford has experienced many of the injuries and practices alleged in the TAC, as discussed *infra*, or that his mobility disabilities are factually similar to the proposed class members' disabilities. *See, e.g., Lacy v. Cook County*, 897 F.3d 847, 865–66 (7th Cir. 2018) (finding commonality in class where individuals who used wheelchairs requested injunctive relief requiring the building of ramps at county courthouses, noting that all class members shared "a common physical impairment," but observing "that the reasonableness of a given accommodation will vary among individuals with differing disabilities" and that the "fact-specific nature of this inquiry may preclude class certification in some cases, for instance if the plaintiffs . . . had alleged a variety of disabilities or had sought a variety of accommodations based on their differing abilities"). The issues presented in this case are extraordinarily fact-intensive: Plaintiffs essentially request accommodations for every type of mobility disability, remediation of a huge swath of city properties, and directives to the NYPD on a range of issues.

was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). "Class actions are no exception," but "[s]tanding is satisfied so long as at least one named plaintiff can demonstrate the requisite injury." *Hyland v. Navient Corp.*, 48 F.4th 110, 117–18 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1747 (2023); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) ("We do not require that each member of a class submit evidence of personal standing.").

Relevant here, a plaintiff seeking "forward-looking, injunctive relief" must establish "a material risk of future harm," i.e., harm "sufficiently imminent and substantial" to justify such a remedy. *TransUnion*, 141 S. Ct. at 2210; *see Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84 (2d Cir. 2004) ("The grant of injunctive relief is an extraordinary remedy."). So too with declaratory relief. *Dorce v. City of New York*, 2 F.4th 82, 95 (2d Cir. 2021). "[A]llegations of *possible* future injury are not sufficient," *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022) (emphasis in original) (quotation marks omitted), and neither is an "objectively reasonable likelihood," *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 410 (2013). Rather, "[s]uch threatened injury must be *certainly impending*." *Calcano*, 36 F.4th at 74 (emphasis in original) (quotation marks omitted); *cf. Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187–88 (2d Cir. 2013) (per curiam) (discussing, in the Title III ADA context, that a plaintiff has suffered an injury in fact for standing purposes when the plaintiff has "alleged past injury under the ADA," it was "reasonable to infer that the discriminatory treatment would continue," and that, based on past frequency of the plaintiff's visits to the location at issue, "that plaintiff intended to return to the subject location").

"The prospective-orientation of the analysis is critical . . . ." *Berni v. Barilla S.p.A.*, 964 F.3d 141, 147 (2d Cir. 2020). Accordingly, although a plaintiff's prior harm is a

prerequisite to establishing an injury in fact, "[a] plaintiff pursuing injunctive relief may not rely solely on past injury, but also must establish that 'she is [sufficiently] likely to be harmed again in the future in a similar way.'" *Calcano*, 36 F.4th at 74 (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016)). "In the arrest context, the Second Circuit has held that a plaintiff 'must carry the burden of establishing that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Wagner v. City of New York*, No. 14-CV-2521 (VEC), at *10, 2015 WL 5707326 (S.D.N.Y. Sept. 28, 2015) (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (internal quotation marks omitted)).

Because standing is "an indispensable part of the plaintiff's case," it must be established "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *see Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (explaining that "standing issue[s] may be raised by a party . . . at any stage in the litigation," and that the plaintiff's burden to establish standing "increases as the suit proceeds" (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006))). "Class certification does not always fit neatly into this framework." *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*In re LIBOR*"), 299 F. Supp. 3d 430, 531 (S.D.N.Y. 2018); *see* Fed. R. Civ. P. 23(c)(1)(A) (providing that certification must be assessed "[a]t an early practicable time after a person sues . . . as a class representative"). Courts in this circuit have reasoned, however, that because plaintiffs are required to demonstrate that class certification should be granted "by a preponderance of the evidence," the same evidentiary burden applies to plaintiffs' showing of standing, at least where significant discovery has taken place. *Calvo v. City of New York*, No. 14-CV-7246 (VEC), 2017 WL 4231431, at *3 (S.D.N.Y. Sept. 21, 2017)

18

(discussing *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008), in which the Second Circuit held that "the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements"); *see also Lowell v. Lyft, Inc.*, No. 17-CV-6251 (PMH), 2023 WL 2622925, at *5 n.5 (S.D.N.Y. Mar. 24, 2023) ("A named plaintiff, at the class certification stage, must prove standing by a preponderance of the evidence."); *Lowell v. Lyft, Inc.*, No. 17-CV-6251 (PMH) (AEK), 2022 WL 19406561, at *5 (S.D.N.Y. Dec. 22, 2022) (concluding that, post-discovery, the court would look beyond the pleadings and "require that Plaintiffs set forth evidence — and not mere allegations — in support of standing"), *report and recommendation adopted as modified*, 2023 WL 2622925. Accordingly, as the litigation progresses, in evaluating class certification, courts may require "evidence of named plaintiffs' standing," e.g., deposition testimony, sworn affidavits, or other documentary evidence. *In re LIBOR*, 299 F. Supp. 3d at 531 (emphasis omitted); *see, e.g., id.* at 531–32; *MacNamara v. City of New York*, 275 F.R.D. 125, 140–41 (S.D.N.Y. 2011). Given the length of time this case has been pending, and the amount of discovery that has been completed, the Court evaluates Plaintiffs' proffered evidence to determine whether they have established standing by a preponderance.

### B. Standing Analysis

Plaintiffs contend that they have established Beckford's and DIA's standing to seek injunctive relief. (*See* Reply, ECF No. 173, at 11–14.) The Court addresses these arguments in turn.[8]

---

[8] Plaintiffs do not appear to assert that the other Individual Plaintiffs, Heggs or Legree, have standing to seek prospective relief. (*See generally* Supp. Mem., ECF No. 171-29; Reply, ECF No. 173.) Other than discussing their allegations of past arrest that are contained in the complaint, Plaintiffs' briefing does not discuss their risk of imminent harm, other than mentioning in passing in Plaintiffs' memorandum of law that "Heggs has been arrested on

1. *Beckford's Individual Standing*

Plaintiffs argue that "Beckford has standing because, as a disabled activist, he faces a real and immediate threat of future arrest." (Reply, ECF No. 173, at 13.) In support, Plaintiffs have submitted records indicating that Beckford has been arrested three times in the past, in April 2016, June 2016, and September 2019. (*See* Exs. 24–26 in Supp. of Mot. for Class Certification, ECF Nos. 185-2, -3, & -4.) Plaintiffs have also submitted portions of Beckford's deposition testimony, wherein Beckford testified that two of his arrests occurred while filming police officers. (*See* Beckford Dep., ECF No. 171-2, at 22:10–23:9; Reply, ECF No. 173, at 13.) When asked how frequently Beckford films police officers, Beckford answered: "Whenever I'm outside or if I see something through my window." (Beckford Dep., ECF No. 171-2, at 40:8–13.) Based on these submissions, Plaintiffs argue that, "[h]aving already been arrested twice for this behavior and by continuing to frequently and regularly do so, Beckford faces a real and immediate threat of arrest and exposure to the conditions that are the subject of the complaint." (Reply, ECF No. 173, at 13–14.) What is notably absent, however, from Plaintiffs' materials — Beckford's arrest papers or deposition testimony — is any discussion of mistreatment at the hands of police during Beckford's first two arrests. (*See generally* Beckford Dep., ECF No. 171-2.)

---

several occasions" and asserting that is sufficient to establish standing. (Supp. Mem., ECF No. 171-29, at 26.) In addition, prior to oral argument on the motion, the Court advised the parties to be prepared to address the issue of standing and Plaintiffs' counsel did not argue that Heggs or Legree has standing to seek injunctive relief. (*See* July 13, 2023 ECF Scheduling Order; Tr. of Oral Arg., ECF No. 187, at 3:13–24.) The Court further notes that Plaintiff Heggs is currently incarcerated and that his earliest possible release date is in 2033. (*See* Ex. H to Toews Decl., ECF No. 172-9.) Similarly, counsel did not address DRNY's standing at oral argument, and the Court does not conclude that DRNY has standing simply by virtue of its status as a designated protection and advocacy system. (*See* Tr. of Oral Arg., ECF No. 187, at 3:13–24.) *See Disability Rights N.Y. v. New York State*, No. 17-CV-6965 (RRM) (SJB), 2019 WL 2497907, at *4–10 (E.D.N.Y. June 14, 2019).

Throughout their briefing and at oral argument, Plaintiffs appear to conflate the likelihood of arrest with standing. But Plaintiffs must show more than a likelihood of arrest to establish Beckford's standing on the injunctive relief claims; they must also show an imminent risk that Beckford will again "be wronged in a similar way" to how he was wronged before. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). This distinction is important, given that "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion*, 141 S. Ct. at 2208. Further, under Second Circuit law, a plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he will be injured in the future." *Shain*, 356 F.3d at 215 (quotation marks and modification omitted). Accordingly, there are two core inquiries in the analysis as to whether Plaintiffs have established Beckford's standing as to the requested injunctive relief: (1) whether he has suffered past injuries sufficient to confer standing to seek redress for each form of harm Plaintiffs seek to enjoin; and (2) whether he faces an imminent risk of similar injury.

    a.  <u>Risk of Injury as to Challenged Practices</u>

As set forth above, Plaintiffs' requested injunctive relief is extremely broad. Plaintiffs have not, however, established that Beckford has standing to challenge most of the alleged practices Plaintiffs seek to enjoin because they are outside the scope of his prior experience and alleged injuries. Specifically, Plaintiffs have failed to show that Beckford was ever (1) denied "wheelchair accessible transport," (2) previously "handcuff[ed] . . . to stationary physical structures," (3) "forcibly removed . . . from [a] wheelchair[]," (4) detained in a location with "architectural impediments and obstacles precluding access to toilets," (5) denied "facilities and equipment to allow for sanitary urination and defecation," or (6) faced a "prolong[ed] . . . processing and detainment"

21

compared to similarly situated arrestees. (TAC, ECF No. 124, at 48–49.) Accordingly, even if the Court were to assume *arguendo* that Beckford will be arrested in the near future, the Court cannot conclude, based on Beckford's prior experiences, that a "threatened injury" from the above practices is "certainly impending." *Calcano*, 36 F.4th at 74 (quotation marks and emphasis omitted); *see also Lyons*, 461 U.S. at 105 ("[Plaintiff's] standing to seek the injunction requested" — an order generally barring the use of chokeholds — "depended on whether he was likely to suffer future injury from the use of . . . chokeholds by police officers.").

b. Risk of Future Injury

As set forth above, Plaintiffs have produced evidence indicating that Beckford's cane was taken from him upon his arrest in 2019 and denied to him once he was taken to the precinct. (*See* Beckford Dep., ECF No. 171-2, at 25:16–26:9, 29:11–15, 30:11–14.) The question is then whether Plaintiffs have established that Beckford is "'likely to be harmed again in the future in a similar way.'" *Calcano*, 36 F.4th at 74 (quoting *Nicosia*, 834 F.3d at 239). In addition, because the challenged conduct is "necessarily contingent" on Beckford being arrested, a threshold question is whether Beckford is sufficiently likely to be arrested again in the future. *O'Shea v. Littleton*, 414 U.S. 488, 498 (1974). (*See* TAC, ECF No. 124, at 48–49 (seeking an order enjoining the City from "limiting [class members'] mobility and range of motion beyond that of similarly situated custodial arrestees").)

The Supreme Court's decision in "*City of Los Angeles v. Lyons* occupies much of this territory." *Shain*, 356 F.3d at 215 (citing 461 U.S. 95). In *Lyons,* the plaintiff filed suit after police officers placed him in a chokehold following a traffic stop, seeking an injunction barring the use of chokeholds by law enforcement absent a threat of deadly force. 461 U.S. at 97–98. In evaluating whether the plaintiff had standing to seek such

relief, the Court framed the requisite risk of harm in terms of the "likelihood that [the plaintiff would] again be wronged in a similar way," i.e., "whether he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105, 111. Accordingly, the Court distinguished between the mere possibility of an encounter with law enforcement (who had discretion to use chokeholds), and the "real and immediate threat that [the plaintiff] would again be stopped . . . by an officer or officers who *would* illegally choke him." *Id.* at 105 (emphasis added); *see id.* at 105–06 (explaining that, to establish a risk of future harm, the plaintiff would have had to allege "that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter" or "that the City ordered or authorized police officers to act in such manner"). Framed this way, the Supreme Court held that the plaintiff had failed to establish a sufficient risk of future harm, despite the plaintiff's allegations that he had been placed in a chokehold in the past, that law enforcement "routinely appl[ied] chokeholds in situations where they [were] not threatened by the use of deadly force," and that the city had authorized the use of chokeholds in non-deadly situations. *Id.* at 105–06.[9]

Additional instructive cases have arisen in the class certification context. In *MacNamara v. City of New York*, a group of arrestees sued the City over "alleged arrest and detention policies" developed in response to mass protests coinciding with the 2004 Republican National Convention. 275 F.R.D. 125, 132, 140 (S.D.N.Y. 2011). The plaintiffs sought an injunction of the City's policies on the basis that several of them "plan[ned] to attend demonstrations in New York in the future" or, at least, did not plan "to avoid

---

[9] In addition, the *Lyons* court further concluded that "the capable-of-repetition" but evading review doctrine did not apply, observing that it "applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109.

protest[s] in New York City." *Id.* at 140–41 (quotation marks omitted). Despite the plaintiffs' prior arrests, the court concluded that they lacked standing to enjoin the challenged policies, reasoning that although "some [p]laintiffs *may* participate in future demonstrations of unspecified date, duration, or scope," those facts did not translate into a sufficient "likelihood of a future encounter with the NYPD likely to *result* in unconstitutional arrests and detentions." *Id.* at 141 (emphasis added). Similarly, in *McLennon v. City of New York*, the court found that the plaintiffs lacked standing to enjoin "suspicionless vehicle checkpoints" occurring on city roadways. 171 F. Supp. 3d 69, 78–79 (E.D.N.Y. 2016); *see id.* at 103–06. Although the plaintiffs asserted that they regularly traveled on city roadways, that the checkpoints were occurring at variable locations such that the plaintiffs could not avoid them, and that each plaintiff had been stopped at least once before, the court held that this amounted to only a "minimal likelihood of future harm," and was insufficient to confer standing to seek injunctive relief. *See id.* at 105–06.

At the other end of the spectrum is *Floyd v. City of New York*, where the plaintiffs challenged the NYPD's widespread stop-and-frisk program. 283 F.R.D. 153, 159–60 (S.D.N.Y. 2012). One of the plaintiffs alleged that he had been stopped four times within a three-year period, and that each had occurred while he was "going about his daily life — walking down the sidewalk, sitting on a bench, getting into a car." *Id.* at 169–70. NYPD had produced documentation indicating that officers made 1,200 stops per day. *Id.* at 170. The plaintiffs had also produced expert statistical analysis (which the court found reliable) indicating that the plaintiff at issue, a Black man, faced a significantly higher risk of being stopped than White people. *Id.* at 168–69. Against this background, the court found that the plaintiff's "risk of future injury [was sufficiently] 'real and

immediate,'" such that he could sue to enjoin the program. *Id.* at 170 (quoting *Lyons*, 461 U.S. at 102).

Cases in the ADA context apply a *Lyons*-like analysis when the challenged service, program, or activity is some aspect of criminal processing. *See Chavez v. L2 Liu Inc.*, No. 20-CV-1388 (ENV) (LB), 2021 WL 1146561, at *4 (E.D.N.Y. Feb. 26, 2021) (observing that ADA cases in the arrest-context are "*Lyons*-like"), *report and recommendation adopted as modified*, 2021 WL 1146040 (E.D.N.Y. Mar. 25, 2021). This is because the likelihood that a plaintiff "will require accommodations . . . during [the] post-arrest" process is contingent on the plaintiff's likelihood of "be[ing] arrested once again in the future." *Morales v. City of New York*, No. 13-CV-7667 (RJS), 2016 WL 4718189, at *6 (S.D.N.Y. Sept. 7, 2016). In *Williams v. City of New York*, for example, a plaintiff brought suit under the ADA, seeking an order requiring the NYPD to provide sign-language interpreters to hearing-impaired arrestees. 34 F. Supp. 3d 292, 293, 297 (S.D.N.Y. 2014). The court held that the plaintiff lacked standing to seek injunctive relief because, although she was hearing-impaired and had been arrested before, the plaintiff had failed to establish that she was sufficiently "likely [to] have any contact with the police in the future — whether under pleasant or unpleasant circumstances." *Id.* at 297. Similarly, in *Morales*, the court held that a paraplegic plaintiff lacked standing to seek injunctive relief under the ADA because he could "point to no facts suggesting that he [was] likely [to] be arrested once again in the future by [Defendants] such that he [would] require accommodations of his paraplegic condition during post-arrest transportation." 2016 WL 4718189, at *6.

In *Wagner v. City of New York*, NYPD officers arrested two veterans working as licensed New York City street vendors, who later brought suit under the ADA, the Rehabilitation Act, and § 1983, alleging that the NYPD took away their assistive devices

(a wheelchair and a cane) and forced them to walk without sufficient assistance, causing them pain, among other things. 2015 WL 5707326, at *2. Relying on *Shain*, *Lyons*, and other cases, the court found that, as to the plaintiffs' ADA and Rehabilitation Act claims, "which [were] predicated on the possibility that Plaintiffs might be re-arrested and deprived of their medically necessary devices during the period of their arrest and detention, [were] simply 'too speculative and conjectural to supply a predicate for prospective injunctive relief.'" *Id*. at *11 (quoting *Shain*, 356 F.3d at 216). This was because, even if a plaintiff establishes a likelihood of future arrest, a plaintiff seeking injunctive relief under the ADA in the arrest context must also establish a sufficient likelihood of being deprived of reasonable accommodations once again. *Id.* (observing that, although the plaintiffs may have had "standing to seek injunctive relief relative to their false arrest claims" on the theory that, as street vendors, they would again be unlawfully rearrested for trademark counterfeiting, their ADA and Rehabilitation Act claims were still too speculative to establish standing to seek injunctive relief).

Collectively, these cases establish that a plaintiff seeking to enjoin law enforcement must demonstrate not only that he is likely to encounter law enforcement in the future, but also that he is likely to be harmed again "in a similar way" during and after arrest.[10] *Lyons*, 461 U.S. at 111; *see MacNamara*, 275 F.R.D. at 141; *Wagner*, 2015 WL 5707326, at *11. Even a reasonable susceptibility to such harm "does not translate into [the requisite] 'real and immediate threat of future injury.'" *MacNamara*, 275 F.R.D. at 141 (quoting *Shain*, 356 F.3d at 215); *see Clapper*, 568 U.S. at 410 (explaining that

---

[10] The Court is unpersuaded by Plaintiffs' argument that certain arrest-context cases are inapplicable because "[t]here was only one [prior] arrest." (Tr. of Oral Arg., ECF No. 187, at 54:9; *see id.* at 54:4–55:2.) Prior harm is certainly informative to the question of whether future harm is "certainly impending," but the Court does not read the case law to support a mere counting exercise. *Clapper*, 568 U.S. at 409 (emphasis and quotation marks omitted).

Article III requires a showing greater than an "objectively reasonable likelihood" of harm).[11] Accordingly, these cases reiterate the well-established rule that previous injury alone is insufficient to confer standing, and that the courts' analysis must focus on "[t]he prospective-orientation" of the risk of harm.[12] *Berni*, 964 F.3d at 147.

The Court finds that Plaintiffs have failed to establish that Beckford is sufficiently likely to be arrested in the near future and thereafter subjected to harm. Plaintiffs' argument is premised on Beckford's continued efforts to film law enforcement, for which they assert he was arrested twice in the past, once nearly four years ago (September 2019), and the other more than seven years ago (June 2016).[13] The Court

---

[11] Only in exceptional circumstances will a plaintiff's mere susceptibility to a particular law enforcement practice confer standing, for instance, where the plaintiff faces a disproportionate risk of being targeted by the practice, the practice is well-documented as widespread, and the plaintiff cannot avoid being subjected to the practice, as in *Floyd*. *See* 283 F.R.D. at 169–70; *McLennon*, 171 F. Supp. 3d at 105–06; *cf. Lyons*, 461 U.S. at 105–06 (explaining that the plaintiff would have standing by showing "that he would have another encounter with the police," along with either "the incredible assertion . . . that *all* police officers . . . *always* choke any citizen with whom they happen to have an encounter" or "that the City ordered or authorized police officers to act in such manner").

[12] Although the Court draws primarily from *Lyons* and other arrest-context cases, the Court notes that other ADA cases likewise focus on prospective harm in evaluating standing. In *Calcano v. Swarovski North America Ltd.*, the Second Circuit clarified that, although courts may consider the plaintiff's past injury in assessing standing to seek injunctive relief, "the central inquiry" is whether, "examined under the totality of all relevant facts, the plaintiff [faces] a real and immediate threat of future injury." 36 F.4th at 75 (quotation marks omitted). "In particular," the question of whether the plaintiff intends to return to the subject premises "is to ensure that the risk of harm is sufficiently imminent and substantial to establish standing." *Id.* (quotation marks omitted); *see also Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 434 (2d Cir. 2022) (explaining that "some day intentions — without any description of concrete plans, or indeed even any specification of when the some day will be — do not support a finding of the actual or imminent injury that Article III requires" (quotation marks omitted)).

[13] Beckford's first arrest in April 2016 was for trespass. (*See* Ex. 24 in Supp. of Mot. for Class Certification, ECF No. 185-2.) Plaintiffs' counsel indicated, at oral argument, that this arrest occurred "in the context of a demonstration." (Tr. of Oral Arg., ECF No. 187, at 12:21–23.) The Court need not decide whether this older arrest was sufficiently similar in kind to Beckford's current activities so as to suggest he is likely to be arrested again because, to put it simply, the record is devoid of allegations that he was treated unlawfully in connection with his 2016 arrests, as noted above. The likelihood of Beckford getting arrested, without more, does not establish standing to seek the injunctive relief requested in this case.

acknowledges that Beckford has stated that he films police-citizen interactions whenever he is "outside or if [he] see[s] something through [the] window." (Beckford Dep., ECF No. 171-2, at 40:12–13.) But Plaintiffs have produced no other evidence showing that Beckford faces a risk of being arrested and subjected to disparate treatment simply because he films law enforcement.[14] This case is therefore less like *Floyd* and more like *MacNamara*, *McLennon*, *Williams*, *Wagner*, and *Morales*. That is, although Beckford claims that he films officers whenever he has the opportunity and has been arrested at least twice in the past seven years for doing so, the Court cannot conclude that Beckford's risk of a future arrest is "certainly impending." *Clapper*, 568 U.S. at 409 (quotation marks and emphasis omitted).

Because Plaintiffs have failed to show that Beckford is sufficiently likely to be arrested again, the Court also finds that there is an insufficient showing that he is at risk

---

[14] In their Reply, Plaintiffs direct the Court for the first time to two news articles, one of which details an increase in the percentage of persons who were arrested and ticketed while filming the NYPD during the third quarter of 2022, as compared to an earlier period. (*See* Reply, ECF No. 173, at 14 n.3.) These sources, raised for the first time on reply, are included in an effort to illustrate the likelihood that Beckford faces risk of arrest for filming law enforcement. However, the Court notes that the article also observed that the majority of the documented arrests were for "criminal charges like assault, resisting arrest, obstruction or larceny," while most of the summons that were issued were for "offenses like drinking alcohol on public streets, noise violations or motor vehicle infractions." Chris Glorioso, *I-Team: More NYers are Being Arrested or Ticketed While Recording Video of NYPD*, NBC New York (Nov. 16, 2022), https://www.nbcnewyork.com/investigations/i-team-more-nyers-are-being-arrested-or-ticketed-while-recording-video-of-nypd/3960766/. Even assuming that these articles should be given some weight in the analysis, evidence that more individuals are filming while being arrested or ticketed does not materially alter the analysis as to whether Beckford himself is at significant risk of arrest and subsequent disparate treatment, provided that he does not interfere with police actions, in light of the state and city laws that expressly provide citizens a right to record law enforcement; both of these statutes were passed after this lawsuit was initiated. *See* New York State Right to Monitor Act, N.Y. Civ. Rights Law § 79-p; N.Y.C. Admin. Code § 14-189 ("Right to record police activities") (effective date Aug. 14, 2020); *see generally Port Auth. Police Benevolent Ass'n, Inc. v. Port Auth.*, No. 15-CV-3526 (AJN), 2016 WL 6083956, at *4 n.3 (S.D.N.Y. Oct. 17, 2016) (explaining that courts "have frequently declined to consider evidence first submitted on reply" and that exceptions to the rule are discretionary).

of post-arrest harm. Accordingly, Plaintiffs have failed to establish by a preponderance of the evidence that Beckford has standing to seek injunctive relief.

> 2.  *Disabled in Action*

"Organizations like [DIA] may have standing in one of two ways: by establishing so-called 'associational' or 'representational' standing to sue on behalf of its members, or by establishing that it was directly injured as an organization." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021). Plaintiffs argue that DIA has standing on both grounds. (*See* Reply, ECF No. 173, at 12–13.) The Court addresses these arguments in turn.

> a.  Representational Standing

A membership organization has standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Under the first requirement, the organization must show "that at least one of the organization's members would have standing to sue on his [or her] own." *United Food & Com. Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554 (1996). Under the second, the organization must show that the "lawsuit would, if successful, reasonably tend to further the general interests that individual members sought to vindicate in joining the association and whether the lawsuit bears a reasonable connection to the association's knowledge and experience." *Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006). The third requirement is inapplicable to claims for injunctive relief; the Court therefore need not address it. *See id.* at 150.

Plaintiffs assert that DIA has representational standing because "[i]t is a membership organization whose members include people with disabilities who have standing in their own right." (Reply, ECF No. 173, at 12.) As a preliminary matter, however, the Court notes that "[i]t is the law of this Circuit that an organization does not have standing to assert" § 1983 claims on behalf of its members. *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011); *see id.* (explaining that organizations lack representative standing to bring a § 1983 or *Monell* claim on behalf of its members because the court has "'interpret[ed] the rights [§ 1983] secures to be personal to those purportedly injured'" (alterations in original) (quoting *League of Women Voters v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984))). Accordingly, Plaintiffs can rely on a theory of representational standing only as to their claims under the ADA, the Rehabilitation Act, and the NYCHRL.

In support of class certification, Plaintiffs have submitted affidavits from Jean Ryan, President of DIA, and Kathleen M. Collins, DIA's treasurer and a board member — both of whom have mobility disabilities. (*See* Aff. of Jean Ryan ("Ryan Aff."), ECF No. 171-25, at ¶¶ 1, 5; Aff. of Kathleen M. Collins ("Collins Aff."), ECF No. 171-26, at ¶¶ 1–2.) Ryan's affidavit states that DIA "consist[s] primarily of and [is] directed by people with disabilities" and that several DIA "members with mobility disabilities have been arrested in New York City and could be arrested again in the future." (Ryan Aff., ECF No. 171-25, ¶¶ 4, 8.) Additionally, "[a]t least one of DIA's members with a mobility disability has been arrested on multiple occasions at various protests and demonstrations in New York City while conducting civil disobedience," and "[t]his member intends to continue performing civil disobedience in the future." (*Id.* ¶ 9.) Ryan herself has "been arrested in the past at a demonstration for engaging in civil disobedience." (*Id.* ¶ 10.) She states: "The fear of being arrested and then subjected to a

humiliating and degrading process due to my mobility disability has stopped me from attending protests and demonstrations in the past." (*Id.* ¶ 11.)

Collins has also "attended demonstrations, protests, and other events," but states that, "[o]ver the past several years, there have been several demonstrations[] and protests[] in New York City that [she] decided not to attend due to a fear of being arrested and placed in a situation where [her] prosthetics and wheelchair could be severely damaged or lost while in police custody or worse, in a situation where [she] could be seriously injured or killed while in the police's custody." (Collins Aff., ECF No. 171-26, ¶¶ 4–5.)

Based on these statements, Plaintiffs raise two arguments as to how DIA's members have standing in their own right (the first requirement of representational standing). The first echoes Plaintiffs' argument as to Beckford's standing: because certain of DIA's members have been arrested in the past, one of whom "continues to perform civil disobedience," these members are likely to "be arrested in the future and [again] suffer degrading disparate treatment from Defendants." (Supp. Mem., ECF No. 171-29, at 28; *see* Reply, ECF No. 173, at 12; *see also* Ryan Aff., ECF No. 171-25, ¶ 9.) As a threshold matter, the Court observes that the record is devoid of any specific evidence establishing that Ryan, Collins, or this other DIA member have been subjected to unlawful harm following arrest due to disparate treatment stemming from their mobility disabilities. Rather, they advance a theory that they have standing due to fear of harm in the future.

However, in their affirmations, neither Ryan nor Collins assert plans to participate in future protests and demonstrations. Rather, they indicate that they have been discouraged from attending demonstrations in the past. (*See* Ryan Aff., ECF No. 171-25, ¶ 11; Collins Aff., ECF No. 171-26, ¶ 5.) As explained below, Plaintiffs argue

31

that this discouragement is itself an ongoing injury that confers standing; but as to Ryan's and Collins's likelihood of being arrested again in the future, these assertions belie a finding of imminent harm. Indeed, based on Plaintiffs' affirmations, the only DIA member as to whom Plaintiffs have offered forward-looking evidence is the member who "*intends to continue* to perform civil disobedience"; it is thus arguable that this person is likely to be arrested in the future. (Ryan Aff., ECF No. 171-25, ¶ 9 (emphasis added).) But absent additional information as to this member, the Court cannot conclude that this unidentified member faces any greater risk of harm than Beckford, and the Court has already found that Beckford lacks standing to seek the requested injunctive relief.

Plaintiffs' second argument is that DIA's members suffer a continuing First Amendment injury in the form of stifled speech, given that they choose not to attend protests and demonstrations for "fear of being arrested, due to the treatment of people with mobility disabilities in custody." (Supp. Mem., ECF No. 171-29, at 28; *see* Ryan Aff., ECF No. 171-25, ¶¶ 11–12.) The Court acknowledges, and is sympathetic to, the members' concerns, particularly in light of the individual Plaintiffs' accounts of their arrests. Yet, the Court is bound by the Supreme Court's disavowal of theories of standing "based on [plaintiffs'] fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. Rather, "[i]t is the *reality* of the threat . . . that is relevant to the standing inquiry." *Lyons*, 461 U.S. at 107 n.8 (emphasis in original). Accordingly, although it is *possible* that DIA's members could face similar harms to those alleged by the individual Plaintiffs if arrested, whether the members' fears are more than hypothetical turns on the likelihood that they will, in fact, be arrested for engaging in their desired speech or civil disobedience. Absent evidence demonstrating some likelihood of arrest and unlawful treatment following that arrest, the Court cannot

32

conclude that the DIA members have demonstrated a sufficient likelihood of future harm.

At oral argument, Plaintiffs' counsel asserted that DIA's members "engage[] in civil disobedience," which counsel characterized as "actively attempting to be arrested, not some random probability of it." (Tr. of Oral Arg., ECF No. 187, at 6:7–8, 23:1–3; *see id.* at 6:11–14 ("[S]o this is not a speculative, the police come out from behind the bushes and do something. This is somebody who is intentionally putting themselves in that circumstance.").) To the extent Plaintiffs' argument is that because their speech entails an intentional effort to be arrested, a sufficient likelihood of arrest necessarily exists, they have provided no evidence or authority in support of that proposition. Ordinarily, federal courts advise against theories of "manufacture[d] standing." *Clapper*, 568 U.S. at 416. Indeed, it is "to be assumed 'that [plaintiffs] will conduct their activities within the law and so avoid . . . exposure to the challenged course of conduct'" they seek to enjoin.[15] *Lyons*, 461 U.S. at 103 (quoting *O'Shea*, 414 U.S. at 497); *see Corr. Officers'*

---

[15] There may also be a more fundamental problem with Plaintiffs' reliance on DIA members' alleged First Amendment injury: Plaintiffs do not challenge Defendants' practices on First Amendment grounds. Rather, their claims allege inaccessibility and disparate treatment under the ADA, the Rehabilitation Act, and the NYCHRL. The members' alleged First Amendment injury therefore appears to fall outside the "zone of interests protected by the law[s] invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quotation marks and modification omitted); *see also Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 130 (2d Cir. 2020). Although that is a separate inquiry from Article III standing, it is "obvious . . . that on any given claim the injury that supplies constitutional standing must be the same as [an] injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996); *see Moya*, 975 F.3d at 133; *see also In re Peeples*, 880 F.3d 1207, 1215 (10th Cir. 2018) (cited approvingly in *Moya*, 975 F.3d at 133) ("The very point of the zone-of-interests doctrine is that not every injury traceable to the violation of a federal statute is remediable in the federal courts."). In other words, even if DIA members' claims of First Amendment injury could suffice for purposes of establishing a concrete harm under Article III (for purposes of a First Amendment claim), in this case, DIA seeks to press claims under the ADA, the Rehabilitation Act, and the NYCHRL. *See Moya*, 975 F.3d at 130.

The Court is of course cognizant that in the ADA context, there are some circumstances where, even when a plaintiff "has not personally encountered a barrier to access, she has

*Benevolent Ass'n v. City of New York*, 192 F. Supp. 3d 369, 375–76 (S.D.N.Y. 2016) (explaining that plaintiffs could not establish a likelihood of harm premised on the possibility that plaintiffs would smuggle contraband in the future); *cf. Floyd*, 283 F.R.D. at 170 (finding that plaintiff had standing to challenge stop-and-frisk given the likelihood that he would be stopped while engaged in the ordinary activities of daily life).

The Court accordingly finds that Plaintiffs have not established that any of DIA's "members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343. Plaintiffs have therefore failed to show that DIA has representational standing.

   b.   DIA's Individual Standing

Whether an organization can sue on its own behalf turns on whether it "meet[s] the same standing test that applies to individuals." *N.Y. C.L. Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (quotation marks omitted). Accordingly, like individuals, an organization seeking injunctive relief must demonstrate, *inter alia*, a sufficiently "'imminent injury in fact to itself as an organization (rather than to its members) that is distinct and palpable.'" *Russell-Tucker*, 8 F.4th at 172 (quoting *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017)); *see Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 448 (2d Cir. 2021). An organization satisfies this burden "if it shows that the challenged action [does] not

---

nonetheless suffered an injury if she had actual knowledge of the barrier complained of and has been deterred from visiting the public accommodation because of that barrier." *Castillo v. John Gore Org., Inc.*, No. 19-CV-388 (ARR) (PK), 2019 WL 6033088, at *3 (E.D.N.Y. Nov. 14, 2019) (quotation marks and modification omitted); *see also, e.g., Lowell*, 2022 WL 19406561, at *5 (discussing similar cases). These cases, which address physical and structural barriers to access are not, however, particularly analogous to the arrest context, where the risk of harm depends upon an unknowable sequence of future events and decisions in a fluid, dynamic setting. Accordingly, although the Court fully credits Plaintiffs' fears of mistreatment in the event that they are arrested in the future, those fears are insufficient to establish Article III standing for the claims to injunctive relief that Plaintiffs advance here.

merely harm its 'abstract social interests' but 'perceptibly impair[s]' its activities." *Russell-Tucker*, 8 F.4th at 173 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). An organization's activities are perceptibly impaired "when it 'diverts its resources away from its [other] current activities,' or otherwise incurs 'some perceptible opportunity cost.'" *Id.* (quoting *Moya v. U.S. Dep't of Homeland Sec.*, 975 F.3d 120, 129–30 (2d Cir. 2020)).

Relevant here, the Second Circuit recently clarified that where "an organization is not directly regulated by a challenged law or regulation" — as in this case — the "inquiry should focus on the *involuntary* and *material* impacts on *core activities* by which the organizational mission has historically been carried out." *Id.* at 173–75 (emphasis in original). "In other words, the challenged law or regulation must impose a cost (*e.g.*, in time, money, or danger) that adversely affects one of the activities the organization regularly conducted (prior to the challenged act) in pursuit of its organizational mission." *Id.* at 173–74. An organizational plaintiff therefore bears the burden of showing that challenged conduct imposes an "involuntary material burden on its established core activities," *id.* at 173, which the organization "cannot show . . . where the defendant's actions merely perpetuated the *status quo*," *Farm Sanctuary v. U.S. Dep't of Agric.*, No. 20-CV-6081 (EAW), 2023 WL 2673141, at *9 (W.D.N.Y. Mar. 28, 2023) (quotation marks omitted); *accord Laws.' Comm. for 9/11 Inquiry, Inc. v. Garland*, 43 F.4th 276, 282–83 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 573 (2023); *Baerga v. City of New York*, No. 21-CV-5762 (PAC), 2023 WL 1107633, at *5 (S.D.N.Y. Jan. 30, 2023); *Am. Ital. Women for Greater New Haven v. City of New Haven*, No. 21-CV-1401 (JCH), 2022 WL 1912853, at *3 (D. Conn. June 3, 2022).

Plaintiffs raise two arguments in support of DIA's standing to sue on its own behalf. "First, due to the disparate treatment of persons with mobility disabilities

during arrest and in custody," Plaintiffs argue that DIA has discouraged "its members [from] attend[ing] various protests and demonstrations in support of its mission, as it fears that its members could face mistreatment if arrested." (Supp. Mem., ECF No. 171-29, at 28; *see* Reply, ECF No. 173, at 13.) Second, the challenged practices have forced DIA to "expend significant resources to continue to advocate for its constituents who have been or could be harmed by Defendants' policies and practices." (Supp. Mem., ECF No. 171-29, at 29.)

Plaintiffs fail, however, to demonstrate that DIA's alleged injuries — an inability to encourage its members to attend protests and demonstrations, and expenditure of additional resources — amount to "involuntary and material impacts on [DIA's] core activities." *Russell-Tucker*, 8 F.4th at 175 (emphasis omitted). As an initial matter, Plaintiffs have not shown how encouraging members to attend protests and demonstrations — of what kind, they do not say — is central to DIA's "organizational mission [as it] has historically been carried out." *Id.* Both President Ryan and Collins assert that "DIA is a civil rights organization that has been committed to ending discrimination against people with disabilities since its founding in 1970." (Ryan Aff., ECF No. 171-25, ¶ 3; *see* Collins Aff., ECF No, 171-26, ¶ 3.) Specifically, Collins describes DIA's efforts to fight for changes at the legislative level, and both Ryan and Collins point to DIA's "participat[ion] in legal actions against New York City." (Ryan Aff., ECF No. 171-25, ¶ 14–16; *see* Collins Aff., ECF No. 171-26, ¶ 3 ("DIA commences actions in [c]ourt when its members civil rights are violated, and it has reached an impasse in obtaining changes out of court.").) Although both Ryan and Collins indicate that two or three of DIA's members have *attended* demonstrations "in support of a civil rights cause," these statements, standing alone, do not show how participation in such events are how DIA itself has historically worked to achieve its mission of ending

discrimination against people with disabilities. (*See* Ryan Aff., ECF No. 171-25, ¶¶ 9–10; Collins Aff., ECF No. 171-26, ¶ 4.) Additionally, Plaintiffs do not show how encouraging members to attend protests and demonstrations is an "activit[y] [that DIA] regularly conducted []prior to the challenged" conduct.[16] *Russell-Tucker*, 8 F.4th at 173–74.

As to DIA's alleged expenditure of resources, Plaintiffs cite President Ryan's description of DIA's prior efforts to litigate the inaccessibility of NYPD precincts, including her assertion that, "[i]f DIA did not have to advocate to combat [Defendants'] noncompliance with the [NYCHRL] and ADA, its time and resources could be expended on other initiatives to benefit its members and the community at large." (Ryan Aff., ECF No. 171-25, ¶ 18; *see* Supp. Mem., ECF No. 171-29, at 29 (citing Ryan Aff., ECF No. 171-25, ¶¶ 14–18).) But the Second Circuit has "rejected plaintiffs' theory based on litigation costs." *Laws.' Comm.*, 43 F.4th at 283; *see Russell-Tucker*, 8 F.4th at 173 ("[W]e reject such an expansive concept of organizational injury for standing purposes."). Otherwise, "an organization could establish standing by claiming to have been injured by any law or regulation touching any issue within the scope of its mission" simply by "expend[ing] resources to oppose that law or regulation." *Russell-Tucker*, 8 F.4th at 173.

---

[16] Plaintiffs do allege, in the TAC, that DIA "plans as well as participates in public demonstrations to draw attention to" disability rights. (TAC, ECF No. 124, ¶ 17.) As explained above, at this stage, the Court is evaluating whether Plaintiffs have established the viability of class certification by a preponderance of the evidence; unsubstantiated allegations set forth in the pleadings are insufficient. Rather, Plaintiffs must produce evidence such as the Ryan and Collins affidavits. *See In re LIBOR*, 299 F. Supp. 3d at 531. These affidavits do not support the assertion that DIA plans and participates in public demonstrations regarding disability rights, nor have Plaintiffs directed the Court to other evidence to that effect.

In sum, Plaintiffs have failed to show by a preponderance of the evidence that DIA faces an imminent risk of harm to its own interests. Accordingly, Plaintiffs have not established that DIA itself has individual standing to seek injunctive relief.[17]

*    *    *    *    *

Having found that Plaintiffs have failed to show that they have standing to seek the prospective relief requested in the TAC, the Court respectfully recommends denial of Plaintiffs' motion to certify a declaratory-injunctive class under Rule 23(b)(2). Because Defendants do not challenge Plaintiffs' standing to maintain a suit for damages, and because Plaintiffs have submitted evidence of several named Plaintiffs' alleged prior harms, the Court proceeds to assess whether certification of a damages class under Rule 23(b)(3) should be granted.

## III. Damages Class

### A. Legal Principles

"To obtain certification of a class action for money damages under Rule 23(b)(3), a plaintiff must satisfy Rule 23(a)'s . . . prerequisites of numerosity, commonality, typicality, and adequacy of representation." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied,'" and "'[a]ctual, not presumed, conformance . . . is indispensable.'" *Wal-Mart Stores, Inc.*, 564 U.S. at 350–51 (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160–61 (1982)). In this circuit, plaintiffs must also satisfy "the implied requirement of ascertainability." *In re Payment*

---

[17] In addition to arguing for denial of class certification, Defendants appear to imply that Plaintiffs' claims for prospective relief should be dismissed. (*See* Opp'n Mem., ECF No. 172, at 29.) The Court's finding as to Plaintiffs' lack of standing is confined, however, to the evidence submitted in support of class certification. Accordingly, the Court does not recommend dismissal in any respect.

*Card Interchange Fee & Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 50 (E.D.N.Y. 2019) (citing *In re Petrobras Secs.*, 862 F.3d 250, 266 (2d Cir. 2017)).

Once those prerequisites are met, the plaintiff "must also establish that 'the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Amgen Inc.*, 568 U.S. at 460 (quoting Fed. R. Civ. P. 23(b)(3)). Rule 23(b)(3) states, in relevant part, that:

> [M]atters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> >
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> >
> > (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "The party seeking class certification bears the burden of establishing" compliance with Rule 23 "by a preponderance of the evidence." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

**B.    Analysis**

Notwithstanding the rigorousness needed in a class certification analysis, the Court declines to make detailed findings as to whether Plaintiffs have met each of the prerequisites for class certification under Rule 23(a) because Rule 23(b)(3) counsels against certification of a damages class. As discussed herein, Plaintiffs have not established, by a preponderance of the evidence, that the common questions of law and fact predominate over individual questions pertaining to individual class members. In

addition, Plaintiffs have not clearly demonstrated that the prerequisites of commonality and typicality are met here.

1. *Rule 23(a) Prerequisites*

a. <u>Numerosity</u>

Plaintiffs have offered evidence that suggests a good likelihood of a class of sufficient numerosity based on arrest documentation provided by Defendants, which indicates that over 2,000 people were arrested during the class period who appear to have had mobility disabilities. However, the record is unclear as to how many of them suffered disparate, discriminatory, or degrading treatment, as discussed further *infra*. (*See* Arrest Data, ECF No. 171-18 (listing arrests and type of disability if known); *see also* Supp. Mem., ECF No. 171-29, at 21–22, 25.) *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("[N]umerosity is presumed at a level of 40 members . . . .").

b. <u>Commonality & Typicality</u>

Commonality "requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" not "merely that they have all suffered a violation of the same provision of law." *Wal-Mart Stores, Inc.*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 157). "In other words, the relevant inquiry is whether a classwide proceeding is capable of 'generat[ing] common *answers* apt to drive the resolution of the litigation.'" *Jacob v. Duane Reade, Inc.*, 602 F. App'x 3, 6 (2d Cir. 2015) (alteration and emphasis in original) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350). Relatedly, "the typicality requirement[] is satisfied by a showing that 'each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'" *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 80 (S.D.N.Y. 2018) (quoting *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009)). It "is usually met" where "the same unlawful conduct was directed at or affected both

40

the named plaintiff and the class sought to be represented." *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993).

As to commonality, the Court has significant concerns as first mentioned *supra* note 7. At the highest level of abstraction, "Plaintiffs' putative class rests on a common contention: Defendants have policies, practices, or customs — or have failed to institute policies — throughout New York City that result in the failure to make reasonable accommodations for arrestees with mobility disabilities as required by law." (Supp. Mem., ECF No. 171-29, at 22.) This level of generality, however, highlights the extraordinary breadth of Plaintiffs' claims. It also raises questions about whether Plaintiffs have presented evidence sufficient to establish that the lead Plaintiffs suffered sufficiently similar injuries, due to the same alleged unlawful conduct, as the injuries that may have been suffered by the rest of the class. As to the injuries the rest of the class may have suffered, the record is fairly quiet: the only evidence before the Court to establish that the proposed class members suffered injury is information that many people with disabilities were arrested. (*See* Arrest Data, ECF No. 171-18.) Accordingly, on the present record, the Court would be required to assume what types of injury, if any, the other people who were arrested suffered during and following their arrests. Given the range of disabilities reflected in the arrest data that has been provided, the Court cannot infer on the basis of the present record that the lead Plaintiffs' arrest and post-arrest experiences were sufficiently similar to these other individuals' experiences. For example, the arrest data indicates a wide range of disabilities, including "uses cane" (which could mean those people were treated similarly to Beckford and Legree, but it may not), as well as many other types of disabilities that may have led to very different experiences, such as "amputee / missing leg(s)," "uses wheelchair" (like Plaintiff Heggs), "limp," "uses walker," "paraplegic" (like Plaintiff Heggs), "amputee / missing toe(s),"

"uses crutches," "amputee/missing foot(feet)," and "quadraplegic [sic]." (*See* Arrest Data, ECF No. 171-18.) Given the wide "variety of disabilities" indicated in the arrest data, determining whether or not the NYPD provided reasonable accommodations as to the other members of the class would likely be a highly fact-specific inquiry. *Lacy*, 897 F.3d at 865.

Plaintiffs urge an evaluation of the claims of injury here at a very high level, and it is of course true that the Second Circuit has observed that, where "plaintiffs allege that their injuries derive from a unitary course of conduct by a single system," the commonality inquiry may be "conceptualiz[ed] . . . at [a] high level of abstraction (or, understood differently, by aggregating all of the plaintiffs' claims into one 'super-claim')." *Marisol A. ex rel. Forbes v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997); *see, e.g.*, *Robinson v. N.Y.C. Transit Auth.*, No. 19-CV-1404 (AT) (BCM), 2020 WL 5884055, at *11–13 (S.D.N.Y. Aug. 31, 2020), *report and recommendation adopted*, 2020 WL 5814189 (S.D.N.Y. Sept. 30, 2020). *But see Wal-Mart Stores*, 564 U.S. at 350 (defining a common question as whether the "determination of its truth or falsity will resolve an issue that is central to the validity of *each one* of the claims in one stroke" (emphasis added)). But simply because one can articulate a unifying theory with which to describe the claims set forth in the TAC, such that they could theoretically be distilled into a "super-claim," there is insufficient evidence here to support a finding of commonality or typicality. *Cf. Marisol*, 126 F.3d at 377.

As noted above, Plaintiffs argue that the Court should craft a class based on the generalized allegation that Defendants' policies and practices, and their failures in policy and practice, resulted in a denial of reasonable accommodations for people with mobility disabilities who were arrested. (*See* Supp. Mem., ECF No. 171-29, at 22.) Although this is a unifying summary, the individual claims of each class member (if

any) will almost certainly arise from different conditions and circumstances, and there would inevitably be a great number of factual differences in the class members' injuries (if any). Once again, Plaintiffs appear to conflate arrest with unlawful treatment by the NYPD. Without knowing more about what happened to other class members following arrest, the Court could only speculate as to whether the lead Plaintiffs' injuries share sufficient commonality and typicality with the proposed class members' injuries.

   c. <u>Adequacy of Representation & Ascertainability</u>

As to adequacy, it does not appear that "class members . . . have interests that are antagonistic to one another" or that the named Plaintiffs are not invested in this action. *In re Drexel Burnham Lambert Grp., Inc.* ("*In re Drexel*"), 960 F.2d 285, 291 (2d Cir. 1992) (quotation marks omitted); *see In re Frontier Ins. Grp., Inc. Secs. Litig.*, 172 F.R.D. 31, 47 (E.D.N.Y. 1997) ("Courts that have denied class certification based on the inadequate qualifications of plaintiffs have done so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." (quotation marks and citations omitted)). In addition, Plaintiffs' counsel appears well qualified to represent the class. *See In re Drexel*, 960 F.2d at 291. Regarding the last prerequisite, ascertainability, although it may be possible that a class could be defined with a more tailored class definition,[18] determining which people who were arrested were treated disparately would require a significant factual undertaking.

---

[18] For example, to help ascertain the class, the applicable legal definitions of persons qualified to sue under Plaintiffs' causes of action could be included in the class description. *See In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017) ("[A] class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries."); *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 716–17 (2d Cir. 2023) (explaining that defining a class based on substantive law satisfies ascertainability).

2. *Rule 23(b)(3) Predominance Requirement*

The predominance inquiry "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case" and "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quotation marks omitted). "[A] court examining predominance must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief." *Johnson*, 780 F.3d at 138 (quotation marks omitted). In addition, "[w]ith respect to class actions for money damages sought under Rule 23(b)(3), the district court must also find that 'questions of law or fact common to class members predominate over any questions affecting only class members' and that the class action 'is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 222 (2d Cir. 2008) (quoting Fed. R. Civ. P. 23(b)(3)), *abrogated in part on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008).

Plaintiffs' opening motion contains a single statement as to why predominance is met here: "Beyond any minor factual issues unique to each individual Plaintiff's case, the core issue for class members is whether Defendants are in violation of [the] NYCHRL, the ADA, and the Rehabilitation Act in their treatment of arrestees with mobility disabilities." (Supp. Mem., ECF No. 171-29, at 34.) The Court disagrees.

Here, the elements of Plaintiffs' respective claims entail more than "minor factual issues unique to each individual Plaintiff's case." (*Id.*) "To establish a claim under Title II, a plaintiff must demonstrate (1) that she is a qualified individual with a

disability; (2) that she was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to her disability." *Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021) (quotation marks omitted); *see Fera v. City of Albany*, 568 F. Supp. 2d 248, 259 (N.D.N.Y. 2008) ("To recover monetary damages, a plaintiff must demonstrate intentional discrimination.").[19] "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *Kerman v. City of New York*, 374 F.3d 93, 108, 124 (2d Cir. 2004) (explaining that compensatory damages are available under § 1983). Here, Plaintiffs allege violations of the Fourth and Fourteenth Amendments, described in the TAC as encompassing the rights to be free from the "deprivation of liberty and excessive punishment without due process of law; to be free from unconstitutional conditions of confinement and objectively unreasonable conditions; and to be free from disparate and inhumane treatment and punishment." (TAC, ECF No. 124, ¶ 186.) *See, e.g.*, *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (discussing Fourteenth Amendment protection for pretrial detainees to be free from unconstitutional conditions of confinement). Because the Individual Defendants are sued in their individual capacities, Plaintiffs may also have to rebut a qualified immunity defense. *See, e.g.*, *Mandell v. County of Suffolk*, 316 F.3d 368,

---

[19] The Court notes that emotional distress and other monetary damages under the Rehabilitation Act are limited. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (2022). As to what Plaintiffs would need to show to prove their Rehabilitation Act claims, "to establish a violation of § 504 of the Rehab[ilitation] Act, a plaintiff must show: (1) that he has a disability for purposes of the Rehabilitation Act; (2) that he was otherwise qualified for the benefit that has been denied; (3) that he has been denied the benefits solely by reason of his disability; and (4) that the benefit is part of a program or activity receiving Federal financial assistance." *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998).

385 (2d Cir. 2003) (observing that, "[u]nder the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights").

To state a reasonable accommodation claim under NYCHRL § 8-107(15), a plaintiff "must show that: (1) [he or she] has a disability; (2) [the defendant] knew or should have known of the disability; (3) an accommodation would enable [the plaintiff] to use or enjoy the public accommodation; (4) and [the defendant] refused to provide an accommodation." *Roberman v. Alamo Drafthouse Cinemas Holdings, LLC*, 120 N.Y.S.3d 709, 713 (N.Y. Sup. Ct. 2020) (quotation marks omitted). Finally, under NYCHRL § 8-107(17) plaintiffs must "establish an 'unlawful discriminatory practice,' or a facially neutral policy that disproportionately affected [members of their class] in comparison to [others]." *Richardson v. City of New York*, No. 17-CV-9447 (JPO), 2021 WL 1910689, at *7 (S.D.N.Y. May 12, 2021) (quotation marks and citations omitted, alterations in original).

Given the specific elements of the claims advanced here, to prevail on various aspects of their causes of action, class members would "need to present evidence that varies from member to member." *Tyson Foods*, 577 U.S. at 453 (quotation marks omitted). As set forth above, the elements of the claims Plaintiffs advance are complex and fact-intensive. Class members would be required to show that they are disabled within the meaning of the applicable law at issue; that, per their specific experience, they were denied reasonable accommodations and/or treated differently from other persons without mobility disabilities during criminal arrest processing, or were otherwise discriminated against; what services or benefits they were denied (e.g., accessible vehicle transport, accessible bathroom facilities while detained); depending

46

on the claim, Defendants' knowledge of the violation or degree of intent; and, as to the § 1983 claims, whether the Individual Defendants have qualified immunity such that damages are not available. These questions are nuanced and specific to each member of the class; they are not the kind of inquiries susceptible to proof by "generalized evidence" on a class-wide basis. *Johnson*, 780 F.3d at 138 (quotation marks omitted).

Determining appropriate money damages for class members would also present myriad issues of individualized proof. Plaintiffs request compensatory damages here for "*inter alia*, physical and mental pain, suffering, humiliation and mental anguish" — as well as punitive damages, where applicable. (TAC, ECF No. 124, ¶ 177; *see also id.* ¶¶ 183–84, 214–15, p. 49.) True, "'the fact that damages may have to be ascertained on an individual basis is not [alone] sufficient to defeat class certification.'" *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *Seijas v. Rep. of Arg.*, 505 F.3d 53, 58 (2d Cir. 2010)). But it is still a "'factor that [courts] consider in deciding whether issues susceptible to generalized proof outweigh individual issues.'" *Id.* (quoting *McLaughlin*, 522 F.3d at 231). To the extent the individual Plaintiffs' accounts set forth in the TAC are representative of the variety of injuries that could be encompassed by class members' claims, the Court finds that class certification "would not 'reduce the range of issues in dispute and promote judicial economy.'" *McLaughlin*, 522 F.3d at 234 (quoting *Robinson v. Metro-N. Commuter R.R.*, 267 F.3d 147, 168 (2d Cir. 2001)). Rather, attempting to ascertain 2,000 or more class members' respective damages would significantly amplify the number of issues in dispute and impede judicial economy and efficiency given the various factual questions unique to each potential class member.[20]

---

[20] Plaintiffs attempt to address this issue in their reply, suggesting that "the Court has many tools to address individualized damages issues that may arise, such as bifurcating liability and damages trials, appointing a special master for individual damages proceedings,

For all of these reasons, individualized issues permeate Plaintiffs' claims and prevent a finding that class members' claims are "sufficiently cohesive to warrant adjudication by representation." *Tyson Foods*, 577 U.S. at 453 (quotation marks omitted). The Court therefore finds that Plaintiffs fail to establish predominance. Accordingly, the Court respectfully recommends denial of the certification of a damages class under Rule 23(b)(3).

## CONCLUSION

For the reasons discussed above, the Court finds that Plaintiffs have failed to demonstrate that they have standing to seek prospective relief on a class-wide basis, such that a declaratory-injunctive class should be certified. Plaintiffs also have not established that a damages class would be cohesive and that class questions predominate over issues affecting individual potential class members. Accordingly, the Court respectfully recommends denying Plaintiffs' motion for class certification.

*    *    *    *    *

Objections to this Report and Recommendation must be filed, with a courtesy copy sent to the Honorable Diane Gujarati, at 225 Cadman Plaza East, Brooklyn, New York 11201, within fourteen (14) days of filing. Failure to file objections within the specified time waives the right to appeal both before the district court and appellate courts. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the

---

decertifying after liability with notice to the class on proving damages, creating subclasses, or altering the class." (Reply, ECF No. 173, at 11.) Even so, the Court's predominance concerns run deeper than the difficulties of assessing individualized damages; as explained above, establishing Defendants' liability as to the claims for each class member in itself presents several complexities. Further, the Court hesitates to recommend creating subclasses, altering the proposed class, or otherwise reengineering this litigation based on the record as currently submitted, and in the absence of any discussion of proposed sub-classes by the parties.

specified time waives the right to appeal the District Court's order. *See, e.g., Caidor v. Onondaga County*, 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision" (quotation marks omitted)).

      **SO ORDERED.**

Dated:    Brooklyn, New York
         August 24, 2023

                        *Taryn A. Merkl*
                        TARYN A. MERKL
                        UNITED STATES MAGISTRATE JUDGE